600 F.2d 600
 Iberia HAMPTON et al., Plaintiffs-Appellants,
v.
Edward V. HANRAHAN et al., Defendants-Appellees.
UNITED STATES of America ex rel. Honorable Joseph Sam PERRY, Appellee,
v.
Jeffrey H. HAAS, Attorney at Law, Contemnor-Appellant.
UNITED STATES of America ex rel. Honorable Joseph Sam PERRY, Appellee,
v.
G. Flint TAYLOR, Attorney at Law, Contemnor-Appellant.
 Nos. 77-1698, 77-1210 and 77-1370.
 United States Court of Appeals,
Seventh Circuit.
 Argued Aug. 14, 1978.
Decided April 23, 1979.
As Amended April 30, 1979.
Rehearing and Rehearing En Banc Denied Sept. 12, 1979.
 
 Jeffrey H. Haas, G. Flint Taylor, Jr., James D. Montgomery, Dennis Cunningham, Charles Hoffman, Jonathan C. Moore, Chicago, Ill., for plaintiffs-appellants.
 John O. Tuohy, Camillo F. Volini, Chicago, Ill., for defendants-appellees.
 Before FAIRCHILD, Chief Judge, and SWYGERT and PELL, Circuit Judges.
 SWYGERT, Circuit Judge.
 
 
 1
 This appeal concerns a civil rights action for monetary damages brought by members of the Black Panther Party and the mothers of two deceased party members against federal and state law enforcement officers. The suit arises from a gun battle which occurred in Chicago during the early morning hours of December 4, 1969. Two Black Panthers were killed and four other Panthers were injured by the gunfire. The action was tried in the district court before a jury in 1976-1977. At the close of plaintiffs' case, the district court directed verdicts for some of the defendants. The district court directed verdicts for the remaining defendants at the conclusion of the trial. We reverse as to most defendants and remand for a new trial.
 
 I. BACKGROUND
 
 2
 At 4:30 a. m. on December 4, 1969, fourteen Chicago police officers, detailed to the Special Prosecutions Unit of the Cook County State's Attorney's Office, arrived at an apartment building located on the near west side of Chicago. They were equipped with a search warrant issued the previous day by a judge of the Cook County Circuit Court authorizing the search for and seizure of "sawed-off shotguns and other illegal weapons," at the first floor apartment, 2337 West Monroe Street. This apartment was occupied by nine members of the Black Panther Party ("BPP"). Seven officers took "cover" positions at the front and rear entrances of the apartment; seven entered the apartment. Immediately upon the police entry there was an enormous burst of gunfire. Two of the occupants, Fred Hampton and Mark Clark, died as a result of the gunfire and four others, Ronald Satchel, Blair Anderson, Brenda Harris, and Verlina Brewer, were wounded. Louis Truelock, Deborah Johnson, and Harold Bell escaped without physical injury.
 
 
 3
 Many reverberations followed the incident. Among these were the arrest and imprisonment of the surviving occupants of the apartment, their prosecution by the Cook County State's Attorney for criminal offenses, a coroner's inquest, and an internal investigation by the Chicago Police Department. A federal and two state grand jury investigations were initiated. Indictments were returned by the Special Cook County Grand Jury against several of the present defendants for conspiring to obstruct justice. The case terminated when defendants' motions for acquittal were granted at the close of the prosecution's case. Finally, this civil action was initiated.
 
 
 4
 The mothers of Hampton and Clark, as administratrices of their sons' estates, and the seven survivors of the December 4 incident filed four separate actions in 1970 against a number of city and state defendants. The actions were consolidated in an amended complaint filed in the district court in April 1972.[1]
 
 
 5
 The defendants moved to dismiss the complaint. The district court denied the motions by the fourteen police officers participating in the raid. The court dismissed the complaint as to the remaining defendants.[2] Upon appeal this court affirmed in part and reversed in part. Hampton v. City of Chicago, 484 F.2d 602 (7th Cir. 1973), Cert. denied, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974), ("Hampton I ").[3] Thereafter plaintiffs requested this court to supplement its mandate by directing that the case be reassigned to another judge for trial. We denied the request.
 
 
 6
 In December 1974 plaintiffs amended their complaint by naming four additional defendants, all connected with the federal government. In October 1975 plaintiffs moved to have the district judge recuse himself or to reassign the case. The motion was heard by another district judge and was denied.
 
 
 7
 The trial began January 5, 1976 and lasted approximately eighteen months. Thirty-seven thousand pages of testimony were taken. At the conclusion of plaintiffs' evidence, defendants moved for directed verdicts with costs. The motion was granted except for the seven police officers directly participating in the shooting incident, the court ruling that "no Prima facie case of a conspiracy or joint venture has been established as alleged in the Amended Complaint . . . ." The trial continued as to the seven remaining defendants and at its conclusion the case was submitted to the jury. After three days deliberation the jury announced it was deadlocked. The trial judge then directed verdicts in favor of these defendants and assessed costs against plaintiffs for $100,000. This appeal followed.
 
 
 8
 During the trial, Jeffrey H. Haas and G. Flint Taylor, attorneys for the plaintiffs, were found guilty of contemptuous conduct in the courtroom. They appeal from the contempt judgments.
 
 
 9
 The principal issue on appeal is whether the trial judge erred in directing verdicts for the defendants. We are convinced that he did err. Among the other issues presented which we deem necessary to discuss are the breadth of the official immunity available to defendants, the scope of discovery, the circumstances of the issuance of the search warrant, the companion diversity action filed by Verlina Brewer, the attorneys' fees and costs, and the contempt judgments. Before a discussion of the directed verdicts and these other issues, we believe it would be helpful to list the names of the defendants and to summarize the amended complaint.
 
 Federal Defendants
 
 10
 Marlin Johnson Special Agent-in-Charge of Chicago office of the Federal Bureau of Investigation.
 
 
 11
 Robert Piper Supervisor of the Racial Matters Squad of the FBI, Chicago office.
 
 
 12
 Roy Martin Mitchell Special agent of the FBI, Chicago office, assigned to the Racial Matters Squad.
 
 
 13
 William O'Neal Paid informant for the FBI.
 
 State Defendants
 Cook County State's Attorney's Office
 
 14
 Edward Hanrahan Cook County State's Attorney.
 
 
 15
 Richard Jalovec Assistant State's Attorney and supervisor of the Special Prosecutions Unit of the State's Attorney's Office.
 
 
 16
 James Meltreger Assistant State's Attorney.
 
 
 17
 Sheldon Sorosky Assistant State's Attorney.
 
 Raiders
 
 18
 Shooters: Daniel Groth, James Davis, Joseph Gorman, George Jones, Raymond Broderick, Edward Carmody, and John Ciszewski.
 
 
 19
 Nonshooters: William Corbett, Lynwood Harris, Fred Howard, Robert Hughes, Philip Joseph, William Kelly, and John Marusich.
 
 
 20
 All of the above defendants were Chicago police officers detailed to the Cook County State's Attorney's Office.
 
 Chicago Police Crime Laboratory
 
 21
 David Purtell Director.
 
 
 22
 John Koludrovic Supervising officer of the Mobile Crime Laboratory Unit.
 
 
 23
 John Sadunas Firearms examiner.
 
 
 24
 Chicago Police Department Internal Investigations Division ("IID")
 
 
 25
 Harry Ervanian Captain, Chicago Police Department, director of IID.
 
 
 26
 Robert Kukowinski Lieutenant, Chicago Police Department, head of Excessive Force Unit of the IID.John Mulchrone Deputy supervisor, Chicago Police Department.
 
 
 27
 John Meade Sergeant, Chicago Police Department.
 
 
 28
 The amended complaint contains seventeen counts. For convenience we shall segregate the counts into different categories.
 
 
 29
 Hanrahan, Jalovec, the raiders, and the four federal defendants are named in Counts 1, 2, 3, and 4. Counts 1 and 2 charge these defendants with intentionally and negligently depriving the occupants of the apartment at 2337 West Monroe Street of their civil rights under the Constitution and under 42 U.S.C. § 1983 by participating in the planning and execution of the raid. Count 3 describes a conspiracy to deprive the occupants of the apartment of the equal protection of the laws, violating 42 U.S.C. §§ 1983, 1985(3), as well as the First, Fourth, Fifth, Eighth, Ninth, Thirteenth, and Fourteenth Amendments. Count 4 alleges, pursuant to 42 U.S.C. § 1986, that these defendants failed to prevent the wrongs perpetrated in violation of section 1985(3).
 
 
 30
 Counts 5 and 6 are directed against Hanrahan, Jalovec, and the police officers participating in the raid. Count 5 alleges intentional deprivation of the occupants' civil rights by false imprisonment in violation of their First, Fifth, and Fourteenth Amendment rights and their rights secured under 42 U.S.C. § 1983. Count 6 charges a conspiracy for the deprivation of the occupants' civil rights by false imprisonment under the First, Fifth, and Fourteenth Amendments and 42 U.S.C. §§ 1983 and 1985(3). Count 7 charges all defendants named in Count 6 and, in addition, Mitchell, Piper, and Johnson, with failing to prevent the alleged conspiracy and illegal acts described in Count 6, in violation of 42 U.S.C. § 1986.
 
 
 31
 Count 8 charges all defendants, except O'Neal, with conspiring to deprive the occupants of the equal protection of the laws and their due process rights by malicious prosecution in violation of the First and Fourteenth Amendments and 42 U.S.C. §§ 1983 and 1985(3). Count 9 charges the same defendants as listed in Count 8 with intentional deprivation of civil rights by malicious prosecution in violation of 42 U.S.C. § 1983. Count 10 alleges that these defendants neglected to prevent harm from the execution of the conspiracy charged in Count 8, thereby violating 42 U.S.C. § 1986.
 
 
 32
 Count 11 charges a conspiracy among Hanrahan, Jalovec, Groth, O'Neal, Mitchell, Johnson, and Piper to obstruct the "due course of justice" with intent to deny the occupants of the apartment the equal protection of the laws and their Sixth Amendment right to counsel as protected by 42 U.S.C. § 1985(2).
 
 
 33
 Counts 12 and 13 charged the City of Chicago and Cook County with the deprivation of the civil rights of the occupants of the apartment, directly and under the doctrine of Respondeat superior. The district court dismissed these counts and there is no appeal from this ruling.
 
 
 34
 Count 14 is a wrongful death action against Hanrahan, Jalovec, the raiders, and the four federal defendants under both federal and state law by the estates of Fred Hampton and Mark Clark through their respective administratrices.
 
 
 35
 Verlina Brewer is the sole plaintiff in Counts 15, 16, and 17 which are based on diversity jurisdiction. These counts name Hanrahan, Jalovec, and the raiders as defendants. Count 15 charges assault and battery, Count 16, false imprisonment, and Count 17, malicious prosecution.
 
 II. DIRECTED VERDICT
 
 36
 We first consider the rulings of the district court directing a verdict for twenty-one of the defendants at the close of plaintiffs' case in chief, and for the remaining seven defendants (who fired their weapons during the raid) after the jury was deadlocked. On appeal plaintiffs assert that the trial court disregarded the proper legal standard in granting the directed verdicts and that their claims justified submission to the jury.
 
 
 37
 This court has enunciated on numerous occasions the rule that a motion for a directed verdict must be denied when the evidence reveals that reasonable persons "in a fair and impartial exercise of their judgment may draw different conclusions therefrom." Hannigan v. Sears, Roebuck & Co., 410 F.2d 285, 287 (7th Cir.), Cert. denied, 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178 (1969). The function of the trial court considering such a motion was further discussed in Byrd v. Brishke, 466 F.2d 6, 9 (7th Cir. 1972), a civil rights action involving facts similar to the case at bar. In Byrd we emphatically stated that the court is not to substitute its judgment for that of the jury and accordingly we reversed a ruling by the district judge granting defendants' motion for a directed verdict on the grounds that the court had weighed the testimonial evidence and had passed on the credibility of the witnesses. Id. The function of the trial judge is to review the testimony most strongly against the moving party "(a)nd if there is doubt, or the question is close, the case should go to the jury." Keaton v. Atchison, Topeka & Santa Fe RR. Co., 321 F.2d 317, 318 (7th Cir. 1963).
 
 
 38
 On appeal our task is equally well established. We must consider all the evidence disregarding conflicting, unfavorable testimony and extract all the reasonable inferences therefrom. Viewing such evidence and inferences in the light most favorable to the plaintiffs, the question is whether a prima facie case has been presented against any of the defendants. Clark v. Universal Builders, Inc., 501 F.2d 324 (7th Cir.), Cert. denied, 419 U.S. 1070, 95 S.Ct. 657, 42 L.Ed.2d 666 (1974); Kish v. Norfolk & Western Ry. Co., 426 F.2d 1132 (7th Cir. 1970); Pinkowski v. Sherman Hotel, 313 F.2d 190 (7th Cir. 1963).
 
 
 39
 At the conclusion of this trial, the district judge prepared a lengthy "Summary" of the evidence which illuminated the court's rationale in directing the verdicts of April 15 and June 20, 1977.[4] Upon a comparison of the extensive record, including the received and improperly rejected evidence, and the trial judge's Summary, there can be no doubt that the district judge erred by supporting his grant of the directed verdicts with evidence which was considered in the light most favorable to the defendants. Furthermore, we are compelled to conclude that, once again, as in Byrd, the district judge weighed the evidence, thereby invading the province of the jury.
 
 
 40
 We recite the facts adduced at trial to determine whether the plaintiffs presented a prima facie case against any defendant which warranted submission to a jury. The facts can be considered in three stages: pre-raid, the raid itself, and post-raid.
 
 A. Pre-Raid
 
 41
 In August 1967 the FBI initiated a national covert counterintelligence program called "COINTELPRO" which was designed to neutralize a variety of political organizations including those which the Bureau characterized as "Black Nationalist Hate Groups." Directives from Washington ordered the Chicago office of the FBI to implement the program in the Chicago area. While the Black Panther Party was not an original target of this program, it was included within the ambit of COINTELPRO's scrutiny by September 1968.[5] The trial court's Summary stated that the "purpose of the counterintelligence program, as it was implemented in Chicago as to the Panthers was to prevent violence." The plaintiffs, however, presented considerable evidence to compel a different conclusion.[6] Perhaps the most damning evidence indicating the COINTELPRO was intended to do much more than simply "prevent violence" comes from the files of the FBI itself. An FBI memorandum from February 1968 described the goals of COINTELPRO as:
 
 
 42
 1. Prevent a coalition of militant black nationalist groups . . . .
 
 
 43
 2. Prevent the rise of a messiah who could unify and electrify the militant nationalist movement . . . Martin Luther King, Stokely Carmichael and Elijah Muhammad all aspire to this position . . . .
 
 
 44
 3. Prevent violence on the part of black nationalist groups . . . .
 
 
 45
 4. Prevent militant black nationalist groups and leaders from gaining respectability by discrediting them . . . .
 
 
 46
 5. . . . prevent the long-range growth of militant black nationalist organizations, especially among youth.
 
 
 47
 Senate Select Committee to Study Governmental Operations with respect to Intelligence Activities, The FBI's Covert Action Program to Destroy the Black Panther Party, S.Rep. No. 94-755, 94th Cong., 2d Sess., 187 (1976). These goals were incorporated into the various directives which Marlin Johnson, the special agent-in-charge of the Chicago FBI office, received instructing him to establish the program in Chicago.
 
 
 48
 The national COINTELPRO program adopted a variety of tactics which seemingly were aimed not at preventing violence, but at neutralizing the BPP as a political entity. These tactics included efforts to discredit the BPP among "liberal" whites, the promotion of violent conflicts between the BPP and other groups,[7] the encouragement of dissension within the BPP, and the disruption of the BPP's Breakfast Program for Children. Memoranda from Washington directing the local employment of such tactics were transmitted to Johnson, Robert Piper (after March 1969 the chief of the Racial Matters Squad of the Chicago FBI which was responsible for FBI programs regarding the BPP), and Roy M. Mitchell (special agent assigned to the Racial Matters Squad in Chicago).
 
 
 49
 The evidence presented by plaintiffs indicates that when the local chapter of the BPP opened in Chicago in November 1968, the Chicago FBI was quick to implement the tactics mandated by Washington. One of the key figures in the Chicago FBI's program to disrupt the Panthers was William O'Neal. O'Neal was a paid FBI informant whom Mitchell originally had contacted while O'Neal was incarcerated in the Cook County Jail. Mitchell recontacted O'Neal and instructed him to join the BPP. O'Neal walked into the BPP office at 2350 West Madison Street the day it opened in November 1968 and joined, soon becoming the local chief of security for the Panthers.
 
 
 50
 The local FBI was able to effectuate many of its plans to disrupt the BPP through O'Neal. O'Neal informed Mitchell about a proposed merger between the BPP and a local black gang, the Blackstone Rangers. The Chicago office, with Johnson's approval, then sent an anonymous letter to Jeff Fort, the leader of the Rangers, telling Fort that the Panthers had a "hit out" on him. The purpose of the letter was to prevent a merger and to induce the Rangers to initiate reprisals against the BPP. O'Neal also falsely accused a member of the Vice Lords, another black Chicago gang, of being a police informant, thereby squelching another possible merger. O'Neal, according to plaintiffs' evidence, encouraged the Panthers to initiate and participate in various criminal activities, to obtain more weapons, and to increase their use of violent tactics.
 
 
 51
 O'Neal also facilitated the FBI's efforts to discredit the BPP leadership and to frustrate their attempts to garner support among white groups. O'Neal provided Mitchell with information that enabled local police to serve an arrest warrant on Fred Hampton, the leader of the BPP in Chicago, just prior to his appearance on a local television interview show. O'Neal also encouraged the distribution of racist BPP cartoons, thereby fostering a rift between the BPP and the Students for a Democratic Society (SDS). For his efforts, O'Neal received several pay raises from Mitchell with Johnson's approval.[8] After March 1969 Piper also lent his approval to O'Neal's efforts as a part of the FBI's counterintelligence program.
 
 
 52
 The FBI had other means of monitoring the BPP in Chicago. Johnson and Piper requested and received authorization for a warrantless wiretap on BPP headquarters. And in June 1969 the FBI, based on information provided by O'Neal, executed a fugitive arrest warrant at Panther headquarters. No shots were fired; however, several Panthers were arrested for harboring a fugitive and weapons were seized. All the charges against the arrested Panthers ultimately were dropped.
 
 
 53
 The FBI in Washington urged its offices implementing COINTELPRO to develop liaisons and working relationships with local law enforcement officials to comply with the FBI's mandate to provide information to these agencies as well as to help effectuate the FBI's counterintelligence goals. In Chicago the FBI had an ally which also was quite concerned about the growth of militant black groups. In November 1968 Edward V. Hanrahan was elected Cook County State's Attorney. Hanrahan appointed Richard Jalovec an Assistant State's Attorney and made him the chief of the office's Special Prosecutions Unit (SPU). By April 1969 the primary focus of the SPU was on black street gangs. About this same time Mitchell contacted Jalovec and told him that the FBI had an informant, O'Neal, within the Chicago BPP.
 
 
 54
 Before June 1969 the State's Attorney's Office had relied on its own police force which it used only for routine matters. At that time, however, the State's Attorney's Office requested that nine Chicago police officers Groth, Davis, Carmody, Jones, Ciszewski, Howard, Marusich, Kelly, and Joseph be assigned to the SPU. Groth was next in command after Jalovec, to whom all the officers reported.
 
 
 55
 Tension and hostilities between the BPP and local law enforcement agencies in Chicago escalated throughout the summer and fall of 1969. Shooting incidents involving Chicago police and Panthers occurred at the BPP headquarters in July and October. On July 21 and October 3 the BPP headquarters was ransacked by Chicago police. And on November 13, 1969 two Chicago policemen were killed in an ambush-shootout with Jake Winters, who was closely associated with the BPP.[9] Winters also was killed and seven other Chicago police officers were wounded.
 
 
 56
 On the evening of the Winters incident, Mitchell met with O'Neal and showed him photographs of the dead police officers. Soon thereafter, on November 19, Mitchell again met with O'Neal and with O'Neal's aid constructed a floorplan of the apartment at 2337 West Monroe Street to which Hampton recently had moved. The floorplan included the layout of the rooms, the placement of doors and furniture, the identity of the apartment's occupants and frequent visitors, and the location of the bedroom which Hampton shared with Deborah Johnson. And, either on the basis of this or previous conversations with O'Neal, Mitchell compiled a list of weapons which O'Neal said were in the apartment and incorporated the list into a memorandum dated November 21. This memorandum, however, failed to mention the presence in the apartment of two federally illegal weapons a sawed-off shotgun and a stolen police riot gun which O'Neal had told Mitchell about. There is evidence that the appropriate FBI procedure would have been to notify the Alcohol, Firearms and Tobacco Division of the Treasury Department about these weapons. This was not done.
 
 
 57
 After his meeting with O'Neal on November 19, Mitchell met with members of the Chicago Police Department's Gang Intelligence Unit (GIU) and conveyed to them the information contained in the floorplan. Mitchell also told them that a large quantity of weapons was stored at the apartment, including the sawed-off shotgun and the stolen police gun.[10] Piper was aware of the transfer of this information to the GIU and at a meeting with Johnson informed him of the same.[11] On the basis of this information, the GIU planned a raid on the apartment to seize the weapons.
 
 
 58
 Shortly thereafter O'Neal told Mitchell that the weapons had been removed from the Monroe Street apartment. Mitchell relayed this information to Piper who in turn informed Johnson. Johnson ordered Piper to inform all local agencies which had received the prior information about the weapons that they had been removed. Piper transmitted this order to Mitchell, who phoned Officer Bizewski of the GIU. Johnson, on November 24, also phoned Thomas Lyons, director of the GIU, and told him that the BPP expected the raid and had removed the weapons from the apartment. Lyons told Johnson that he would cancel the raid.
 
 
 59
 Within two days of the cancellation of the GIU raid, Mitchell called Jalovec and told him that the weapons had been returned to the apartment.[12] Mitchell also informed Jalovec that Hampton and Johnson were living at the apartment, that other members of the BPP frequented the apartment, and that a variety of weapons, illegally purchased, was kept there. About the first of December Mitchell told Jalovec that a sawed-off shotgun and a stolen police gun were in the apartment. Shortly thereafter, according to plaintiffs' evidence, Mitchell met with Jalovec and Groth and, with Piper's prior approval, showed them the floorplan of the West Monroe Street apartment. Mitchell also told them that a BPP political education meeting was scheduled for the evening of December 3 and that the occupants of the apartment likely would be absent then.
 
 
 60
 At trial, Groth did not recall attending the meeting with Mitchell. Groth did claim, however, to have received a phone call sometime during the late afternoon or evening of December 2 from an unidentified informant who provided information paralleling the information transmitted by Mitchell. Groth stated that this unidentified informant who was unpaid was a member of the BPP.[13]
 
 
 61
 Groth met with Jalovec on December 3 and had a discussion with him about the information Groth received from his informant. Jalovec said that he had received essentially the same information from Mitchell. Groth also told Jalovec that he had surveyed the premises at 2337 West Monroe Street on his way to work that morning. Later that day Groth instructed Davis and Kelly to survey the premises, and they returned with a street diagram of the surrounding area. Groth told Davis, Kelly, and a few other officers assigned to the SPU that they would be going to the apartment at 8:00 p. m. that night to search the premises for illegal weapons.
 
 
 62
 At midday on December 3 Jalovec and Groth met with Hanrahan and recounted the information they had received from their sources. At this meeting Jalovec told Hanrahan that they intended to obtain a search warrant for the Monroe Street apartment. Jalovec and Groth drafted the warrant. The affidavit stated that Jalovec had received information from a reliable informant Mitchell was not mentioned by name that sawed-off shotguns and other weapons were kept in the apartment. It also stated that a reliable informant had told Groth that the apartment contained numerous weapons including three sawed-off shotguns. The warrant and affidavit were shown to Hanrahan and then taken to a Cook County Circuit judge who was formerly Hanrahan's first assistant when Hanrahan was United States Attorney. The warrant was issued that afternoon.
 
 
 63
 After the warrant was issued, Jalovec and Groth busied themselves with the final preparations for its execution. They decided that fourteen men would take part in the mission. Groth described the plan to some of the police officers who would be accompanying him. Jalovec phoned the Chicago Police Department to obtain approval to bring certain weapons, including a machine gun, when they served the search warrant. Jalovec also approved Groth's revised decision to serve the warrant at 4:00 a. m., rather than in the evening, so that the sleeping occupants in the apartment could be taken by surprise. At trial Jalovec and Groth indicated that they did not discuss the use of tear gas, sound equipment, or other means to gain entry to the apartment.
 
 
 64
 Jalovec met with Hanrahan and detailed the final plan for the search of the apartment. He told him that Groth would be leading twelve to fourteen men. Again the testimony indicated that there was no discussion of alternative ways of gaining entry to the apartment or of the use of any equipment besides guns. Hanrahan told Jalovec to tell the men to be careful. Jalovec related his conversation with Hanrahan to Groth, and told Groth to call him at home after the raid.
 
 
 65
 This same day, on December 3, 1969, Johnson and Piper approved a counterintelligence memorandum sent to the Director in Washington. The memorandum stated that local police[14] planned "a positive course of action" based on the information regarding the West Monroe Street apartment which the Chicago FBI had provided local law enforcement officials.
 
 B. Raid
 
 66
 The fourteen raiders met at the State's Attorney's Office for a briefing at 4:00 a. m. the morning of the raid. Groth described the apartment's layout and informed the other officers that it was a BPP dwelling frequented by Fred Hampton. Armed with a machine gun, a sawed-off shotgun, a semi-automatic .30-caliber carbine, and other weapons, they arrived at the apartment at 4:30 a. m. Groth instructed seven officers (the nonshooters) to guard the apartment's exterior. Groth, Jones, Gorman, and Davis approached the front of the apartment while Broderick, Carmody, and Ciszewski circled to the rear door.
 
 
 67
 Before the raid began, Clark, Truelock, Bell, and Harris were in the living room on chairs and mattresses scattered around the room. Satchel, Anderson, and Brewer were asleep in the front bedroom which was located directly south of the living room. The rear bedroom of the apartment, directly south of the front bedroom, was occupied by Hampton and Johnson. A diagram of the apartment is shown here:NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 68
 A factual dispute exists as to the activity inside the apartment. Plaintiffs' testimony depicts a violent, well-armed, unprovoked attack on the apartment. Plaintiffs testified that the officers did not announce their purpose when they arrived at the apartment. After hearing a knock at the apartment door, Truelock and Bell ran to the rear bedroom to awaken Hampton. Davis burst through the door into the living room and began firing into the darkened room. Clark, in the northwest part of the room about three or four feet from the door, was struck in the heart by a bullet from Davis' rifle. According to Harris, Clark's gun went off as he fell. Groth also began firing into the living room from the apartment doorway. Harris was shot as she lay in bed. She testified at trial that she neither fired nor handled a gun during the raid.
 
 
 69
 The attack from the rear of the apartment was precipitated by the sound of a shotgun blast from within. Carmody broke through the back door and entered the kitchen. Using a .38 revolver, he fired five times. Corbett, Ciszewski, and Broderick followed him into the kitchen, the latter two firing into the two bedrooms from the dining room area. Bell, Truelock, and Johnson emerged from the back bedroom during a pause in the shooting.
 
 
 70
 Meanwhile, Gorman had entered the living room and began firing his machine gun into the south wall toward the bedrooms. Davis also began firing into the south wall. Carmody entered the back bedroom and found Hampton lying on his bed.[15] Carmody went to the head of the bed clutching a revolver in his right hand. During the course of the firing, Hampton was shot several times in the body and the head. The bullets which went through his brain were never found. Carmody emerged from the bedroom dragging Hampton's body by the left wrist. In Carmody's firearms report, he indicated that he had critically wounded a suspect. He recorded that his first shot was fired from a distance of ten feet and noted the distance of his second shot by a question mark.
 
 
 71
 Meanwhile the other shooters were moving toward the front bedroom where Satchel, Anderson, and Brewer lay huddled on the floor. Broderick, located in the bathroom, and Ciszewski, positioned in the dining room, fired several blasts from their shotguns into the front bedroom. Simultaneously, Gorman advanced down the hallway and approached this bedroom. Seeing the forms of Anderson and Brewer rising between the beds, he aimed and fired his machine gun into the bedroom. At that point Carmody charged through the front bedroom doorway and the occupants surrendered. When the guns were stilled, Satchel had been struck four times, Anderson and Brewer, twice. All three plaintiffs denied firing weapons. While the survivors were gathered into the kitchen the nonshooters entered the apartment. According to the survivors' testimony, they were then physically and verbally abused.
 
 
 72
 The evidence introduced by defendants at trial produces a portrait of the incident which barely resembles the one depicted by plaintiffs. All the officers testified that they were fired on from within the apartment as they attempted to serve the search warrant. Groth testified that he and his men announced their purpose to the occupants on the morning of December 4 while standing on the apartment porch. After receiving no response, Davis struck down the front door of the apartment. As he lunged into the living room a shotgun blast flashed through the room from Clark's gun. Seeing Harris' gun directed at the front entrance door, he fired and hit her in the leg. Fearing for Davis' life, Groth stepped into the living room and was met by the barrel of Harris' gun aimed in his direction; believing that she had fired a shot at him, Groth responded by firing at her. Davis noticed Clark rising from his chair, "pumping" his shotgun, and turning toward him. Davis fired three shots while simultaneously rushing at Clark. A struggle for Clark's gun followed and the men dropped to the floor. In the meantime, Gorman had entered the living room and grabbed the shotgun from Harris who was sitting on a bed next to the south wall of the living room. The officers testified that during the next few seconds they observed flashes of firing exiting from both bedrooms. Testimony was given that a cease-fire was called, but was broken by two shots, one from each bedroom.
 
 
 73
 At the same time, Carmody broke through the kitchen door into the rear of the apartment. Observing flashes of firing exiting from the back bedroom, he lunged into the kitchen. He advanced to a position in the dining room and fired into the bedroom. Ciszewski and Broderick followed Carmody's lead. Ciszewski pointed his flashlight into the back bedroom and Bell surrendered.
 
 
 74
 A second cease-fire was called. It too was broken when flashes were observed again in the rear of the apartment. When Gorman and Davis fired through the living room wall, their volleys were returned by more firing from the bedroom.
 
 
 75
 Truelock and Johnson emerged from the back room during a third cease-fire. Carmody then entered the back bedroom where he saw Hampton's body on the bed. While Carmody dragged the body from the room, Ciszewski entered to remove weapons. A bullet ripped through the north wall of the bedroom and struck Ciszewski in the ankle.
 
 
 76
 Having secured the living room and back bedroom, the raiders concentrated their efforts on the front bedroom. Gorman ran to the bedroom after shooting through the south wall of the living room. He fired his machine gun into the front bedroom as he saw Anderson rising between the beds with a shotgun clutched in his hands. Anderson was hit by Gorman's volley. Gorman also spotted Brewer with an object in her hands, but no shots were exchanged. Carmody and Broderick also fired into the north bedroom. According to a tape of a radio dispatcher's communication with the raiders that morning, the apartment was under control within seven minutes.
 
 
 77
 In addition to the raiders' testimony, the statements of several plaintiffs given to their lawyers after the incident were presented by the defense at trial. In these statements, both sworn and unsworn, several plaintiffs said they picked up weapons during the course of the raid and Truelock said he fired two shots at the raiders. These statements were offered as further proof that the officers were fired at and that they perceived themselves to be in great danger during the course of the raid.
 
 
 78
 Countering this defense evidence and in support of their trial testimony in which the survivors denied firing at the raiders, plaintiffs introduced the expert testimony of Robert Zimmers, a ballistics examiner with the FBI crime laboratory. Zimmers also was qualified as an expert to testify regarding the angle a shot entered a surface based on evidence of its impact point. According to his testimony, he examined the weapons seized from the apartment, the shooters' weapons and their bullets, bullet fragments, and shotgun casings and cartridges found in the apartment. He also analyzed impact points on the walls and furniture in the apartment. On the basis of this examination and his analysis, he concluded that there was no evidence of a shotgun blast coming from the corner of the living room where Harris was during the raid. He also concluded that there was no evidence of shotgun shots exiting from the front bedroom where Satchel, Anderson, and Brewer were sleeping, and found no evidence of a shot being fired from within the rear bedroom where Johnson, Hampton, Truelock, and Bell were located.
 
 
 79
 On the other hand, Zimmers determined that there were forty-two bullet holes created by shots fired from the living room through its south wall into the front bedroom. Additionally, there were thirty-three bullet holes of entrance found in the south wall of the front bedroom (the wall between the front and rear bedrooms), twenty-five of which entered from the living room. There were fourteen bullet holes of entrance found in the south wall of the back bedroom occupied by Hampton and Johnson. Six of these bullet holes came from shots that originated in the doorway of the north bedroom. Zimmers also testified that on the basis of his examination only one shot shell was identified with the seized weapons and that this shell corresponded with a hole of exit in the living room door; further, he stated that a bullet removed from the body of Hampton was fired from the .30-caliber carbine carried on the raid by Davis.C. Post-Raid
 
 
 80
 After the firing ceased, Gorman telephoned Jalovec from the back bedroom to report what occurred and to inquire whether Jalovec would be directing the evidence collection at the apartment. Jalovec responded that the men should leave the apartment immediately to avoid creating a riotous situation and should bring the seized weapons to the State's Attorney's Office. The other raiders were searching the apartment, overturning furniture and seizing books and files in the process. The raiders retrieved bullets and other ballistics material but failed to identify the recovered items. According to Groth, the seized weapons were neither tagged for identification purposes nor fingerprinted, and the locations were not specifically recorded. Consequently, when the Mobile Crime Unit of the Chicago Police Department arrived at approximately 5:15 a. m. to collect evidence, its task was hindered greatly by the raiders' search. The Unit, headed by Koludrovic, nevertheless recovered a number of ballistics items from throughout the apartment which were taken to department headquarters for examination by experts in firearms identification. The officers retained their own weapons, and the weapons found inside the apartment were taken to the State's Attorney's Office.
 
 
 81
 Immediately after the raid, the four wounded occupants were taken to a hospital and the three other survivors were incarcerated in Cook County Jail. On the basis of sworn complaints which stated that the plaintiffs fired at the raiders, charges of attempted murder, aggravated battery, and unlawful use of weapons were filed against the survivors. Bond was set for each at $100,000. (Several survivors remained in jail until December 21 when their bond was lowered.)
 
 
 82
 As the day unfolded, an atmosphere of confusion and tension developed in Chicago's black community. Hanrahan met with the raiders and decided to engage in a series of media activities because "there were no methods of getting the officers' story to the public as effectively." The initial phase began around noon on December 4 when he issued a statement to the press in the presence of Jalovec, Groth, and other raiders. Although aware of conflicting stories, he adopted the raiders' version of the incident and urged the support of the citizens of Chicago for the courageous actions of the police officers. He frequently emphasized his words by pointing to a display of seized weapons and, in particular, to a revolver which he said was "used by Hampton in the course of the attack on the police."
 
 
 83
 On December 8, amidst the continuing storm of controversy surrounding the raid, Hanrahan called his second press conference. Reading from a prepared statement, he reiterated the raiders' account of the incident and summarily dispelled conflicting reports referred to by reporters. Despite further potential pre-trial prejudice to the survivors' criminal defense, Hanrahan continued to publicize the incident and decided to employ additional media tactics to promote the raiders' version of the incident. At his behest the Chicago Tribune published an exclusive interview with the raiders on December 11. The article stated that the occupants initiated the firing and contained photographs provided by the State's Attorney's Office which showed holes in walls and doors of the apartment which purportedly represented shots originating from guns fired in the bedrooms. At trial a reporter for the newspaper testified that his sole source of material for the article was the information obtained from Hanrahan, Jalovec, and the raiders during an interview.
 
 
 84
 The following day a reenactment of the raid was filmed by CBS-TV in Chicago. Hanrahan asked the broadcasting company to film the story for television without editing by CBS. A set was constructed at the State's Attorney's Office, and Jalovec assisted the production directors. All the raiders were present for the event and those who participated in the reenactment were informed that the film could be cut as the raiders desired. To insure the production's conformity with his previous press statements, Hanrahan visited the set during portions of the taping. The broadcast was aired the same evening. Hanrahan held his final press conference the following day. When confronted with questions from reporters that focused on the photographic misrepresentations contained in the Chicago Tribune article, Hanrahan again confirmed the accuracy of the officers' stories without investigating the conflicting reports. At trial Hanrahan testified that he believed his publicity efforts were necessary to maintain the integrity and reputation of law enforcement in the community.
 
 
 85
 The role of the federal defendants continued in the post-raid period. Mitchell, Piper, and Johnson testified that they first learned of the raid through the news media the morning of December 4. Later that day, they received information from the State's Attorney's Office that Hampton's body had been positively identified. Johnson then approved the transmission of an "urgent" teletype to FBI headquarters in Washington reporting the raid. Pursuant to Piper's instructions, Mitchell spoke with Jalovec and Groth at the State's Attorney's Office to obtain more details. At this meeting Jalovec asked Mitchell whether he would be concerned if "it got out" that Mitchell was the source of the preliminary information for the raid.
 
 
 86
 The FBI continued to monitor BPP activities through O'Neal's assistance, and it was during this early post-raid period that FBI officials wrote a series of memoranda highlighting their involvement in the raid. Piper sent a memorandum to Bureau headquarters on December 11 which requested a bonus for O'Neal. The request was "justified" on the grounds that the raid was based on information furnished by O'Neal and that this information was not available from any other source. Shortly thereafter, a three hundred dollar bonus was approved. On December 12 Mitchell wrote a memorandum which stated for the first time that federally illegal weapons had been present in the apartment a few days prior to the raid. The memorandum also noted that the FBI communicated with the State's Attorney's Office around the first of December regarding the illegal weapons. Mitchell's memorandum was not sent to the Washington office of the FBI but instead was placed in the Chicago FBI's "O'Neal" file which also contained the floorplan that had been furnished to Mitchell prior to the raid.
 
 
 87
 A series of investigations and inquests followed the December 4 raid. On December 12 Hanrahan requested Chicago Police Superintendent Conlisk to initiate an internal police investigation. Internal investigations generally were conducted by Ervanian and Kukowinski, director of the Internal Investigations Division of the Chicago Police Department (IID) and head of the Excessive Force Unit of the IID, respectively. This investigation, however, was placed under the direct supervision of Mulchrone, a deputy police superintendent. Meade, a police department legal advisor, was placed in charge of the investigation by Mulchrone. Meade designed a few questions based on Groth's official report and typed in answers which, as Mulchrone stated, "would justify the use of entry and force by the officers." Ervanian and Kukowinski were informed of the limited nature of the inquiry and of Meade's and Mulchrone's decision that all of the raiders' statements were to be identical. Although dismayed at the proposed procedures, neither protested. Copies of Meade's material were distributed to Assistant State's Attorneys Sorosky and Meltreger who were advising the officers at the December 16 questioning. Jalovec, Kukowinski, Ervanian, Mulchrone, and Meade also were present at the interviews. Prior to the commencement of the inquiry, Groth was shown the prearranged questions and answers and then requested to give his account of the raid. Thereafter the other raiders met privately with Jalovec and Sorosky and were shown copies of both the Meade material and Groth's statement. During the interviews each officer was asked substantially the same four questions:
 
 
 88
 Does Groth's statement describe what occurred at the apartment?
 
 
 89
 Did you use excessive force in effecting these arrests?
 
 
 90
 Did other officers use excessive force in effecting these arrests?Is there anything you wish to add?
 
 
 91
 Each of the raiders answered "yes" to the first question and "no" to the next two. They gave a varied assortment of immaterial answers to the fourth question.[16] The survivors were asked to participate in the IID investigation by filing complaints, but declined.
 
 
 92
 While the internal investigation was underway, Sadunas, a ballistics analyst for the Chicago Police Department Crime Laboratory, had been conducting a series of firearms identification tests based on the materials recovered by the Mobile Crime Laboratory Unit. Sadunas was urged by the State's Attorney's Office and some of the raiders to complete his report as quickly as possible. On December 17 he issued his findings which included an identification of two shells with the gun allegedly fired by Brenda Harris. Sadunas, however, failed to include the raiders' weapons in his testings. The Sadunas report was sent to the IID for consideration. On December 18, six days after Hanrahan's request for the investigation, the IID submitted its report to Conlisk. He determined that no disciplinary action was warranted against the fourteen raiders. At trial both Kukowinski and Ervanian characterized the investigation as less than thorough and admitted that the irregular nature of the proceeding might be attributed to the involvement of the State's Attorney's Office. According to Mulchrone, "(the) purpose of the investigation was not to in any way serve to later destroy (the police officers') testimony before a criminal trial" which the IID knew was going to take place in Cook County Circuit Court.
 
 
 93
 Additional state investigations during the post-raid period included a January 1970 Cook County Special Coroner's Inquest into the deaths of Hampton and Clark. Testimony was taken from the raiders and Crime Laboratory personnel. The survivors refused to testify at the inquest. A finding of justifiable homicide was made by the Coroner's office. Plaintiffs challenged this finding at trial with evidence that Groth made several statements at the inquest which he later contradicted, including testimony in which he denied being aware prior to the raid of the interior design of the apartment.
 
 
 94
 Also, during the month of January, a Cook County grand jury returned an indictment for attempted murder and aggravated battery against the seven survivors of the raid. Hanrahan was responsible for the presentation to the grand jury of evidence consisting mainly of the police officers' testimony and the Sadunas report.
 
 
 95
 A federal grand jury had been convened in December 1969 to investigate whether the occupants' civil rights had been violated. Jerris Leonard, Assistant Attorney General in charge of the Civil Rights Division, was assigned by the Department of Justice to present evidence to the grand jury, and Leonard Treviranus served as case agent for the grand jury on behalf of the FBI.[17] Johnson instructed Treviranus that all requests for evidence from the grand jury and Leonard were to be channelled through Johnson. Additionally, Johnson and Leonard met throughout the investigations and Leonard revealed to Johnson what information he was seeking for presentation to the grand jury.
 
 
 96
 The grand jury began to hear evidence in January 1970 and Johnson was requested to appear before it to testify concerning the June 1969 raid on the BPP headquarters. Treviranus sent a memorandum to FBI headquarters in Washington which assured that Johnson's testimony would not relate to "the circumstances" of the December 4 raid, insuring that "no exposure" to the Bureau would occur. Leonard, however, informed Johnson that the grand jury was interested additionally in what information the FBI had supplied to local authorities prior to the raid. Johnson asked a member of his staff to brief him on the information that had been disseminated. Although Johnson knew Mitchell had provided information about the BPP to local authorities, he asked neither Mitchell nor Piper about these communications. On February 11, 1970 Johnson testified before the grand jury. He stated that the Chicago office of the FBI was not aware that illegal weapons were in the apartment prior to the raid. Additionally, Johnson failed to mention that a floorplan was furnished by Mitchell to the State's Attorney's Office. On the same day that Johnson testified, Mitchell wrote the FBI Director on behalf of the Chicago office for authorization to continue paying O'Neal as an informant. In the letter Mitchell justified the request, as Piper had justified the earlier bonus for O'Neal, by reminding headquarters that O'Neal had provided a detailed floorplan of the apartment, as well as other information, which subsequently "saved injury and possible death to police officers" participating in the December 4 raid.
 
 
 97
 Neither Mitchell nor Piper testified before the grand jury. The Racial Matters Squad, however, which was under Piper's supervision, regularly provided Treviranus with selective intelligence information on the BPP and the raid. Included in this information flow were Bureau files on the survivors, a report on Hampton's activities one week before the raid, and Mitchell's November 21 weapons memorandum listing the legally purchased weapons reported by O'Neal to be in the apartment. Conspicuously absent was information on the floorplan and Mitchell's December 12 memorandum concerning the presence of illegal weapons in the apartment prior to the raid. O'Neal was never made available to testify before the grand jury nor to be interviewed by the prosecutors in charge of the grand jury despite Bureau instructions issued in September 1969 that efforts should be made to convince informants to testify about information they had furnished concerning the BPP.
 
 
 98
 During the first weeks of February 1970, Zimmers conducted exhaustive tests of the ballistics evidence and weapons involved in the raid. Zimmers concluded that the spent shells identified in the Sadunas report as having been fired from Brenda Harris' gun actually had been fired from Officer Ciszewski's weapon. Sadunas was informed of this discrepancy in mid-February. Upon receiving the evidence and weapons from the FBI, Sadunas retested the shotshells and test-fired Ciszewski's gun for the first time. His findings confirmed Zimmers'. Several weeks later Sadunas appeared before the federal grand jury and testified to his previous error. Hanrahan, who was in charge of the state prosecution, learned of Sadunas' error in March. He discussed the corrected findings with the raiders and asked if they wanted to make further statements. Hanrahan and the raiders decided that the raiders should testify before the federal grand jury to relate their accounts of the incident. At the same time Hanrahan was considering dismissal of the state indictments.
 
 
 99
 According to Leonard, Hanrahan, the raiders, and other police officers eventually became "targets" of the federal grand jury investigation. Hanrahan was warned of this several weeks before he was requested to testify. Subsequently Leonard discussed the potential indictments with Johnson and informed him that "an arrangement" had been made between Hanrahan and him, whereby the raiders' testimony would be given to Hanrahan after they testified and that Hanrahan would drop the indictments against the survivors within thirty days. Leonard hoped that the survivors would then testify before the federal grand jury. Shortly after this discussion, Johnson informed Treviranus of the "arrangement" and, on the basis of this conversation, Treviranus sent a teletype to FBI headquarters on April 8. The teletype stated that the dismissal of the local indictments would be based on the change in Sadunas' testimony.[18] Enclosed with the teletype was a draft of the first chapter of the grand jury report.
 
 
 100
 Groth and the other raiders began their testimony before the grand jury on the same day that Treviranus dispatched the teletype and the report. Groth was not requested to reveal the identity of his informant even though Leonard's assistants had requested this information from the State's Attorney's Office and Groth in early February. At that time the State's Attorney's Office informed the assistants that "Jalovec was informed by a federal employee: (and) Groth may consider course of action if asked before the Grand Jury." The raiders refused to conform their testimony to the ballistics evidence and physical evidence shown them by the federal prosecutors prior to their appearance.
 
 
 101
 On May 4 Hanrahan appeared before the grand jury and testified that it was his intention to dismiss the indictments based on the revised Sadunas report. Four days after Hanrahan's appearance, the indictments against the survivors were dropped. The Government sought the seven survivors' testimony before the grand jury on May 11; however, the plaintiffs refused to testify. No indictments were returned and the federal grand jury was discharged on May 15.
 
 
 102
 In June 1970 a special prosecutor was appointed by the Chief Judge of the Criminal Division of the Circuit Court of Cook County to inquire into the police and Black Panther actions on December 4. A special state grand jury was convened in December 1970 which returned indictments against Hanrahan, Jalovec, Mulchrone, Meade, Sadunas, Koludrovic, Groth, Broderick, Carmody, Ciszewski, Corbett, Davis, Gorman, and Jones for conspiring to obstruct justice. On October 25, 1972 these defendants were found not guilty after a bench trial in the Criminal Court of Cook County.
 
 
 103
 These facts provide the basis for a determination of the legal issues concerning the directed verdicts. The plaintiffs' principal claim is that defendants conspired to deprive them of their civil rights.[19] The plaintiffs also assert claims against individual defendants for intentional and negligent violations of their rights. We now seek to outline generally the governing legal principles regarding civil conspiracies. This discussion will be followed by an analysis both of these standards and of the individualized claims as applied to the facts presented in the three stages of plaintiffs' case.
 
 III. CONSPIRACY CLAIMS
 
 104
 A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damage.' " Rotermund v. United States Steel Corp., 474 F.2d 1139 (8th Cir. 1973) (citation omitted). In order to prove the existence of a civil conspiracy, a plaintiff is not required to provide direct evidence of the agreement between the conspirators; "(c)ircumstantial evidence may provide adequate proof of conspiracy." Hoffman-LaRoche, Inc. v. Greenberg, 447 F.2d 872, 875 (7th Cir. 1971). See also United States v. Varelli, 407 F.2d 735, 741-42 (7th Cir. 1969). Absent the testimony of a coconspirator, it is unlikely that direct evidence of a conspiratorial agreement will exist. Thus, the question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can "infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding" to achieve the conspiracy's objectives. Adickes v. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970).
 
 
 105
 A plaintiff seeking redress need not prove that each participant in a conspiracy knew the "exact limits of the illegal plan or the identity of all participants therein." Hoffman-LaRoche, Inc., supra, 447 F.2d at 875. An express agreement among all the conspirators is not a necessary element of a civil conspiracy. The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result. To demonstrate the existence of a conspiratorial agreement, it simply must be shown that there was "a single plan, the essential nature and general scope of which (was) known to each person who is to be held responsible for its consequences." Id.
 
 
 106
 Keeping these standards in mind, when we examine the evidence presented by both sides in this case in the light most favorable to the plaintiffs, we conclude that the district court erred when it ruled that the plaintiffs had not established a prima facie case of conspiracy. Our analysis of the plaintiffs' case leads us to conclude that the plaintiffs did offer sufficient evidence to warrant a jury determination of whether a conspiracy existed. The fact that "all of the evidence . . . does not point in one direction and different inferences might reasonably be drawn from it" does not justify judicial intrusion into the jury's role in determining whether a civil conspiracy existed. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 700-01, 82 S.Ct. 1404, 1411, 8 L.Ed.2d 777 (1962). In such a situation, "it is the jury which 'weighs the contradictory evidence and inferences' and draws 'the ultimate conclusion as to the facts.' " Id. (citation omitted). When a plaintiff alleges a conspiracy to violate civil rights, "(t)he existence or nonexistence of a conspiracy is essentially a factual issue that the jury, not the trial judge, should decide." Adickes, supra, 398 U.S. at 176, 90 S.Ct. at 1618 (Black, J., concurring.)
 
 
 107
 We do wish, however, to make one observation about the nature of the conspiracy described by plaintiffs' evidence in this case.[20] We believe that plaintiffs have presented a prima facie case, not of a single conspiracy, but of two conspiracies designed to violate their rights in distinct ways. These conspiracies share many of the same participants who form "the common nucleus of separate conspiracies," Varelli, supra, 407 F.2d at 743, but they are not identical conspiracies. The first conspiracy, as we view the evidence, involves the state and federal defendants who participated in the pre-raid preparations and planning, and the raid itself. The second conspiracy, involving many of these same defendants, was the alleged coverup of evidence regarding the instigation, preparation and execution of the raid, and the post-raid legal harassment of the plaintiffs. These two conspiracies required entirely different kinds of activities, both legal and illegal, to achieve their ends. But more importantly, these two conspiracies had distinct objectives. The first conspiracy was designed to subvert and eliminate the Black Panther Party and its members, thereby suppressing both a potential source of unrest, turmoil, and even violence in the black community, and a vital, radical-black political organization. The second conspiracy harassed the survivors of the raid. Moreover, the post-raid conspiracy was intended to frustrate any redress the plaintiffs might seek and, more importantly, to conceal the true character of the pre-raid and raid activities of the defendants involved in the first conspiracy.
 
 
 108
 Reference to the law of criminal conspiracy suggests that this distinction between the substantive criminal conspiracy and the subsequent concealment of the crime is important. The Supreme Court stated in Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957): "Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators." Id. at 401-02, 77 S.Ct. at 972. Thus, in order to prove that acts of concealment constitute a part of the initial conspiracy, the prosecution must present "direct evidence (of) an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission." Id. at 404, 77 S.Ct. at 973-74. Absent such evidence, the concealment is independent of the original conspiracy; the original conspiracy is not considered ongoing simply because concealment of the conspiracy continues. Thus, persons who participate in the concealment are not Ipso facto participants in the original conspiracy.
 
 
 109
 These principles are instructive in analyzing the case presented by plaintiffs. Many of the state defendants are named in plaintiffs' complaint only for their participation in the post-raid coverup. Without direct proof that an agreement to conceal was part of the original conspiracy, these defendants should be liable only for damages arising out of the post-raid conspiracy. Defendants who are proved to have participated in both the pre-raid and post-raid conspiracies are liable, of course, for damages arising out of both conspiracies.
 
 
 110
 We do not decide now that plaintiffs' case involves two conspiracies and that liability must be determined on the basis of that conclusion. Plaintiffs' discovery was hampered unduly by the trial court, See infra, pp. 639-642, and we cannot be certain that the plaintiffs, given full discovery, would be unable to prove that an agreement to conceal the facts concerning the preparation and execution of the raid existed as part of the original conspiracy. And, as we have noted before,
 
 
 111
 (s)ince the existence of multiple conspiracies is really a fact question as to the nature of the agreement, it is for the jury to decide whether there is one agreement or several. United States v. Crosby, 294 F.2d 928 (2d Cir. 1961); Green v. United States, 332 F.2d 788, 789 (5th Cir. 1964); United States v. American Honda Motor Co., 273 F.Supp. 810 (N.D.Ill.1967).
 
 
 112
 Varelli, supra, 407 F.2d at 746. Thus the trial court upon remand should provide jury instructions that will insure that the jury is aware of the alternatives of finding single or multiple conspiracies in the evidence presented by plaintiffs.
 
 
 113
 The defendants raise several questions about the legal sufficiency of plaintiffs' conspiracy claims which must be discussed. First, defendants contend that in order to have an adequate claim for relief under section 1983, a plaintiff must allege and prove both a conspiracy and an actual deprivation of rights; mere proof of a conspiracy is insufficient to establish a section 1983 claim. This statement of the law is correct, See Lesser v. Braniff Airways, Inc., 518 F.2d 538, 540 n.2 (7th Cir. 1975), but we do not see how this affects the viability of plaintiffs' claims in the instant case. Plaintiffs' prima facie case offers a number of constitutional deprivations to accompany their conspiracy allegations; clearly, the evidence would support a finding of injury which would constitute deprivation of constitutional rights. Thus, this requirement of a section 1983 claim has been satisfied.
 
 
 114
 The federal defendants also contend that section 1983 is inapplicable to them since its prohibitions are directed only against state actors. Yet when federal officials are engaged in a conspiracy with state officials to deprive constitutional rights, the state officials provide the requisite state action to make the entire conspiracy actionable under section 1983. The Second Circuit has stated: "When the violation is the joint product of the exercise of a State power and of a non-State power then the test under the Fourteenth Amendment and § 1983 is whether the state or its officials played a 'significant' role in the result." Kletschka v. Driver, 411 F.2d 436, 449 (2d Cir. 1969) (citation omitted.) Our recent decision in Askew v. Bloemker, 548 F.2d 673 (7th Cir. 1976), is not to the contrary. In Askew the state officials did not play a significant role in the conspiracy: "(B)oth the impetus for and the execution of" the conspiratorial plan derived from the federal officials. Id. at 678. Plaintiffs' evidence in the instant case indicates that the federal and state defendants shared in instigating and preparing for the raid. There can be no question that the state defendants "played a 'significant' role in the result." Kletschka, supra, 411 F.2d at 449.
 
 
 115
 Defendants also contend that plaintiffs have failed to state a claim under section 1985(3) because they have not proved that a racial or otherwise class-based, invidiously discriminatory animus was behind the conspirators' actions.[21] Proof of a class-based animus underlying the conspiracy is, of course, a requirement of a section 1985(3) claim. Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Griffin itself held that race was such a class-based animus, but did not establish what other types of class-based animi were sufficient to state a claim. The conspiracy alleged in this case, however, does not require an intensive analysis into either the meaning of Griffin or Congress' intent in drafting section 1985(3) to determine whether the class-based animus requirement was satisfied. The statute was intended, perhaps more than anything else, to provide redress for victims of conspiracies impelled by a commingling of racial and political motives.[22] And this is precisely the sort of conspiracy alleged by plaintiffs in this case.
 
 
 116
 A brief recital of some of the evidence presented by plaintiffs substantiates this conclusion.[23] The BPP was a black organization with a distinct political ideology and a variety of politically-oriented programs. FBI documents offered by plaintiffs demonstrate that certain FBI activities directed against the BPP transcended mere "law enforcement," and were designed to "neutralize" the BPP as a political voice on racial issues. Hanrahan testified that two of the principal goals of the unit his office assigned to investigate the BPP were to combat the anti-police propaganda the BPP had been disseminating in the black community and to mobilize support among blacks for police. And one of the purposes of the post-raid coverup was to prevent the development of widespread sympathy for the BPP cause which might have arisen out of a full disclosure of the facts surrounding the raid and the deaths of Clark and Hampton. Such purposes, if proven, bespeak of a class-based discriminatory animus which is at the heart of section 1985(3)'s prohibitions. There is no doubt that the plaintiffs have satisfied this requirement for proving a section 1985(3) claim.
 
 
 117
 Reviewing the facts presented by plaintiffs in light of these standards, we find that the trial court erred when it directed verdicts as to plaintiffs' conspiracy claims against Hanrahan, Jalovec, the raiders, and the federal defendants regarding their participation in the planning and execution of the raid. Plaintiffs presented considerable evidence, including FBI documents and express statements by Hanrahan, from which reasonable persons could conclude that these parties shared a "class-based or otherwise discriminatory" desire to undermine the BPP. These defendants also engaged in an extensive series of communications which could demonstrate to a reasonable person the existence of an agreement either tacit or express to act in concert to achieve their shared objective.[24] Plaintiffs need not prove that the individual motives underlying a common, illegal desire to achieve the conspiratorial objective were identical. The essence of a conspiracy is the agreement, and a reasonable jury could find that the actions of these defendants demonstrate that they had agreed at least tacitly to work together to eliminate the BPP.
 
 
 118
 The state defendants argue that they never heard of a FBI counterintelligence program called "COINTELPRO" and thus they cannot be liable as coconspirators with the federal defendants. Similarly, the federal defendants contend that because they never met with any of the raiders in fact, they had never heard of most of them they cannot be part of a conspiracy which includes the raid on the BPP apartment. As we stated earlier, however, each participant in a conspiracy need not know the "exact limits of the illegal plan or the identity of all participants therein." Hoffman-LaRoche, Inc., supra, 447 F.2d at 875.
 
 
 119
 For example, the fact that Special Agent-in-Charge Johnson never spoke to Carmody (one of the raiders) does not preclude their being conspirators. Johnson closely supervised his subordinate FBI officials' activities vis-a-vis the BPP. These agents, in turn, had their contacts among the state defendants. The communications between Jalovec and Mitchell, in particular, were essential to the planning and successful execution of the raid. Without the information the federal defendants furnished the state defendants, the state defendants could not have acted in furtherance of the purpose which plaintiffs contend the state and federal defendants shared inflicting injury to the BPP. The absence of a sole instigator who personally communicated with all the participants in the conspiracy and orchestrated each of their actions does not preclude a jury from concluding that a conspiracy existed. Plaintiffs presented sufficient evidence from which a reasonable person could find that all the defendants named in the initial conspiracy performed discreet functions in concert to further a common plan the raid.
 
 
 120
 Liability for civil conspiracy requires proof of more than an agreement among conspirators; a plaintiff must show that an actual deprivation of his rights resulted from the conspiracy. See supra, p. 622. The raid and the injuries suffered by plaintiffs as a result of the raid reasonably could be found to constitute this actual deprivation of rights. Thus, plaintiffs have established a prima facie case under sections 1983 and 1985(3) for civil liability: a conspiracy to violate their civil rights and actual deprivation of those rights arising from the implementation of the conspiratorial plan.
 
 
 121
 IV. CLAIMS OF INDIVIDUAL LIABILITY FOR ACTS BEFORE AND DURING THE RAID
 
 
 122
 As an alternative to the conspiracy allegations, plaintiffs assert that these defendants are subject to individual liability under section 1983 or directly under the Constitution. The gist of their claims is that these defendants are liable for the intentional and negligent deprivation of rights which occurred during the raid.[25]
 
 A. Shooters
 
 123
 Plaintiffs seek recovery against the shooters on the ground that these defendants, acting under color of state law, made an illegal entry into the West Monroe Street apartment and used deadly and excessive force in addition to committing assault, battery, and other abusive acts on its occupants. Our discussion of the facts concerning the propriety of the search warrant which defendants assert justified their entry into the apartment is found in our analysis of Groth's refusal to identify the informant he used to support the affidavit for the warrant. See infra, pp. 635-639. Even if the officers were acting pursuant to a search warrant validly issued, the question remains for the jury's determination whether the force used by the raiders within the apartment was reasonable under the circumstances. The officers had a right to use some degree of force in executing the warrant and defending themselves. As noted in Terry v. Ohio, 392 U.S. 1, 23, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968), "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." The record is replete with factual disputes regarding the activities of the shooters on the morning of December 4. For example, it reasonably could be inferred that Mark Clark's gun fired during his struggle with Groth rather than when the police officers first broke through the door. Additionally, plaintiffs testified at trial that none of the survivors fired a gun during the raid. And Zimmers' expert testimony corroborated these assertions. Numerous other questions of fact are present in the record, including the issue of whether Fred Hampton was drugged at the time of the raid and shot deliberately after Johnson, Truelock, and Bell had left the bedroom.
 
 
 124
 Assessing the credibility of witnesses and weighing the evidence are matters within the sole province of the jury. In granting the directed verdicts, the trial judge repeatedly usurped this function. For example, the judge concluded in his Summary that "Brenda Harris fired a shot which went past Groth's shoulder." This finding was made in disregard of Harris' testimony to the contrary and the physical evidence offered at trial. Additionally, the trial court ignored the testimony of Johnson and Truelock and determined that "the evidence is conclusive that (Hampton) was shot three times and that he was dead when Deborah Johnson and Louis Truelock left the bedroom." The court also weighed the conflicting evidence of the experts and found that the evidence introduced by plaintiffs' toxologist, Dr. Eleanor Berman, was "in error."
 
 
 125
 In light of the evidence presented by plaintiffs, the question of the seven shooting police officers' liability should have been submitted to the jury. Accordingly, we reverse the verdicts directed in favor of these police officers on the individual counts.
 
 B. Nonshooters
 
 126
 In addition to their conspiracy allegations, plaintiffs have presented a prima facie case under section 1983 against the nonshooters on the basis of their nonfeasance at the BPP apartment. This court previously imposed liability in damages for nonfeasance in Byrd v. Brishke, 466 F.2d 6 (7th Cir. 1972). The facts in Byrd are strikingly similar to those alleged in the case at bar. In Byrd Chicago police officers failed to deter other officers who, in their presence, beat the plaintiff with fists and clubs. Holding that purposeful nonfeasance of such magnitude could serve as the basis of tort liability under section 1983, we stated that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence." 466 F.2d at 11.
 
 
 127
 Plaintiffs in this case assert that the nonshooters are liable, under the rule in Byrd, for failing to assist or protect the wounded occupants. The officers entered the apartment immediately after the firing ceased and plaintiffs testified that the nonshooters were present during the beatings and abuse which they said followed the shootout. In light of our decision in Byrd, the fact if found by a jury determination that these men did not personally participate in the abuse, but instead callously chose to watch, would not preclude their liability. Accordingly, this issue should have been submitted to the jury. We hold that the directed verdicts in favor of the nonshooters regarding their activities in the raid were improperly granted by the trial court.*
 
 C. Hanrahan and Jalovec
 
 128
 Plaintiffs contend that the alleged failure of Hanrahan and Jalovec to supervise properly the officers attached to the SPU creates a cause of action based on section 1983. We agree. In Schnell v. City of Chicago, 407 F.2d 1084 (7th Cir. 1969), we held that supervisory personnel are proper party-defendants to a section 1983 action
 
 
 129
 whether the plaintiffs' constitutional rights are violated as a result of police behavior which is the product of the active encouragement and direction of their superiors or as a result of the superiors' mere acquiescence in such behavior.
 
 
 130
 Id. at 1086. See also Sims v. Adams, 537 F.2d 829, 831 (5th Cir. 1976). Plaintiffs have established a prima facie case against Hanrahan and Jalovec on the basis of their roles as supervisors of the police officers who participated in the raid. They approved Groth's selection of men and weapons carried on the raid. Additionally, they approved of the early morning timing of the execution of the search warrant. It was for the jury to determine whether the consequences of these actions were foreseeable. We believe that the trial court improperly directed verdicts in favor of these defendants on the nonconspiracy counts.
 
 D. Federal Defendants
 
 131
 Finally, we fail to see the distinction which plaintiffs make between "joint activity" under section 1983 and conspiracy under sections 1985(3) and 1983 regarding the federal defendants' liability for damages resulting from the raid. The same legal standards apply to each form of liability. As stated by Prosser,
 
 
 132
 joint tortfeasor liability arises when persons "who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit are equally liable with him." Prosser, Torts (4th ed. 1971) p. 292.
 
 
 133
 The evidence which plaintiffs presented to support their nonconspiracy theory against these defendants is identical to that which was aimed at establishing their conspiracy claims. Accordingly, although we fail to see the need to allege this redundant theory of recovery, we hold that plaintiffs have presented sufficient evidence to support their joint activity claims.[26]
 
 V. CLAIMS OF LIABILITY FOR POST-RAID ACTS
 
 134
 On the basis of the post-trial facts, plaintiffs claim that defendants conspired to cause the false arrest, imprisonment, and prosecution of the survivors of the raid. All defendants are named as participants in the post-raid conspiracy. As a further result of the conspiracy, plaintiffs allege that the Cook County criminal prosecution against them was prolonged to May 8, 1970 and that they incurred unnecessary legal expenses and suffered mental anguish and injury to their reputations. Relief is sought under sections 1983 and 1985(3).
 
 
 135
 A. Hanrahan, Jalovec, the raiders, and the federal defendants
 
 
 136
 We hold that plaintiffs have presented sufficient evidence to establish a prima facie case that Hanrahan, Jalovec, the raiders, and the federal defendants participated in a post-raid conspiracy to harass the survivors of the raid and to conceal the facts surrounding the raid, thereby injuring plaintiffs.[27]
 
 
 137
 On the morning of December 4 several raiders met with Hanrahan and Jalovec to discuss the raid. Mitchell met with Groth and Jalovec the same morning and left immediately prior to Hanrahan's first press conference. From these conversations emerged an allegedly distorted, if not false, account of the raid which justified the officers' actions. In the days that followed, Hanrahan instituted a promotional campaign. Despite their awareness of conflicting stories, Hanrahan, Jalovec, and the raiders continued to circulate reports to justify the continuation of plaintiffs' detention. And it was the raiders' testimony which provided much of the basis for the indictments Hanrahan brought against the survivors.
 
 
 138
 The irregularities in the series of official investigations into the raid also constitute evidence from which there could be found a concerted effort to suppress facts about the planning and execution of the raid and to justify the charges filed against the survivors. For example, at the internal investigation (IID) conducted by the Chicago Police Department, customary procedures were abandoned. Detailed statements normally taken were never obtained. Jalovec and Sorosky, present at Hanrahan's direction, met with the raiders immediately before the raiders supplied their previously prepared, uniform answers to predetermined questions. At the same time, a ballistics report, compiled under pressure from the State's Attorney's Office and several of the raiders, was issued by Sadunas of the Chicago Police Department. Despite its lack of completeness, the report immediately was used to support the raiders' account of the raid, the IID findings, and the Cook County indictments.
 
 
 139
 The concerted effort to suppress facts is further evidenced by the obstruction of the federal grand jury investigation, caused by the failure of the federal defendants to turn over materials sought by the grand jury. The evidence shows that a jury could find that Johnson's testimony before the grand jury was false and misleading and concealed the involvement of FBI headquarters and the roles of Piper, Mitchell, and O'Neal in the planning of the raid. Additionally, Johnson participated in the arrangement between Hanrahan and Leonard whereby Leonard agreed not to obtain indictments against any state officials for their actions with regard to the raid in exchange for the dismissal of the state indictments against the survivors. And during the pretrial discovery in this suit, the federal defendants continued to engage in dilatory and obstructive tactics to conceal evidence of their involvement in the planning of the raid. See infra, pp. 639-642.
 
 
 140
 A jury reasonably could infer that a conspiracy existed to conceal the facts of the raid and to continue an unfounded prosecution against plaintiffs.[28]
 
 B. Purtell, Koludrovic, and Sadunas
 
 141
 We hold that plaintiffs' evidence does not present a prima facie case as to Purtell and Koludrovic. Purtell was the director of the Chicago Crime Laboratory and the supervisor of Koludrovic and Sadunas. There is, however, no evidence that he participated in any agreement or effort to distort the evidence found inside the apartment on December 4. Similarly, plaintiffs' case against Koludrovic is insufficient. In his official report he stated that more than one shot was fired at the raiders as they entered the apartment and he reiterated this conclusion at the Coroner's inquest. There was, however, no evidence of an agreement, either tacit or express, between him and any other defendant to conceal or distort facts about the raid. His task at the apartment was made especially difficult by the raiders' disruptive search prior to his arrival and, if his examination of the premises was less than thorough, the evidence suggests that this was the result, at worst, of negligent rather than intentional conduct.
 
 
 142
 There is, however, evidence and reasonable inferences pointing to Sadunas' participation in the post-raid conspiracy. Sadunas' initial ballistics test was incomplete; he compared spent shotshells from the apartment only with the weapons seized at the apartment and ignored the weapons which had been used by the raiders. His examination resulted in a crucial misidentification which would have remained uncorrected absent Zimmers' subsequent tests and conclusions. When he learned of Zimmers' findings, Sadunas retested the shells comparing them with all the weapons including those of the raiders. After these tests, Sadunas readily admitted his mistake. Given this set of events, we think that the determination whether his misidentification was the result of professional incompetence or conspiratorial conduct should have been left for the jury.
 
 C. Participants in the IID Investigation
 
 143
 Meade and Mulchrone, through their participation in the IID investigation, were not involved in the dimension of the conspiracy which resulted in the imprisonment and prosecution of the survivors without legal basis; rather, their actions reasonably could have been found to have encouraged the continuation of the unfounded prosecution by suppressing the development of inconsistent evidence against the raiders, Hanrahan, and Jalovec. Police Superintendent Conlisk initiated the investigation at Hanrahan's request and ordered Mulchrone to supervise the proceedings. Mulchrone admitted that the purpose of the investigation was not to test the veracity of the raiders' stories, but to prevent the emergence of contradictory testimony. Meade designed the perfunctory questions and supplied the uniform answers for the inquiry. Accordingly, the facts were sufficient to include Meade and Mulchrone in a post-raid conspiracy charge.
 
 
 144
 Plaintiffs did not present a prima facie case for conspiratorial liability against Ervanian, Kukowinski, Sorosky, and Meltreger. A reasonable jury might find, however, that these defendants violated 42 U.S.C. § 1986. Section 1986 provides:
 
 
 145
 Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action.
 
 
 146
 Ervanian and Kukowinski, who normally conducted IID investigations, were replaced for the Hampton investigation. They were aware of and later acknowledged the irregular character of the investigation. Although they were not active participants in the "whitewash," they took no steps to correct it. Similarly, plaintiffs presented no evidence that Assistant State's Attorneys Sorosky and Meltreger participated in the preparation for the perfunctory interrogation of the raiders. Prior to this examination, however, they were shown the questions and answers which had been prepared for the raiders, and Sorosky, with Jalovec, met with the raiders immediately before their interviews. And, like Ervanian and Kukowinski, Sorosky and Meltreger made no attempt to prevent the irregular conduct of the investigation. Thus, although these defendants could not be liable on the basis of the existing record under plaintiffs' conspiracy claims, there is sufficient evidence to support the claims brought against them pursuant to 42 U.S.C. § 1986.
 
 
 147
 Plaintiffs also contend, in addition to their conspiracy claims, that there was no legal basis for the arrest and imprisonment of the survivors of the raid and therefore that Hanrahan, Jalovec, and the raiders are liable under section 1983 for the intentional deprivation of civil rights by false imprisonment. See Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Joseph v. Rowlen, 402 F.2d 367 (7th Cir. 1968). Several survivors were jailed on the basis of the officers' sworn complaints that the occupants committed attempted murder and aggravated battery against the raiders. Hanrahan and Jalovec authorized the filing of these charges. As a result of the charges, the high bond set at the request of the State's Attorney's Office, and the denial of plaintiffs' demand for a preliminary hearing, these survivors were imprisoned until December 21.
 
 
 148
 Plaintiffs' claim, of course, hinges on the question whether defendants were acting with probable cause when they filed charges against the survivors. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Banish v. Locks, 414 F.2d 638 (7th Cir. 1969). See also pp. 631-635 Infra. The question of whether the facts known to a defendant amounted to probable cause should be determined by the court when there is no disagreement as to the facts or circumstances surrounding the detention. Banish v. Locks, supra, 414 F.2d at 641. In light of the numerous disputes regarding the facts defendants knew or reasonably believed, however, the trial court should have submitted the issue of probable cause to the jury.
 
 
 149
 Plaintiffs argue that all defendants (except O'Neal) are liable individually under section 1983 for malicious prosecution. An action for malicious prosecution may be brought under section 1983 if, acting under color of state law, the defendant has subjected the plaintiff to a deprivation of constitutional magnitude. Hampton I, supra; Banish v. Locks, supra; Nesmith v. Alford, 318 F.2d 110, 126 (5th Cir. 1963). Plaintiffs contend that the raiders, Hanrahan, and Jalovec instituted an unfounded prosecution and that they, along with the other defendants, supported its continuation. Relief is sought for the constitutional deprivations and injuries arising from this prosecution.
 
 
 150
 The absence of probable cause is an essential element of an action for malicious prosecution. Banish v. Locks, supra, 414 F.2d at 640. Under the general tort principles of malicious prosecution,
 
 
 151
 The defendant may be liable Either for initiating or for continuing a criminal prosecution without probable cause. But he cannot be held responsible unless he takes some active part in instigating or encouraging the prosecution. He is not liable merely because of his approval or silent acquiescence in the acts of another, nor for appearing as a witness against the accused, even though his testimony is perjured. . . . On the other hand, if he advises or assists another person to begin the proceeding, ratifies it when it is begun in his behalf, or takes any active part in directing or aiding the conduct of the case, he will be responsible (emphasis added).
 
 
 152
 Prosser, Torts (4th ed. 1971) pp. 836-37.
 
 
 153
 Plaintiffs referred to essentially the same evidence to support their individual malicious prosecution claims as they did to substantiate their conspiracy claims regarding malicious prosecution. We reach the same conclusion here as we did earlier. We hold that plaintiffs failed to establish a prima facie case against defendants Purtell, Koludrovic, Kukowinski, Ervanian, Sorosky, and Meltreger. The malicious prosecution claims against the remaining defendants should have been submitted to the jury and, accordingly, we reverse the trial court's directed verdicts as to these defendants.[29]VI. CLAIMS OF IMMUNITY
 
 
 154
 The Supreme Court stated many years ago that the "very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." Marbury v. Madison, 1 Cranch 137, 163, 2 L.Ed. 60 (1803). When Congress adopted section 1983, it decided that "every person" who, under color of state law, deprived another of a constitutional right, privilege, or immunity was liable to the victim for damages. Since then, however, the courts have recognized certain exceptions to the unrestricted language of this provision and have afforded immunity to persons acting in specified official capacities.
 
 
 155
 Both the state and federal defendants claim that they enjoy official immunity for their actions in connection with the raid on the apartment on West Monroe Street. The entreaties of public officials for immunity for their official wrongdoing, however, should be treated with circumspection. Grow v. Fisher, 523 F.2d 875 (7th Cir. 1975). We should be hesitant to expand the scope of official activity which, from the perspective of a victim seeking civil redress, stands beyond the constraints of the Constitution. See generally Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). For us to hold that all of the actions of the defendants in this case should be immune from liability as a matter of law would require us to expand radically the parameters which the Supreme Court has set for the doctrine of official immunity. This we are unwilling to do.
 
 A. State Defendants: Absolute Immunity
 
 156
 State defendants Hanrahan, Jalovec, Meltreger, and Sorosky (the Cook County State's Attorney and three of his assistants) contend that they cannot be found liable for the damages alleged by plaintiffs because they enjoy absolute immunity for their actions under the rule of Imbler v. Pachtman,424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). The other state defendants claim a qualified immunity. See Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). We hold that the four state prosecutors have absolute immunity from section 1983 liability for some of their post-raid activities. Most of their allegedly illegal actions, however including all of their pre-raid activities must be tested by the standards of qualified immunity.
 
 
 157
 The Supreme Court in Imbler did not hold that all official actions of a state prosecutor are absolutely immune from section 1983 liability. Imbler held only that a prosecutor has absolute immunity "in initiating a prosecution and in presenting the State's case." Imbler, supra 424 U.S. at 431, 96 S.Ct. at 995. See Briggs v. Goodwin, 186 U.S.App.D.C. 179, 569 F.2d 10 (1977), Cert. denied, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978) (prosecutor's immunity limited to his "advocacy" functions). The Court left standing circuit decisions which, by focusing on "the functional nature of the activities" rather than the "status" of the prosecutor, held that certain official actions by state prosecutors are entitled only to qualified immunity. Imbler, supra, 424 U.S. at 430, 96 S.Ct. at 995. See, e. g., Guerro v. Mulhearn, 498 F.2d 1249, 1256 (1st Cir. 1974); Hampton v. City of Chicago, 484 F.2d 602, 608-09 (7th Cir. 1973); Robichaud v. Ronan, 351 F.2d 533, 536-37 (9th Cir. 1965). These cases clearly indicate that when a state prosecutor is performing investigative rather than advocacy functions, he is not wrapped with absolute immunity.[30] See Briggs, supra, 569 F.2d at 16-17.
 
 
 158
 In Hampton I, supra, we examined the claim of Hanrahan and Jalovec to absolute immunity for their pre-raid conduct. We concluded that their
 
 
 159
 alleged participation in the planning and execution of a raid of this character has no greater claim to complete immunity than activities of police officers allegedly acting under (their) direction.
 
 
 160
 Hampton I, supra, 484 F.2d at 609. Neither Imbler, supra, 424 U.S. at 430, 96 S.Ct. 984, nor our fuller consideration of the issue aided by the evidence produced at trial alters that conclusion.
 
 
 161
 More difficult questions are presented by the claims of the defendants from the State's Attorney's Office Hanrahan, Jalovec, Meltreger, and Sorosky to absolute immunity with respect to their post-raid conduct. Resolution of these claims requires a close analysis of the nature of the defendants' activities. We hold that while some of their actions fall within the ambit of Imbler's Protection, others do not.
 
 
 162
 Hanrahan's decision to file charges against the survivors of the raid, his presentation of evidence before the state grand jury, and his deal with Assistant Attorney General Leonard to drop the state charges all comprise part of his "quasi-judicial" duties as state prosecutor "initiating a prosecution and . . . presenting the State's case . . . ." Imbler, supra, 424 U.S. at 431, 96 S.Ct. at 995; Butz, supra, 438 U.S. at 512-517, 98 S.Ct. at 2914-2916. Thus, Hanrahan and any Assistant State's Attorney who aided him in these phases of his post-raid activity are absolutely immune from civil liability for their conduct.
 
 
 163
 Other post-raid actions of these defendants, however, do not warrant absolute immunity. To the extent that plaintiffs can both show injuries arising from this conduct and demonstrate that the defendants' actions were illegal and unprotected by their qualified immunity, the defendants will be liable for damages. In particular, the State's Attorney's Office's generation of post-raid publicity, which may have caused pre-trial prejudice to the plaintiffs and encouraged the alleged coverup of the true facts of the raid, is not protected by absolute immunity. Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), said that a federal official who, even maliciously, issues a false and damaging publication the issuance of which is within the parameters of his official duties, is absolutely immune from liability for libel. However, the Supreme Court this term noted that
 
 
 164
 a quite different question would have been presented had the officer ignored an express statutory or constitutional limitation on his authority.
 
 
 165
 Barr did not, therefore, purport to depart from the general rule, which long prevailed, that a federal official may not with impunity ignore the limitations which the controlling law has placed on his powers.
 
 
 166
 Butz, supra, 438 U.S. at 482, 98 S.Ct. at 290. Thus, Barr does not control in this case where the state officials' post-raid public relations activity allegedly violated specific statutory and constitutional guarantees.
 
 
 167
 Further, the Supreme Court's recent decisions in Butz and Imbler do not suggest that a state prosecutor's publicity actions should be absolutely immune from civil liability. In Butz, one of the actions plaintiff complained of was the defendants' issuance of a deceptive press release. Butz, supra 438 U.S. at 482, 98 S.Ct. at 2898. And the language in Butz suggests that the defendants were absolutely immune for most of their conduct vis-a-vis the plaintiff. However, "the task of applying the foregoing principles" to the particular claims against the defendants in Butz was left to the district court on remand. Id. 438 U.S. at 517, 98 S.Ct. at 2916. A close reading of Butz suggests that the boundaries of the absolute immunity afforded prosecutors in administrative proceedings do not encompass their publicity campaigns. The Court said that "the decision to initiate or continue a proceeding" and "the role of an agency attorney in conducting a trial and presenting evidence on the record to the trier of fact" are cloaked in absolute immunity but made no intimation that a prosecutor's issuance of a press release warrants the same treatment. Id. 438 U.S. at 516-517, 98 S.Ct. at 2916. Significantly, one of the safeguards the Butz Court persistently referred to in justifying its extension of absolute immunity to certain "quasi-judicial" actions of administrative prosecutors the scrutiny a prosecutor's discretionary decisions receive in the adjudicatory process, Id. 438 U.S. at 516-517, 98 S.Ct. at 2916 is absent in the publicity context.
 
 
 168
 Imbler 's imposition of absolute immunity on the "judicial phase" of a prosecutor's duties likewise does not protect a prosecutor's publicity campaigns. Imbler 's justification for granting absolute immunity to all of a state prosecutor's "quasi-judicial" activities has been sharply criticized, See, e. g., Imbler, supra, 424 U.S. at 432-47, 96 S.Ct. 984 (White, J., concurring); Developments in the Law: Section 1983, 90 Harv.L.Rev. 1133, at 1200, 1204 (1977), but even on its own terms the justification does not extend to a prosecutor's decision to publicize his actions or actions taken by others in the community. Neither the prosecutor's judgment "in deciding which suits to bring and in conducting them in court," Imbler, supra, 424 U.S. at 424-25, 96 S.Ct. at 992, nor "the functioning of the criminal justice system," Id. at 426-27, 96 S.Ct. at 993, would be undermined by maintaining the exposure of a prosecutor's public relations decisions to section 1983 liability, subject only to a qualified immunity. There is no compelling justification for extending absolute immunity to these decisions. Thus, we hold that Hanrahan's post-raid press conferences and the participation of Hanrahan and Jalovec in the exclusive interview with the Chicago Tribune and in the CBS-TV reenactment of the raid are protected only by a qualified immunity.
 
 
 169
 State defendants Jalovec, Sorosky, and Meltreger contend that they are absolutely immune from liability for their participation in the IID investigation. In our earlier review of Sorosky's and Meltreger's claims for absolute immunity, Hampton I, supra, we observed that the plaintiffs essentially alleged that these defendants had engaged in "the deliberate preparation of perjured testimony." Id. at 609 n. 9.[31] We concluded that such conduct "clearly exceeded the scope of their quasi-judicial immunity." Id.
 
 
 170
 Since our decision in Hampton I, however, the Supreme Court rendered its decision in Imbler v. Pachtman, supra. Applying that decision, we recently held that prosecutors who with local police allegedly destroyed and falsified a line-up report and police tapes of incoming phone calls, were protected by the doctrine of absolute immunity. Heidelberg v. Hammer, 577 F.2d 429, 432 (7th Cir. 1978). The actions of Jalovec, Sorosky, and Meltreger at the IID investigation constituted failure to prevent conduct which was essentially indistinguishable from the prosecutorial activity encapsulated in the allegations in Heidelberg. Thus, we are compelled to conclude that Jalovec, Sorosky, and Meltreger are absolutely immune from liability for their actions at this hearing.
 
 B. Federal Defendants: Absolute Immunity
 
 171
 The federal defendants, Johnson, Piper, Mitchell, and O'Neal, seek absolute or at least qualified official immunity for their allegedly illegal actions. They rely on Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), as the basis for their claim to absolute immunity. But as we noted earlier, Supra at p. 632, the Supreme Court recently explained that Barr does not afford protection to a federal official who has exceeded an express statutory or constitutional limitation on his authority. "(A) federal official may not with impunity ignore the limitations which the controlling law has placed on his powers." Butz, supra, 438 U.S. at 489, 98 S.Ct. at 2902. Plaintiffs have presented considerable evidence to support their allegations that the federal defendants violated both constitutional and statutory limitations on their authority. Thus, the absolute immunity granted to federal officials pursuant to Barr does not apply to the federal defendants in this case.
 
 
 172
 Butz made clear that federal officials should receive no more judicial protection from liability for violating an individual's civil rights than their state counterparts. The Court stated:
 
 
 173
 . . . in the absence of congressional direction to the contrary, there is no basis for according to federal officials a higher degree of immunity from liability when sued for a constitutional infringement as authorized by Bivens than is accorded state officials when sued for the identical violation under § 1983.
 
 
 174
 Id. 438 U.S. at 500, 98 S.Ct. at 2907.[32] It must be remembered, though, that while Butz concluded that federal officials exercising discretion generally are protected only by qualified immunity for their official actions, there are "exceptional situations" where "absolute immunity is essential for the conduct of public business." Id. 438 U.S. at 507, 98 S.Ct. at 2911. The situation of these federal defendants is not exceptional. They were, according to their own characterizations, law enforcement officials investigating potential wrongdoing. It is a firmly established rule that such activity by state law enforcement officials warrants only qualified immunity. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). And as the Supreme Court observed in Butz : "We see no sense . . . in distinguishing between state and federal police participating in the same investigation." Butz, supra, 438 U.S. at 500, 98 S.Ct. at 2908. Thus we conclude that the federal defendants in this case are not absolutely immune from liability for their actions and are protected only by the doctrine of qualified official immunity.
 
 C. Qualified Immunity
 
 175
 The test for applying the doctrine of qualified immunity to a given defendant was most recently restated by the Supreme Court in Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 54 L.Ed.2d 24 (1978). See also Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court in Procunier described the two circumstances in which an official ordinarily insulated by qualified immunity would be exposed to section 1983 liability. First, the Court said:
 
 
 176
 (T)he immunity defense would be unavailing to petitioners if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm.
 
 
 177
 Procunier, supra, 434 U.S. at 562, 98 S.Ct. at 860. See Wood, supra, 420 U.S. at 322, 95 S.Ct. 992. Alternatively, the Court stated that qualified immunity is not available
 
 
 178
 where the official has acted with "malicious intention" to deprive the plaintiff of a constitutional right or to cause him "other injury." This part of the rule speaks of "intentional injury," contemplating that the actor intends the consequences of his conduct. See Restatement (Second) of Torts § 8A (1965).
 
 
 179
 Procunier, supra, 434 U.S. at 566, 98 S.Ct. at 862.
 
 
 180
 The allegations of plaintiffs in this case clearly complain of official misconduct which is outside the ambit of the doctrine of qualified immunity. If plaintiffs prove their case against the defendants, the doctrine of qualified immunity will not thwart recovery of damages. The rights which plaintiffs contend that defendants have violated are clearly established. Plaintiffs have presented evidence which could suggest that the defendants both as part of a conspiracy and individually violated, among others, their clearly established First,[33] Fourth,[34] and Fourteenth Amendment rights.[35] And defendants have not shown as a matter of law that they should not have known either that these rights existed or that their alleged conduct violated them. See Procunier, supra, 434 U.S. at 562, 98 S.Ct. 855. Thus, we hold that the question whether defendants reasonably believed that their conduct did not violate a constitutional right, given the evidence presented at trial, should have been submitted to the jury.[36]
 
 
 181
 In summary, Hanrahan's decision to file criminal charges against the survivors, his presentation of evidence to the grand jury, and his eventual decision to drop these charges, are absolutely immune from civil liability under the Imbler doctrine. Similarly, the activities of Jalovec, Sorosky, and Meltreger at the IID hearing are absolutely immune. All the remaining activities of the defendants in this controversy are protected only by a qualified immunity, and a determination of whether their actions satisfy the conditions for this defense must await the retrial.
 
 VII. VALIDITY OF THE SEARCH WARRANT
 
 182
 The police officers who went to 2337 West Monroe Street on December 4, 1969 were acting pursuant to a warrant issued by a Cook County circuit judge. The warrant was supported by an affidavit in which Groth stated that a reliable informant had provided information that illegal weapons were present in the Monroe Street apartment. Groth's complaint for the search warrant further stated that Jalovec told Groth that he too had a conversation with a reliable informant who told him that illegal weapons were stored in the apartment.
 
 
 183
 The plaintiffs seek disclosure of the identity of Groth's informant.[37] The plaintiffs contend that only disclosure of the identity of Groth's informant if, in fact, one exists will permit a full inquiry into whether probable cause existed for the issuance of the warrant. If Groth did not have an informant, or his informant did not provide the information contained in the affidavit, or the informant was unreliable, the validity of the warrant would be in jeopardy and plaintiffs' Fourth Amendment violation claims would be strengthened.[38] Further, plaintiffs contend that the search warrant was merely a pretext for the raid and that misrepresentations in the affidavit would constitute evidence of a conspiracy to violate the civil rights of the plaintiffs. If Groth did not receive the information contained in his affidavit from a reliable informant, this contention would be strengthened.
 
 
 184
 In his complaint for the search warrant, Groth stated that his informant had been inside the Hampton apartment on December 1 and had seen illegal weapons. The complaint also stated that this informant had provided reliable information which led to two prior, successful raids for illegal weapons and information which led to several convictions. At his deposition five years later, Groth said that this informant had told him about illegal weapons, persons who frequented the apartment, and the layout of the apartment. When asked about the informant's identity and reliability, however, Groth refused to elaborate further upon the information contained in the affidavit, saying that to do so would endanger the lives of other persons.
 
 
 185
 At trial Groth persisted in his refusal to answer questions which related to the identity of the informant. Plaintiffs moved to compel his testimony. The trial judge then held a private, In camera, off-the-record meeting with Groth in which he asked him only one question the identity of his informant. Groth refused to answer, saying that he would maintain his silence even if it would lead to "consequences" for him. On the record the court repeated the question and received the same answer. The court then denied plaintiffs' motion to compel Groth's testimony.
 
 
 186
 The trial court did not permit the development of a record on the questions of Groth's credibility regarding the existence and reliability of his informant and the danger the informant might be subjected to if his identity were disclosed. The court concluded that the reliability of Groth's informant was established by the results of the raid and, therefore, inquiry into his identity was irrelevant. At the end of trial, the judge refused to give instructions to the jury which would have allowed it to decide whether the informant existed and whether information about the informant was relevant to the conspiracy and Fourth Amendment claims of plaintiffs.
 
 
 187
 Since Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), it has been clear that the so-called informer's privilege (the privilege that protects the identity of a person which otherwise would be required to be disclosed during the course of litigation) is not absolute.[39] In Roviaro the Court said, "Where the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." Id. at 60-61, 77 S.Ct. at 628. The Court went on to explain the test to be applied to determine when disclosure is required:
 
 
 188
 We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.
 
 
 189
 The Roviaro test has been applied in the context of civil litigation in a variety of cases, See e. g., Socialist Workers Party v. Attorney General, 565 F.2d 19 (2d Cir. 1977) Cert. denied, 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978); Westinghouse Elec. Corp. v. City of Burlington, 122 U.S.App.D.C. 65, 351 F.2d 762 (1965), and we see no reason to depart from this well-established rule. The language employed by the Court in Roviaro encompasses civil litigation as well as criminal litigation, and the competing interests underlying the privilege and its exceptions are essentially the same in both contexts.[40] See Westinghouse, supra, 122 U.S.App.D.C. at 72, 351 F.2d at 769. As the Westinghouse court concluded, "The Roviaro balance should be struck in each case, civil and criminal, in deciding whether disclosure 'is essential to a fair determination of a cause.' 353 U.S. at 61, 77 S.Ct. at 628." Id. And in striking this balance, the court should examine the "relevance" of the informer's information to "possible defenses,"[41] the "possible significance" of the information, and "the seriousness of the litigation." Id. 122 U.S.App.D.C. at 74, 351 F.2d at 771.
 
 
 190
 The trial judge never attempted to apply the Roviaro balancing test or to determine whether disclosure was essential to a fair determination of plaintiffs' cause of action. The judge, in fact, resisted plaintiffs' efforts to develop a record on these issues. Ordinarily, we would remand the disclosure issue to the trial court for adjudication under the appropriate legal standards. In this case, however, enough evidence relevant to the validity of Groth's assertion of informer's privilege has been amassed throughout the trial to make such a remand unnecessary.
 
 
 191
 A considerable amount of evidence was introduced leading to the conclusion that either Groth did not have an informant and merely repeated information he had received from Jalovec in the affidavit for the warrant or that O'Neal was Groth's informant as well as the ultimate source for Jalovec's information. First, Groth had no record of payments to his informant since, according to Groth, the informant's information was provided for advancement in other areas. Groth never elaborated what these incentives were. Further, the similarity of the content and the timing of the information received by Jalovec and Groth is striking: Each said that on December 2 his informant told him about the weapons, inhabitants and visitors to the apartment, the apartment's layout, and the BPP meeting on December 3. And while, as the state defendants correctly indicate, this could mean simply that the reports provided by two different sources were corroborated, the fact that each report was similarly incorrect about the number of sawed-off shotguns in the apartment casts doubt on this explanation. Groth's destruction of all the information he received from his informant, including the floorplan he allegedly constructed based on his informant's description of the apartment, also undermines Groth's claim that he had an independent source. More importantly, Jalovec asked Mitchell after the raid if he cared whether it was disclosed that he was "the source" for the information leading to the raid. And both Piper and Mitchell sent memoranda to the FBI in Washington which said that O'Neal was the only source for the preraid information about the weapons and the apartment.[42]
 
 
 192
 A determination that Groth's informant did not exist would have significant ramifications for plaintiffs' case. The warrant used to gain entry to the apartment would be supported only by the misrepresented, triple hearsay Groth received from Jalovec, and Groth's own perjured statement. Perhaps more importantly, such a conclusion would bolster plaintiffs' conspiracy claims. It would be powerful evidence of Groth's bad faith vis-a-vis plaintiffs. And it would highlight the importance of the federal defendants in the alleged conspiracy. If O'Neal was the only eyewitness informant able to provide the crucial pre-raid information about the apartment, there could be no question that he and his conduit to the state defendants, Mitchell, were indispensable to the entire operation.
 
 
 193
 Even if Groth did have an informant, disclosure of his identity would be important to a resolution of the case since that informant might be a critical figure in the conspiracy alleged by plaintiffs. If O'Neal, who was being paid for his work by the federal defendants, was also the informant Groth relied on in his affidavit, plaintiffs would have additional evidence of the federal involvement in the raid itself. Further, the person described by Groth as his informant according to Groth a member of the BPP could be a coconspirator. Groth said that his informant asked when he was going to "move on the crib," and provided information about the weapons when told that the presence of weapons in the apartment would precipitate a raid. Also, as a member of the BPP, Groth's informant may have been in the apartment or at least with Hampton the night before the raid an important fact given the testimonial and scientific evidence introduced by plaintiffs suggesting that Hampton had been drugged prior to the raid.
 
 
 194
 Disclosure of Groth's informant's identity is "essential to a fair determination" of this case. Roviaro, supra, 353 U.S. at 61, 77 S.Ct. 623. The plaintiffs' request for disclosure is based neither on mere speculation about the informant's identity, See United States v. Prueitt, 540 F.2d 995 (9th Cir. 1976), Cert. denied, 429 U.S. 1063, 97 S.Ct. 790, 50 L.Ed.2d 780 (1977), nor on a desire to extract punitive damages from an additional defendant. See Black v. Sheraton Corp. of America, 184 U.S.App.D.C. 65, 564 F.2d 550 (1977). We are mindful of "the public interest in protecting the flow of information," Roviaro, supra, 353 U.S. at 62, 77 S.Ct. at 629, but we also are aware of the need to maintain the integrity of and confidence in the criminal justice system. The assertion of informer's privilege by a law enforcement official defending against a civil suit for damages based on his own alleged official misconduct should be scrutinized closely.
 
 
 195
 This case, in which plaintiffs have alleged gross misconduct by federal and state law enforcement officials and have presented serious evidence to support these claims, is of paramount significance. There is a serious factual controversy focusing on the existence or identity of Groth's informant, and a resolution of this controversy is essential to a just adjudication of plaintiffs' claims. Thus, we conclude that the public's interest in encouraging the flow of information to law enforcement officials cannot prevail in this case, and that Groth must disclose the identity of his informant. In order to minimize both the risks to this particular informant and any adverse effects on law enforcement generally, we suggest that the appropriate parties move at the retrial for a protective order to set the terms of this disclosure.
 
 VIII. CHALLENGED DISCOVERY RULINGS
 
 196
 Even though the judgments for the defendants must be vacated and the cause remanded for a new trial because of the trial judge's errors in directing verdicts for the defendants, we deem it necessary to discuss a separate issue: the delaying and obstructive tactics of the federal defendants and their counsel in matters of discovery. To demonstrate the importance of the delay and its crippling effect on plaintiffs' case, a full summary must be undertaken. Only for the sake of brevity do we refrain from reciting all the details.
 
 A. Pre-Trial Discovery
 
 197
 In March 1974 a subpoena duces tecum was issued for FBI Agent Roy Mitchell's deposition calling for all information furnished by O'Neal on plaintiffs and the BPP from 1968 through 1970. In April 1974 thirty-four documents were turned over by the defendants. By affidavit the FBI represented that these were the only ones within the scope of the subpoena. Government counsel affirmed this in open court.
 
 
 198
 In July 1974 a subpoena duces tecum was served on Marlin Johnson for FBI files on plaintiffs and the BPP. No documents were produced, and Johnson refused to answer questions on deposition about the FBI's counterintelligence program and the federal grand jury proceedings.
 
 
 199
 In the latter part of 1974 plaintiffs subpoenaed FBI Agent Robert Piper and the Special Agent-in-Charge of the Chicago FBI office, Richard Held, for depositions duces tecum. No documents were furnished. Assistant United States Attorney Arnold Kanter informed the court that he had reviewed the FBI files and found the thirty-four documents already furnished were the only ones that were relevant. Piper refused to answer deposition questions on matters such as the counterintelligence program, wiretaps, and informants.
 
 
 200
 In response to the Held subpoena, Government counsel, in February 1975, delivered a packet of counterintelligence documents to the trial judge for an In camera inspection on the representation that the documents were "irrelevant." Over plaintiffs' protest the judge examined the documents before plaintiffs could be heard on the propriety of the submission. The judge ruled that the counterintelligence information which he had examined In camera was "irrelevant and immaterial." Later it was discovered that among the documents submitted were the Jeff Fort "hit letter;" a memo which applauded the December 4, 1969 raid as a counterintelligence achievement; documents which showed O'Neal to be implementing counterintelligence operations and acting as a provocateur; and a directive from the FBI headquarters in Washington which called for measures to "cripple" the BPP.
 
 
 201
 In March 1975 the trial judge entered an order at plaintiffs' request requiring the production of documents that contained information relating to plaintiffs or the raid. In June 1975 plaintiffs received 193 documents in response to this order.
 
 
 202
 The FBI witnesses continued to refuse to answer any questions on deposition that related to their counterintelligence activities on the BPP. In August 1975 plaintiffs renewed their attempts to subpoena documents from the FBI files. Government counsel resisted and made representations to the effect that plaintiffs had received all pertinent documentary material. The subpoena was denied by the trial judge. Three additional attempts made by plaintiffs prior to trial brought similar results. In fact, the last effort to obtain relevant documents was denied by the judge before Government counsel filed their response.
 
 B. Trial Discovery
 
 203
 When the trial started in January 1976 plaintiffs had received over 200 extensively excised documents from the FBI. On the opening day of trial, plaintiffs issued trial subpoenas on Held, Mitchell, Piper, and Johnson calling for relevant counterintelligence documents. After the jury was selected, the judge admitted that he had made a "mistake" in allowing the federal defendants to determine the relevancy of the documents. He thereupon ordered the complete O'Neal and plaintiffs' files maintained by the FBI to be turned over to plaintiffs as well as the counterintelligence documents which plaintiffs had previously sought. In response to the order, Government counsel turned over approximately 100 documents which contained many deletions. Hearings were held to determine the propriety of the deletions. The court sustained all deletions which did not mention the BPP directly.
 
 
 204
 On February 2 plaintiffs moved to reopen discovery in order to depose the FBI defendants and other agents. Three days later plaintiffs again issued a trial subpoena on Held, this time requesting certain documents relating to the case, including those concerning the Racial Matters Squad and payments to O'Neal. Government counsel moved to quash the subpoena and Assistant United States Attorney Kanter represented to the court that the plaintiffs would be furnished the entire O'Neal file, including all information concerning payments to him. On February 26 the FBI completed its turnover of the O'Neal documentary material, and again it was represented that this constituted the complete file.
 
 
 205
 At a later date Mitchell was called to the stand. Prior to his testimony, plaintiffs asked for a hearing to review the Government's deletions in certain documents which had been furnished. During the hearings relevant documents which had not been produced were discovered to exist in the Government's files. Moreover, after Mitchell took the stand he volunteered certain information allegedly supplied by O'Neal that was not contained in any document which had been produced by the Government. The court ordered Mitchell to search for the document. Kanter again represented that the complete O'Neal file had been furnished. While Mitchell was still on the stand, he reported that he had found the document in a FBI file relating to a BPP member who lived in Rockford, Illinois. Mitchell conceded that the document should have been placed in the Hampton or O'Neal files but that it had not been located there. Plaintiffs then moved for the complete Hampton and O'Neal files to be brought into open court. The court granted the request. Although Kanter admitted that the O'Neal documents were indeed located in the Hampton and O'Neal files, he excused the nonproduction as an oversight.
 
 
 206
 Despite the court's order, Kanter produced only one volume of the O'Neal file. Thereupon the judge ordered that the entire files on Hampton, O'Neal, the plaintiffs, and the BPP be brought into the courtroom. The Government responded that there were 135 volumes of files which responded to the court's order. The next morning the Government produced nearly 200 volumes of files in open court. Although acknowledging that the documents should have been produced earlier, the judge stated that he deemed it a mistake or negligence on the part of the FBI in failing to comply with his order. He informed the jury that they were to "blame him" rather than the parties or their attorneys. Plaintiffs moved for sanctions, including holding the Government attorneys in contempt. The judge refused to hear the motions, indicating that he would defer any hearings until after the trial. The judge, however, said that he would allow plaintiffs to recall the federal defendants to the witness stand in order to examine them on documents which plaintiffs did not have at the time of the witnesses' examinations.[43] Plaintiffs asked that the trial be suspended until all the documents had been produced. The judge denied the request.
 
 
 207
 On April 8, three months after the trial began, Government counsel completed the turnover to plaintiffs of the twelve volumes of Hampton files and sixteen volumes of O'Neal files. One of the O'Neal files contained a document written by Piper claiming FBI credit for the December 4 raid and asking that the FBI pay a bonus to O'Neal for his furnishing the floorplan of the apartment and setting up the raid. At that point the Government's entire turnover consisted of fifty volumes of documents, of which plaintiffs had received about six percent before Mitchell's inadvertent reference to the O'Neal document.
 
 
 208
 On April 16, 1976 the FBI revealed to the court and plaintiffs' counsel the existence of 45 additional files in its possession pertaining to the case. On May 6 the Government furnished two volumes of documents relating to plaintiffs. Among these documents were instructions from the FBI's headquarters in Washington "to destroy what the BPP stood for," to engage informants in thefts of BPP records and documents, to escalate actions against the Panther Breakfast Program for Children and other similar activities, and to combat the adverse publicity of the December 4 raid. Many of these instructions had Piper's and Johnson's initials on them.
 
 
 209
 On May 11, 1976, four months into the trial, the court ordered the production of other FBI files, including the balance of its counterintelligence program file. In response the Government furnished thirteen additional files. These included three volumes of counterintelligence, three volumes relating to federal grand jury proceedings, two volumes relating to the Breakfast Program, and one volume concerning the June 4, 1969 search of the BPP headquarters. In these files were counterintelligence documents which called for the destruction of the Breakfast Program and for the use of local police to harass the BPP for possession of guns. Many of these documents were approved by Johnson, Piper, and Mitchell. On June 14, 1976 the Government furnished the plaintiffs two more volumes of documents; these related to wiretaps on the BPP.
 
 
 210
 On June 30, 1976 the court finally denied plaintiffs' motion to reconsider its February 26 order which quashed the second Held trial subpoena duces tecum. The court also denied plaintiffs' request for production of other files relating to the case, finding that their production would be duplicative of the files already produced. The court also found that the Government's deletions and withholdings were proper.
 
 
 211
 It is clear that federal defendants, Johnson, Piper, and Mitchell, and their counsel, rather than promptly furnishing relevant documents as requested, deliberately impeded discovery and actively obstructed the judicial process, thus denying plaintiffs the fair trial to which they were entitled.[44] Regrettably, the trial judge permitted these tactics. Moreover, he repeatedly exonerated the federal defendants for their derelictions. Instead of applying sanctions on these defendants and their counsel, the court assessed costs against plaintiffs in excess of $26,000 for the Government's time in reproducing the documents which were finally furnished to plaintiffs only under the orders of the court.
 
 
 212
 If there were any doubts about the sufficiency of the evidence when considered under the applicable standard constituting a jury question on liability, the delay of the federal defendants in meeting their obligations to produce relevant documentary material would supply a basis for an inference that plaintiffs were unable to present all the available evidence and thus were denied the opportunity to prove their case. On retrial the court should consider plaintiffs' contention that they ultimately were denied full discovery. Moreover, sanctions should be imposed, pursuant to Fed.R.Civ.P. 37(b)(2), against the federal defendants and counsel representing them at the first trial for repeatedly disobeying court orders to produce documentary material.[45]
 
 IX. DISMISSAL OF BREWER'S DIVERSITY COUNTS
 
 213
 The state defendants challenge the appealability of the trial court's dismissal of Counts 15, 16, and 17 of the amended complaint. Plaintiff Verlina Brewer originally filed a separate complaint against the state defendants, including the City of Chicago and Cook County, Illinois. The complaint alleged common law torts of assault and battery, false imprisonment, and malicious prosecution. Jurisdiction was based on diversity of citizenship. 28 U.S.C. § 1332. In the consolidated amended complaint the three counts of the original complaint became Counts 15, 16, and 17, respectively.
 
 
 214
 Prior to trial, state defendants moved to dismiss the Brewer counts for lack of diversity or, in the alternative, to sever them for trial. The district court granted severance, and took under advisement the dismissal aspect of the motion. At the conclusion of trial and after the state defendants had again moved to dismiss the Brewer counts, the district court on June 30, 1977 filed an order which read in pertinent part:
 
 
 215
 For the reasons set forth in the State defendants' original motion, their recent motion and in the arguments of counsel for the State defendants and based upon the entire record of this case, the court finds that said counts 15, 16 and 17 should be dismissed.
 
 
 216
 The actual dismissal order was entered July 1, 1977.
 
 
 217
 Prior to the events just described, the district court on April 15, 1977 granted motions for directed verdicts in favor of all defendants except the seven shooters. Later, on June 20, 1977, the court granted directed verdicts in favor of these seven and entered judgment for all the defendants on the basis of the directed verdicts. The court's order reads:
 
 
 218
 It is Ordered and Adjudged that the Court finds as a matter of law that the plaintiffs and each of them have failed to sustain their burden of proof on the issues of each and every count remaining in the plaintiffs' amended complaint, accordingly the defendants' motion for a directed verdict in favor of each and every defendant and against each and every plaintiff is granted and judgment is entered herein together with costs against each and every plaintiff and in favor of each and every defendant.
 
 
 219
 On June 22, 1977 plaintiffs, including Brewer, filed a notice of appeal from the orders of April 15, 1977 and June 20, 1977.
 
 
 220
 It is apparent from this sequence of events that the notice of appeal filed June 22, 1977 did not encompass the dismissal of Counts 15, 16, and 17 which occurred on July 1, 1977. No notice of appeal was filed with respect to these specific counts. Brewer's argument is that this defect in the notice of appeal should not be fatal because an intent to appeal the district court's ruling regarding her common law counts can be implied. The argument is unpersuasive. Although courts generally have held that an error in designating the judgment appealed from is not per se fatal if an intent to appeal from a specific judgment can be inferred, Daily Mirror, Inc. v. New York News, Inc., 533 F.2d 53, 56 (2d Cir.), Cert. denied, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 140 (1976), that rule has no application here. Because of the severance, the judgment for the defendants based on the directed verdicts did not affect the viability of Brewer's common law counts. Therefore no inference of inclusion in the only notice of appeal can be made.
 
 
 221
 Accordingly, the dismissal of the Brewer common law counts is not properly before us.
 
 X. ATTORNEYS' FEES
 
 222
 Plaintiffs seek, in addition to a reversal of the district court judgments and a remand for a new trial, an award of attorneys' fees for "their efforts to date." The request is based on the Civil Rights Attorney's Fees Awards Act of 1976 (the Act), Pub.L. No. 94-559 (Oct. 19, 1976), codified in42 U.S.C. § 1988. We grant the request for an award of attorneys' fees for their appellate work, but hold that plaintiffs presently are not eligible to receive an award for their trial endeavors.
 
 Section 1988 as amended reads:
 
 223
 In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
 
 
 224
 This court has recently held in Davis v. Murphy, 587 F.2d 362 (7th Cir. 1978), that the Act permits a prevailing plaintiff on appeal to receive fees for appellate work. Accordingly, we have the discretion to award a reasonable fee to plaintiffs as part of their appellate costs unless special circumstances render such recovery unjust. Fed.R.App.P. 39. See also Wharton v. Knefel, 562 F.2d 550 (8th Cir. 1977). A review of the record fails to disclose any special circumstances which would render an award inequitable.[46] No affidavits have been submitted by plaintiffs, however, to support their request. Therefore, plaintiffs should submit to this Court a statement of the fees requested supported by any relevant material and in affidavit form. Defendants shall be afforded an opportunity to respond. Employing the standard expressed in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), factors bearing on the amount of the award will include
 
 
 225
 (1) the time and labor required; (2) the novelty and difficulty of the question presented; (3) the skill required to perform the legal services; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; (12) awards in similar cases.
 
 
 226
 Id. at 717-19, as cited in King v. Greenblatt, 560 F.2d 1024, 1026-27 (1st Cir. 1977), cert. denied, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978).
 
 
 227
 Plaintiffs also seek attorneys' fees for their trial work. The language of the Act precludes an award to the unsuccessful party in a civil rights trial. In the case at bar, plaintiffs were not "the prevailing party" at the trial level and therefore are not permitted to receive fees for that effort under section 1988. In light of our decision today, however, we hold that if plaintiffs ultimately prevail, the district court shall award reasonable attorneys' fees for the district court phase of the case preceding this appeal in addition to any further attorneys' fees the trial court may deem appropriate after retrial.
 
 XI. CONTEMPT JUDGMENTS
 
 228
 In separate appeals Jeffrey H. Haas and G. Flint Taylor, attorneys for plaintiffs, asked that the contempt judgments entered against them be reversed. These appeals have been consolidated with the main appeal. In order to appraise fully these contempt matters, it is necessary to present the facts in detail.
 
 TAYLOR
 
 229
 In the last days of October 1976 plaintiffs called Robert Zimmers, the FBI firearms expert, as a witness. On November 1, while Zimmers was on the stand, the following took place:
 
 
 230
 Mr. Haas (attorney for plaintiffs): I now show you what I will mark as RZ51 and ask you what type of weapon is this, sir?
 
 
 231
 Mr. Zimmers: A double-barrelled Stevens shotgun, which bears serial number 43312 . . . .
 
 
 232
 Mr. Haas: Could we have a stipulation, your Honor, that this weapon was taken on the raid by George Jones?
 
 
 233
 Mr. Witkowski (attorney for defendants): Yes.
 
 
 234
 The Court: So stipulated . . . Let the record show that counsel has so agreed.
 
 
 235
 Mr. Witkowski: Yes, your Honor.
 
 
 236
 Several days later Haas again presented the Jones shotgun to Zimmers on the witness stand.
 
 
 237
 Mr. Haas: And is that the item, RZ51, the double standard sawed-off shotgun which we have shown you earlier, sir?
 
 
 238
 Mr. Zimmers: . . . Yes, this is the one.
 
 
 239
 Mr. Haas: And it has been stipulated that this is the weapon that was carried by Officer Jones on the raid of December 4, 1969.
 
 
 240
 At that point defense counsel objected. The judge said he would hear the objection outside the presence of the jury. Attorney John P. Coghlan, defense counsel, then argued that the defendants had never entered into a stipulation using the word "raid." He accused Haas of a "deliberate, wilful and intentional attempt to prejudice the jury." Haas said that his statement about the stipulation was accurate. At that point Taylor asked for a recess so that the transcript could be inspected. The judge denied the request.
 
 
 241
 When the jury returned to the courtroom, the judge announced: "Mr. Haas has deliberately and wilfully misread a statement. I direct you (Haas) to read that statement, that stipulation, corrected." Haas said he had stated the stipulation correctly. The judge then asked Coghlan to "state the stipulation correctly." Coghlan extemporized:
 
 
 242
 Mr. Coghlan: The stipulation is that the weapon that was shown to the witness was one of the weapons carried by the officers serving a search warrant at 2337 W. Monroe.
 
 
 243
 The Court: Now that is it . . . .
 
 
 244
 During the next two days plaintiffs' counsel repeated their requests on several occasions to review the court's transcript because they had none of their own. Finally, on November 10, the judge permitted the inspection.
 
 
 245
 The next day plaintiffs' counsel presented a motion to "Correct Prejudicial Remarks Made by the Court to the Jury and For Mistrial," supported by the transcript showing Haas' statement was not a misrepresentation. The judge summarily said he was taking the motion under advisement, and gave defense counsel ten days to respond. Haas argued that the prejudice should be cured as soon as possible. The judge refused to reconsider. At that point counsel for plaintiffs returned to their table flinging down their papers. Taylor's hand struck a pitcher of water on the table. The pitcher slid along the table top and fell to the floor near the jury box. The glass lining broke and water spilled on the rug. All of this took place while the court was in recess and the jury out of the courtroom. The transcript reads as follows:The Court: I have entered my order.
 
 
 246
 Now, there is one juror who has not arrived yet. We will now recess until
 
 
 247
 All right. Let the record show the conduct of both counsel in throwing papers around and one of them what is it that is broken over there?
 
 
 248
 Mr. Coghlan: Sir, there is broken a glass water pitcher.
 
 
 249
 The Court: All right. Mr. Taylor, you did that, and you are now held in contempt of court, and the Court now orders you committed to the custody of the Attorney General of the United States for a period of 24 hours, and orders the Marshal to take you into custody forthwith.
 
 
 250
 Mr. Taylor: May I be heard, your Honor?
 
 
 251
 The Court: No, sir.
 
 
 252
 Mr. Taylor: I have the right to speak before I am summarily sentenced, and I want to say
 
 
 253
 The Marshal: This court will stand in recess.
 
 
 254
 After a brief recess, the trial resumed. The judge ordered that the pitcher and debris be left before the jury box. Haas made several requests to be heard out of the presence of the jury concerning the incident. The requests were denied. The judge, however, did grant a request of Special Corporation Counsel Camillo F. Volini that Volini's photographer take pictures of the broken pitcher. Although the judge refused to permit the press to take photographs, he told Volini that "they (the press) may have a copy of the picture that is taken." He also told defense counsel to have the press "pay you whatever it costs," if they desired a copy.
 
 
 255
 After the incident, an attorney appeared on behalf of Taylor and attempted to be heard. The judge refused the request telling the attorney to return later in the day. Near the close of the afternoon session, the judge, without hearing argument on behalf of Taylor, entered the following order:
 
 
 256
 The Court finds that a motion was made by counsel for plaintiffs herein, and the Court ordered counsel for defendants to answer the same within 10 days. Both Jeffrey Haas and G. Flint Taylor, two of the attorneys for plaintiffs, demanded an oral hearing, which the Court denied. Immediately after the Court refused to hear them orally, Attorney G. Flint Taylor, In a fit of anger, threw paper, books and other objects on the table for counsel, including a decanter with an inside glass lining, which was broken. Water and glass were sprayed over the floor in front of the jury box. Present in the Court were a number of spectators and representatives of the press.
 
 
 257
 The Court finds that such action was a contemptuous and constituted willful and deliberate contempt of this Court in its presence at 10:30 a. m., November 11, 1976. The Court does hereby find Attorney G. Flint Taylor in contempt of Court, and does hereby order and direct that he be and is hereby committed to the custody of the Attorney General of the United States for a period of 24 hours, ending at 10:35 a. m. on November 12, 1976.
 
 
 258
 The Court further orders and directs the United States Marshal to immediately execute this order and take Attorney G. Flint Taylor into custody forthwith.
 
 
 259
 The judge immediately amended the order by substituting the words "in the presence of the Court" for "in a fit of anger." He also commuted the time to be served.
 
 HAAS
 
 260
 On February 22, 1977 Hanrahan was recalled as a witness after a four-day interval during which Treviranus had testified regarding the federal grand jury investigation. Treviranus identified a memo he had written which outlined the arrangement between Hanrahan and Assistant Attorney General Leonard whereby the raiders would not be indicted by the grand jury and Hanrahan would terminate the prosecution in the state court against the survivors of the raid. The court had deferred a request to introduce the document while Johnson and Treviranus were under examination. With Hanrahan back on the stand the transcript reads:
 
 
 261
 Mr. Haas: Sir, were you present at a meeting with Marlin Johnson in late March or early April of 1970 in which he indicated that there would be no indictments of police officers or yourself?
 
 
 262
 Mr. Hanrahan: No, sir.
 
 
 263
 Q: Well now, didn't Mr. Hanrahan, didn't you tell the Federal prosecutors on or about April 8 that you were going to drop the indictments against the occupants of the apartment?
 
 
 264
 A: My recollection is that on the second date that I appeared before the Grand Jury I indicated that they would review the indictments that are pending and probably dismiss them.
 
 
 265
 Q: You are referring to May 5th of 1970?
 
 
 266
 A: I am referring to the second occasion that I appeared before the Federal Grand Jury. It was early in the year and I believe it was in May.
 
 
 267
 Q: But prior to that you had entered an agreement with the Federal prosecutors to drop the charges, had you not?
 
 
 268
 A: No, sir.
 
 
 269
 Q: And hadn't you told them that the reason that
 
 
 270
 Defense counsel Volini objected and asked for a hearing outside the presence of the jury. After the jury had left the courtroom, Volini asked that Haas be instructed to cease asking questions concerning the agreement and that the jury be "instructed to disregard it." Arnold Kanter, counsel for the defendants, asserted that Haas should be denied the opportunity to ask more questions concerning such agreements because the witness had already asserted there were none. The judge did not rule on these motions, nor did he wait to hear from plaintiffs' counsel. He called the jury back and said, "The last question is stricken. You will disregard it." Haas then resumed his questioning of Hanrahan:
 
 
 271
 Mr. Haas: Mr. Hanrahan, do you know how it was that Leonard Treviranus knew on April 8th that the Grand Jury
 
 
 272
 Mr. Kanter: Objection.
 
 The Court: Now, Mr. Haas
 
 273
 Mr. Haas: Wait a minute.
 
 
 274
 The Court: we just got through out of the presence of the jury. You will not go into that subject matter any further.
 
 
 275
 Mr. Haas: I didn't even get to argue it. Well, Judge, the deal
 
 
 276
 The Court: I said you will not go into it any further.
 
 
 277
 Mr. Haas: Judge, we can't cover up the coverup.
 
 
 278
 Mr. Witkowski (attorney for defendants): Your Honor
 
 
 279
 Mr. Haas: That is part of our complaint, that they covered up, Judge.
 
 Mr. Coghlan: If the court please
 
 280
 The Court: Mr. Haas, you are now held in contempt of court for the last remark directed to the Court, and I will prepare an order accordingly.
 
 Mr. Taylor: May the jury be excused
 
 281
 The Court: The Court will take a recess, and we will prepare an order holding you in contempt.
 
 
 282
 Mr. Haas: All right, Judge. I think all the people who have spoken the truth have always ended up in contempt, and the coverup goes on and on and on.
 
 
 283
 Mr. Taylor: And Mr. Treviranus testified on Friday, Judge.
 
 
 284
 The Court: I will hold you in contempt and I will now turn you over to the custody
 
 
 285
 Mr. Haas: O.K., Judge.
 
 
 286
 The Court: of the U. S. Marshal for contempt, and hold you in custody until tomorrow morning at 9:00 o'clock.
 
 Mr. Haas: All right, Judge, I would just
 
 287
 Mr. Taylor: There is a document right here that says there was
 
 
 288
 The Court: Court now stands in recess.
 
 
 289
 Haas was taken into custody by the United States Marshal and ordered held until the following morning. An order was entered by the judge that day finding that Haas' "statements and actions in the presence of the Court are serious and that it resulted in the obstruction of the administration of justice . . . ." The judge referred to no specific language, but did recite "certain statements in open court in the presence of the jury as set forth in the transcript of the Court proceedings certified by the court reporter and attached hereto made a part hereof." The court denied a motion for appeal bond, and Haas remained in jail until the next morning. On the following day the judge reversed his ruling and heard extensive testimony from Hanrahan about the alleged arrangement.
 
 
 290
 Unquestionably, a court has the power to punish summarily contemptuous conduct which occurs in the presence, sight, or hearing of a presiding judge. Ex parte Terry, 128 U.S. 289, 302-04, 9 S.Ct. 77, 32 L.Ed. 405 (1888). For example, that the contumacious refusal of a witness to testify, "may so directly obstruct a court in the performance of its duty as to justify punishment for contempt is so well settled as to need only statement." Ex parte Hudgings, 249 U.S. 378, 382, 39 S.Ct. 337, 339, 63 L.Ed. 656 (1919).
 
 
 291
 The power of a federal court to punish immediately and summarily for "direct contempt" is codified in 18 U.S.C. § 401 which provides that:
 
 
 292
 A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as
 
 
 293
 (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice . . . .
 
 
 294
 The Supreme Court, commenting on this statute in In re McConnell, 370 U.S. 230, 233-34, 82 S.Ct. 1288, 1291, 8 L.Ed.2d 434 (1962), explained that this provision was enacted by Congress "in order to correct serious abuses of the summary contempt power that had grown up . . . revealing 'a Congressional intent to safeguard Constitutional procedures by limiting courts . . . to "the least possible power adequate to the end proposed." ' " The Court in McConnell then defined the issue:
 
 
 295
 Thus the question in this case comes down to whether it can "clearly be shown" on this record that the petitioner's statements while attempting to make his offers of proof actually obstructed the district judge in "the performance of judicial duty."
 
 
 296
 Id. at 234, 82 S.Ct. at 1291.
 
 
 297
 In the case before us, paraphrasing the above-quoted language, the question comes down to whether it can "clearly be shown" on the record that the respective conduct of Haas and Taylor actually obstructed the district judge in the "performance of judicial duty." We are convinced that their conduct cannot be so characterized.
 
 
 298
 The Taylor episode must be viewed against the background of the events leading up to it: The trial judge's erroneous accusation before the jury that Haas had deliberately and wilfully misread the statement about the stipulation; the judge's repeated denials to permit the inspection of the court's transcript for verification that Haas had not "misread the statement"; the judge's refusal to correct the record immediately, but in lieu thereof giving the defendants ten days to respond. These combined circumstances apparently caused Taylor to reach the "breaking point" of his patience and forbearance. We also must take into consideration that the episode occurred while the court was recessed, and that the judge permitted the fallen pitcher and broken glass to remain on the floor after the jury returned to the courtroom.
 
 
 299
 While we do not intend to condone Taylor's gesture of anger, we are convinced, in the words of Judge Duffy in his dissent in McConnell, ". . . there was no interference with the conduct of the trial. There was no obstruction in the administration of justice." Parmelee Transp. Co. v. Keeshin, 294 F.2d 310, 318 (7th Cir. 1961). And the Supreme Court agreed with Judge Duffy's appraisal in that case.
 
 
 300
 What we have said about Taylor's complained-of conduct applies to Haas' conduct as well. Haas was held in contempt for saying "we can't cover up the coverup." After saying this, he tried to explain: "That is part of our complaint, that they covered up, Judge." The judge, however, took the remark as personally directed at him. In the context of what had happened before, the judge, in our opinion, had no reason to interpret the remark in that manner, and should have given Haas the benefit of every doubt. This court's statement in In re Dellinger is pertinent:
 
 
 301
 While McConnell cannot be read as an immunization for all conduct undertaken by an attorney in good faith representation of his client, it does require that attorneys be given great latitude in the area of vigorous advocacy. Appellate courts must ensure that trial judges (or the jury on remand) are not left free to manipulate the balance between vigorous advocacy and obstructions so as to chill effective advocacy when deciding lawyer contempts. Admittedly, the line defies strict delineation (Goldfarb, The Contempt Power, 172 (1971)), but by our resolving doubts in favor of advocacy, an independent and unintimidated bar can be maintained while actual obstruction is dealt with appropriately.
 
 
 302
 Attorneys have a right to be persistent, vociferous, contentious, and imposing, even to the point of appearing obnoxious, when acting on their client's behalf. An attorney may with impunity take full advantage of the range of conduct that our adversary system allows.
 
 
 303
 461 F.2d 389, 398, 400 (7th Cir. 1972). Accordingly, we find that the contempt citations are unwarranted when considered in their factual setting.
 
 XII. CONCLUSION
 
 304
 The contempt judgments are reversed. In addition, the directed verdicts are reversed and the judgments of dismissal vacated, except for the claims against Purtell, Koludrovic, Sorosky, and Meltreger and all but the section 1986 claims against Ervanian and Kukowinski. The judgments of dismissal with respect to these claims are affirmed. The judgments for costs against plaintiffs are reversed. Costs on appeal and attorneys' fees are awarded to plaintiffs against all nonprevailing defendants.
 
 
 305
 The cause is remanded to the district court for a new trial. As an administrative matter, the district court is directed to reassign this case under the provisions of Circuit Rule 18 and, because of its age, to direct the judge to whom it is assigned to give the retrial high priority.
 
 
 306
 FAIRCHILD, Chief Judge, concurring.
 
 
 307
 I concur in the opinion written by Judge Swygert except as qualified by the following observations.
 
 
 308
 I agree that, viewing the evidence in the light most favorable to plaintiffs, and drawing all reasonable inferences in their favor, a jury verdict for them on one or more theories of liability could be sustained. I am sure that no more is meant by the frequent references in the opinion to a "prima facie" case. Because so much depends upon the fact-finder's choice among inferences, there was never any stage of this case (with the possible exception of the case against the shooters) at which the evidence compelled a verdict for plaintiffs unless rebutted.
 
 
 309
 I have some problem in analyzing the impact on plaintiffs' case of the several possible findings with respect to a conspiracy. The main objective of plaintiffs appears to be recovery of damages arising from the events of the raid. Undeniably there was loss of life, loss of liberty (including bodily injury), and invasion of privacy. The § 1983 claim for those damages must rest upon establishing that life and liberty were taken without due process of law in violation of the Fourteenth Amendment (or that privacy was invaded in violation of the Fourth and Fourteenth Amendments). If the search warrant was valid and if the force used was not excessive under the circumstances, that § 1983 claim (and any corresponding § 1985(3) claim) must fail.
 
 
 310
 I agree that the jury could properly find a conspiracy by federal and state defendants to discredit and hamper BPP in its political activity and thus impair First Amendment rights. But it would not follow, without more, that the search, if found to be unconstitutional, or the use of force, if found to be excessive, was within the objects of that conspiracy. The activity of the federal defendants in surveillance of a group from whom violent, unlawful conduct was expected, and in informing state officers of the floor plan and possession of weapons could be found to have been legitimate activity and cooperation in law enforcement, and not wrongful acts pursuant to a conspiracy, even though the jury also found a conspiracy to disrupt or discredit BPP politically. In my view, there could be no recovery of damages, arising from the raid, based solely on a conspiracy theory, unless the jury was satisfied that the unlawful raid or the use of excessive force in carrying out a lawful raid was within the objects of the conspiracy.
 
 
 311
 In the discussion of immunity, Judge Swygert suggests that certain defendants may be liable for damages resulting from the generation of post-raid publicity misrepresenting the facts. Whatever course may be followed on retrial with respect to such a claim, it seems clear that plaintiffs cannot recover damages for injury to reputation, without more. See Paul v. Davis, 424 U.S. 693, 712, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).
 
 
 312
 I do not join in directing the imposition of sanctions under F.R.Civ.P. 37(b) (2), although I would favor directing the district court to give consideration to doing so, on remand.
 
 
 313
 I would limit the holding that a prosecutor is not entitled to full immunity while performing "investigative" functions to the investigative functions of the prosecutor defendants described in this case.
 
 
 314
 PELL, Circuit Judge, dissenting in part, concurring in part.
 
 
 315
 It has been difficult for me to place this case in a proper perspective, but following the effort to do so I am convinced that the opinion written by Judge Swygert reaches an incorrect result in a substantial number of instances. Therefore while concurring in that opinion wherein it affirms the district court's judgment and with regard to the reversal as to one group of defendants on one issue, I otherwise respectfully dissent, all as set forth hereinafter.
 
 
 316
 The initial difficulty in acquiring a proper perspective, indeed any kind of an overall view, of the case comes from the sheer volume of material it has generated. To begin with, the mass of documents, which is what this court basically has to go on to make its decision, includes some 37,000 pages of evidence, plus exhibits which we can only view visually as a cold record but which was presented audibly to the district court bit by bit, painstakingly and tediously, over the approximate eighteen months that this civil case jury trial took. Next we have before us the contentions of the parties in the so-called briefs, occupying more than 800 pages. At this point, the accumulation of additional paper might appear to be drawing to a welcome close. There is virtually no dispute as to the basic law applicable to the appellate treatment of directed verdicts. At the risk of over-simplification, they are not favored by the law and the judgments based thereon will be reversed when the evidence reflects that reasonable persons in a fair and impartial exercise of their judgment may draw different conclusions therefrom. Thus it would seem that if the 37,000 pages reasonably exhibited a basis for different conclusions, the resulting decisional opinion, unless it were designed to serve some other purpose than its primary one of disposing of the case, could be of fairly short length. Alternatively, of course, if there is difficulty in finding a solid base in the monumental record we have here for different conclusions under the applicable law, the effort to reverse might necessarily achieve extensive proportions. In any event, Judge Swygert's opinion has added to the bulk more than 125 typed pages.
 
 
 317
 The matter of a proper perspective is further made difficult by the diverse approaches of the parties which I might have assumed before becoming involved in the case was to recover monetary damages for claimed wrongs visited upon them by the state and federal defendants. From my evaluation of their briefs and oral arguments, however, there is not this singleminded pursuit. One group of plaintiffs, whom for convenience of reference I will call the Hampton plaintiffs, consists of the Administratrix of the Fred Hampton estate, Hampton's girlfriend and the mother of his posthumously born child, and two other persons. Of the four Hampton plaintiffs, three were present in the apartment at the time the raid occurred and two of the three were wounded. The fourth Hampton plaintiff is the personal representative of one of the two persons killed in the raid.
 
 
 318
 While the compact original brief filed by the attorney for the Hampton plaintiffs does purport to incorporate by reference most of the issues and supporting arguments advanced by the remaining plaintiffs (with the exception of those dealing with the bias and prejudice of the trial judge and his failure to recuse himself), this brief "relates to the directed verdict granted, following the dismissal of the jury as distinguished from the (earlier) directed verdict regarding the Federal and certain State defendants." While the reply brief of the Hampton plaintiffs does advance some argument as to the conspiracy and liability vis-a-vis the federal defendants, it appears abundantly clear to me that the prime thrust of the Hampton plaintiffs both in briefing and oral argument is toward the most vulnerable underside of this litigation, the directed verdict as to the defendant raiders who engaged in shooting in the apartment. This appears to me to be a realistic evaluation of this civil damage case and one best designed to achieve the purpose of the case, that of expeditiously collecting damages from claimed wrongdoers without undertaking once again the agonizingly extended trial of extraneous political issues. I can only assume that the Hampton plaintiffs' attorney is pursuing that which his clients most desire, compensation for the wrong which they feel they suffered.
 
 
 319
 The remaining five plaintiffs, designated for convenience as the Anderson plaintiffs, includes the Administratrix of the Estate of Mark Clark and two more of those who were wounded. While all of these people no doubt will not spurn any recovery that might be made in their behalf, I come away from an examination of this case with the distinct sensation that the Anderson plaintiffs' lawyers, although equally willing for and desirous of a substantial money recovery, are fervently bent on attempting to demonstrate the existence of a widespread and sinister conspiracy among top law enforcement officials, state and federal, serving in the Chicago area in 1969, to kill Fred Hampton and other functionaries of the Black Panther Party. Their wide-ranging and vociferous charges indicate that the conspiracy was racially motivated to put down and destroy people associated with a political movement. But, the tenor and scope of their assertions is best illustrated by these quotations from their brief's Introduction and Statement of the Case:
 
 
 320
 In response to this challenge to white supremacy, the F.B.I. mobilized to stop this political movement. They implemented and refined illegal, unconstitutional counterintelligence tactics designed to neutralize and destroy these organizations with special, violent emphasis on those leaders and organizations such as the B.P.P. who sought the liberation of black people. This program, implemented and run in Chicago by the F.B.I. Defendants, solicited and obtained the willing assistance of State's Attorney EDWARD HANRAHAN who was himself anxious to gain political prominence by exploiting racism. HANRAHAN and his special political police force, in conspiracy with these F.B.I. Defendants, planned and executed the murderous December 4th raid at the apartment of the Plaintiffs. . . . After Hampton and Mark Clark were killed, a concentrated effort was launched by City, County and Federal officials to cover up both the true nature of the political assassination as well as their involvement in it. They manipulated the judicial system at every turn to accomplish this end. HANRAHAN used his power as State's Attorney to falsely charge the survivors, and to prosecute them for six months to mask his culpability and that of his police. Richard Nixon's Justice Department, in cooperation with the F.B.I., used a Federal Grand Jury investigation to cover up the F.B.I. involvement in the raid and subsequently entered into an agreement with HANRAHAN which saved him from indictment in exchange for HANRAHAN's continued silence concerning the F.B.I. involvement. The Justice Department then attempted to put the controversy to rest in the public eye by releasing a report which was critical of both the police and the Panthers. . . . By the fall of 1975, pretrial discovery, because of Defendants' obstructions, served little purpose except to frustrate the search for truth, the Court's prejudice having similarly frustrated this search. . . . January 1976, the Plaintiffs went to trial in front of a Judge determined to defeat their claims and with much of the evidence which proved the F.B.I. Defendants' involvement in the raid still being concealed by the Defendants and their attorneys. . . . After 15 months of treachery to the Plaintiffs' claims the District Court, four days before the mayoral primary in which HANRAHAN was a candidate, directed verdicts for all the Defendants except those seven raiders who admitted to firing their weapons at the apartment. . . . Plaintiffs appeal, but they seek not only reversal of these grossly unfair and illegal verdicts, but sanctions and fees against the parties and their attorneys who knowingly obstructed justice in the Court below, and appropriate orders to assist them to finally obtain the discovery to which they are entitled, and strong rebuke to the trial Court who completely abused his power, trammelled the Constitution and nullified the Civil Rights Act.
 
 
 321
 Thus it seems although they are not charged as unindicted co-conspirators that the entire officialdom of government from the President to the federal district judge were intent upon bringing about the elimination of a small group of people who simply desired to achieve the desirable and constitutionally required status of racial equality.
 
 
 322
 The Introduction and Statement of the Case of the Anderson plaintiffs' brief set the tone which was followed through their 247 pages of overstated characterizations. Thus, initially, supposedly by way of background they move on the Federal Bureau of Investigation in an endeavor to demonstrate that the FBI's counterintelligence program insofar as it was directed toward the Black Panther Party was a basis for a reasonable inference that FBI officials in reality were conspiring to implement the program by resorting to homicide of the local Black Panther leader. Conspicuously absent in the development is any reference to the fact that the program was directed toward an organization which had announced it would achieve its objectives by violent means.
 
 
 323
 The intemperance of the Anderson plaintiffs' approach is particularly demonstrated in the some 75 or more pages devoted to denigrating the district court judge. Thus, typically:
 
 
 324
 . . . the Court, ignoring the merits of Plaintiffs' claim, denied the Motion "as not well taken." . . . The Court refused to declare them hostile witnesses or allow them to be impeached or cross examined by Plaintiffs' counsel. . . . The Court repeatedly refused to hear the motions, and angrily postponed hearing the contempt and sanctions motions until after the trial. . . . the court (in sustaining a specious objection by Defendant . . . the Court grasped at various straws in attempting to justify his baseless and punitive ruling. . . . The Court's arbitrary refusal to allow discovery concerning GROTH's alleged informant and his obstruction of meaningful cross-examination. . . . The Court, in essence, scuttled the entire Plaintiffs' rebuttal case . . . . The entire record demonstrates that the trial judge was not an impartial judge representing the impersonal authority of the law, but was both an advocate from the bench for the Defendants' cause, and an "activist seeking combat" with Plaintiffs' counsel . . . Despite this powerful evidence of racism and prejudice against the Plaintiffs, the Court refused to allow lawyer voir dire. . . . The Court tightly controlled the voir dire, and attempted to select a jury which he could manipulate to agree with his view of the case and return a verdict for the Defendants . . . In stark contrast to the treatment afforded the Plaintiffs and their evidence, the trial court aided the Defendants and supported their cause throughout the trial, in its rulings and remarks from the bench . . . unduly restricted questioning in key areas . . . using the pretext that they hadn't been questioned with the sketch on direct . . . The Court, on its own added to the prejudicial information imparted to the jury during the course of the trial. . . . He (the judge) repeatedly threatened contempt in order to discourage Plaintiffs' right to be heard and to make a record. . . . Defendants' lawyers were allowed almost free reign in the Courtroom. . . . Constant interruption from the Bench, and frivolous objections from the Defense counsel (encouraged by the Court's obvious attitudes) diluted the strength of Plaintiffs' evidence. The atmosphere of intimidation generated from the bench made an effective presentation of the evidence against Defendants difficult, if not impossible. The Court's arbitrary and ever-shifting rules made cross-examination of Defendants a perilous task, with Summary Contempt lurking behind each question. Merely rising to object was fraught with danger and likely to evoke a strong rebuke from the Court. Plaintiffs' counsel were confronted with a hostile, powerful adversary in the District Court; the damage inflicted on Plaintiffs as a result of the intimidation and belittlement of Plaintiffs' counsel by the District Court of itself requires reversal. . . . Both in specific instances, and as a whole, the court's charge to the jury revealed its bias in favor of the defendants, and constituted reversible error. . . . He (the judge) used his judicial power as well as the resources and bullying of defense counsel to harass and attack the Plaintiffs when they attempted to recuse him. (Footnotes omitted.)
 
 
 325
 I do not mean to suggest that the multi-page portions of the brief from which the above extracts were taken is not replete with specific instances purporting to show the asserted unbridled bias and prejudice of the trial judge. A close analysis of these supportive instances reflects, however, that many of them pertained to rulings in evidentiary matters as to which the trial judge is accorded substantial discretion. Any trial lawyer of any competence is aware that he doesn't prevail on every ruling of the court but that his failure to do so is no ground for a legitimate claim of bias and prejudice. Such a lawyer also is sufficiently perceptive to realize the scope of the judge's rulings and that to attempt another tack on the same forbidden subject may well occasion a rebuke. Nevertheless, the Anderson plaintiffs' trial counsel pursued such a course and then when rebuked claimed this to be another example of the unfairness of the judge. I find the claim of unfair limitation of the presentation of their case to be virtually frivolous. A year and a half of trial and 37,000 pages of testimony scarcely is supportive of a restrictive evidentiary limitation. Nor can I find any real indication in this record that the ebullient trial counsel were intimidated by the judge. In this circuit, voir dire of the jury is conducted by the trial judge. Yet in this civil case, failing to get special treatment, the plaintiffs claim they were treated unfairly.
 
 
 326
 If there is merit in claims of incorrect judicial rulings, those rulings should speak for themselves in requiring reversal and they do not need to be sandwiched in a desperate collage of conclusory overstated characterizations. Even though it often might seem that heaping abuse on public officials is now a favorite public pastime, it does appear to me that the proper place for this steam-venting is other than in the area of appellate review. We have here the matter of the propriety of directed verdicts. I should think that while hyperbolic and cynical character castigations might create an atmosphere of suspicion and distrust, even though unfounded, it does not upon examination provide a case or controversy to go to a jury. I do not, I hasten to add, mean to suggest that history has not recorded corrupt governments, or public officials who have intentionally deprived citizens of those rights which are given to them by our constitution. When, however, the charge is a broadside condemnation of the entire fabric of law enforcement in a large metropolis, we at the very least ought to examine most carefully the underlying facts to see if the charges are reasonably inferable or are nothing more than fanciful conjectures.
 
 
 327
 Chief Judge Fairchild observes in his concurring opinion that the main objective of the plaintiffs appears to be the recovery of damages arising from the events of the raid. I agree with him insofar as the Hampton plaintiffs are concerned but, as I have already indicated, it appears to me that the Anderson plaintiffs have a secondary objective, indeed, one which may well be a primary objective in view of their emphasis on it, and that is to use this litigation as an exposition ground for political philosophy and the courtroom as a political forum. If law enforcement or other government officials are demonstrated by evidence as having deprived citizens of their constitutional rights and in the process of such litigation those officials get smeared with the brush of villainy then it must be so; it is simply that I think the process should not go in reverse.
 
 
 328
 I regret to do so, but feel compelled in candor to add, that it appears to me that Judge Swygert's opinion, although I would question whether it was so intended, lends aid and succor to the political espousal objective of the Anderson plaintiffs. I come away from each reading of the opinion, despite occasional references therein to the requirement that plaintiffs to recover must prove their case to the trier of fact, with the feeling that the author of the opinion thinks that the case has already been convincingly proven in many respects.
 
 Thus, on a random basis, I note:
 
 329
 Plaintiffs' prima facie case offers a number of constitutional deprivations to accompany their conspiracy allegations . . . Plaintiffs' evidence in the instant case indicates that the federal and state defendants share in instigating and preparing for the raid . . . The BPP was a black organization with a distinct political ideology and a variety of politically-oriented programs. FBI documents offered by plaintiffs demonstrate that certain FBI activities directed against the BPP transcended mere "law enforcement." . . . Without the information the federal defendants furnished the state defendants, the state defendants could not have acted in furtherance of the purpose which plaintiffs contend the state and federal defendants share inflicting injury to the BPP. . . . In granting the directed verdicts, the trial judge repeatedly usurped this (the jury's) function. . . . Despite their awareness of conflicting stories, Hanrahan, Jalovec, and the raiders continued to circulate reports to justify the continuation of plaintiffs' detention. . . . The evidence shows that a jury could find that Johnson's testimony before the grand jury was false and misleading and concealed the involvement of FBI headquarters and the roles of Piper, Mitchell, and O'Neal in the planning of the raid. . . . And during the pretrial discovery in this suit, the federal defendants continued to engage in dilatory and obstructive tactics to conceal evidence of their involvement in the planning of the raid. . . . His (Sadunas') examination resulted in a crucial misidentification which would have remained uncorrected absent Zimmers' subsequent tests and conclusions. . . .
 
 
 330
 Because of the high esteem in which I hold my brother Swygert, it is with considerable regret that I feel compelled to observe that had I not had an acquaintanceship with the case as a member of the panel prior to reading Judge Swygert's opinion I could, upon the completion of the lengthy process of reading it, well have entertained the idea that the case involved a group of political idealists who had been subjected to a cleverly orchestrated governmental persecution designed not just to neutralize their effectiveness[1] but to remove them from the American scene physically. It is time, it seems to me, to look realistically at the group to which the local authorities directed their activities pursuant to a judicially authorized search warrant.
 
 
 331
 The state defendants have summarized from the record of this case the matters pertaining to the Black Panther Party which undoubtedly engaged the attention of law enforcement agencies. Because this factual information does not appear to be subject to challenge as to accuracy I note some of the salient aspects thereof.
 
 
 332
 The Black Panther Party was a militant, black, extremist, paramilitary, uniformed organization formed in Oakland, California in 1966. It was a violent, revolutionary organization, which by party edict required its members to own and know how to use weapons and to have access to more than one weapon. The Illinois Chapter of the Black Panther Party proclaimed that a class struggle in this country required the leadership of an armed revolutionary party, and that the Black Panther Party was simultaneously a military organization and political organization with leaders holding both military and political rank.
 
 
 333
 Black Panther publications called for killing policemen. The party's policy was that if at least one shot was not fired by a member being arrested, then the party would not stand behind that member. Black Panthers were called on to "revolt," "to arm themselves," to "dynamite," to "kill the pigs everywhere," to "not dissent from American government, we will overthrow it," and were admonished that "political power grows out of the barrel of a gun." Black Panthers published a "Destruction Kit" which described how to make and use incendiary bombs and other similar devices.
 
 
 334
 Much emphasis is placed in the record on the social service to the community provided by the Black Panther Party particularly with regard to their "Breakfast for Children Program." However, the record also reflects that drawings were made on blackboards instructing children to "Kill the Pigs." At these breakfasts there was distributed a "Black Panther Coloring Book" depicting in cartoons pictures of children killing policemen. At one similar Black Panther Breakfast program the children were given revolutionary posters entitled "Free Huey, In Revolution One Lives and One Dies, and Off The Pig." A report concerning the FBI raid of Panther headquarters on Madison Street on June 4, 1969 reflects that the material seized therein included posters which advocated violent overthrow of the government, numerous weapons, both handguns and long guns including stolen weapons, and press releases promoting Panther propaganda. The Black Panther Publications during 1969 contained quotations of various of their leaders such as
 
 
 335
 Huey P. Newton When the people move for liberation, they must have the basic tool of liberation the gun . . . The blood, sweat, tears and suffering of Black people are the foundation of the wealth and power of the United States of America. We were forced to build America, and if forced to we will tear it down. The immediate result of this destruction will be suffering and bloodshed. But the end result will be perpetual peace for all mankind.
 
 
 336
 In one exhibit there appears a description of a "Plan for the Complete Breakdown of the State of Illinois Power Structure." This plan documents the Panthers advocating the bombing and destruction of buildings and public systems as well as the killing of government leaders.
 
 
 337
 There had been numerous shooting confrontations and clashes between the Black Panthers and police prior to December 4, 1969, both nationally and locally. Several policemen had been wounded and there had been shooting with Chicago police at the Black Panther Party headquarters a block from the apartment in question on July 31, 1969, and October 4, 1969. On November 13, 1969, two Chicago police officers were killed in a shootout with Spurgeon Jake Winters. Winters was killed in the incident and seven other Chicago police officers were wounded. The Black Panthers boasted of the killing of these police officers by Winters and claimed Winters as a member.
 
 
 338
 Hampton's own propensities as a leader in the Black Panther Party were evident from his proposal to murder a state trooper who was approaching his car stalled on a highway on a trip to Rockford, his conviction by a jury for robbery in May 1969, his kidnapping and torturing of a party member who is accused of stealing a Panther weapon, his use of weapons during a shootout of the Panthers with the Blackstone Rangers in Robbins, Illinois, and his often-quoted statement, "If you kill one pig, you get a little satisfaction, if you kill some more pigs you get more satisfaction, if you kill all the pigs, you get complete satisfaction." Others of the plaintiffs who were at the apartment in question had criminal records and all had familiarity with handling firearms.
 
 
 339
 Finally, on the matter of the Black Panthers being a political party it must be remembered that the nine people who occupied this relatively small apartment on the morning in question were in the midst of a private arsenal consisting of 19 unregistered weapons, including 12 shotguns and rifles, among which were a stolen Chicago Police Department riot gun and 2 sawed-off shotguns, 7 handguns and several hundred rounds of ammunition. The occupants were not without knowledge in the use of the weapons and were members of an organization that advocated use of the weapons when a confrontation with police was involved.
 
 
 340
 This brings me to a final difficulty in placing this case in a proper perspective and that is the role of martyrdom in which many now regard Hampton and Clark. Irrespective of whether that shroud of martyrdom is misconceived, I cannot imagine that prior to December 4, 1969, this posthumously acquired respectability would have been accorded by many persons, either black or white, other than those subscribing to ochlocracy even though many persons, both black and white supported the goal of equal recognition and treatment for black people. The emotionalism of the plaintiffs' sinister conspiracy presentation should not obliterate the fact that there were ample grounds for regarding Hampton and those in the apartment with him as law violators.
 
 
 341
 Perhaps this is not in keeping with the time in which we live, but I cannot believe simply because a minority group, even one composed of people who have been rather consistently repressed and denied equal treatment before the law, calls itself a political party and espouses a commendable purpose, that there is created some sort of an irrebuttable presumption that it is above the law, or that it can accomplish its goals by violence or other illegal means.
 
 
 342
 In saying the above I am not ignoring the fact that in our system of jurisprudence every law violator is guaranteed the full scale of rights provided for by law, including the constitution, statutes, and case law. I am simply endeavoring to put this case into the perspective in which it clearly was viewed by law enforcement officials in 1969, that there was a group of people who were dangerous to the law-abiding citizens of the community. Also, this case concerns itself with the Black Panther Party as it existed and functioned in 1969 and what its subsequent direction or conduct may have been is immaterial.
 
 
 343
 Turning then to my views on the disposition of the various components of this case, as I have already indicated, I concur in the relatively limited portions of Judge Swygert's opinion in which the judgment of the district court was affirmed.
 
 
 344
 Judge Swygert's opinion directs that sanctions should be imposed, pursuant to Fed.R.Civ.P. 37(b)(2), against the federal defendants and counsel representing them at the first trial for repeatedly disobeying court orders to produce documentary material. I do not agree with the premise. This was a trial in which the judge told the jury on the first day that it would last many weeks, "possibly as much as three months," but which in fact continued some six times that long. The district judge was on a day-by-day basis aware of the extreme difficulties of complying with the every-nook-and-cranny discovery demands of the plaintiffs, was in an excellent position to gauge the good faith of the defense efforts to comply with those orders, and also knew that these government files were not at the beck and call of former employees, were monumental in nature, contained much information not pertinent to the present lawsuit but which involved national security and which in any event was duplicative of that which had already been furnished. I cannot believe that this respected trial judge, who for the most part patiently continued presiding over a trial that was stretching beyond the wildest preliminary estimates, would have, in the words of Judge Swygert, "repeatedly exonerated the federal defendants," if in his position to observe there had been reason to support Judge Swygert's basis for sanctions that the federal defendants, other than O'Neal and their counsel "deliberately impeded discovery and actively obstructed the judicial process." It flies in the face of reason to think that the judge would not have reacted promptly to any defense obstructionist tactics which were further lengthening the time of this tediously long trial.
 
 
 345
 For these reasons I would see no necessity for the imposition of sanctions. Nevertheless, because the case is going back and so that the mandate of this court is clear, I will join Chief Judge Fairchild with regard to a direction to the district court to giving consideration to the matter, rather than requiring it to impose sanctions.
 
 
 346
 There is one other matter not mentioned in Judge Swygert's opinion to which the district judge on remand might properly give some attention. As one reads Judge Swygert's summary of the seventeen counts of the amended complaint, of which twelve will remain viable as to most defendants on remand, it seems rather obvious that the plaintiffs were fractionalizing what was at most five basic issues, possibly following the school of thought that a shotgun charge is more likely to hit something than would a rifle bullet. The federal jurisdictional issues, four in number, as I see them, allegedly arise from (1) the raid, (2) the conspiracy concerning the raid, (3) the post-raid activities of obstruction and malicious prosecution, and (4) the conspiracy regarding the post-raid activities. All of these have the common underpinning of claimed violations of constitutional rights and the post-Civil War civil rights statutes. The fifth issue would concern the pendent state jurisdictional claims.
 
 
 347
 It is true that Rule 8(e)(2), Fed.R.Civ.P., permits the statement of separate counts which here would seem to be utilized to the maximum. On the other hand, it would seem to me that the new trial judge pursuant to Rule 16 could use pre-trial procedure to good effect to accomplish a fundamental simplification of the issues as an aid to the jury's comprehension of what was involved. Although Rule 16 speaks of the pre-trial order limiting the issues for trial to those not disposed of by admissions or agreements of counsel, "it has been pointed out that that is an understatement, since the pre-trial judge does not merely eliminate uncontroversial issues but also formulates the remaining issues to show the real contentions of the parties." (Footnote omitted.) 3 Moore's Federal Practice P 16.18 at 1129 (1978). As another text has stated, "Rule 16 calls for a pretrial conference, which can produce a pretrial order that supersedes the pleadings, . . . ." 5 Wright and Miller, Federal Practice and Procedure, § 1189 at 28 (1969).
 
 
 348
 Perhaps a simplification of the issues would also help avoid a repeat performance of the same length.
 
 
 349
 Turning then to the various issues as applicable to the various defendants, I will first treat the situation as to the remaining thirteen policemen and their liability herein insofar as the raid is concerned. It appears necessary here to consider separately the actual activity of the raid and the conspiracy and likewise consider separately the shooters and nonshooters. In my opinion a directed verdict was proper on all aspects of the raid itself and the conspiracy as to the nonshooters and as to the conspiracy with regard to the shooters with the possible exception of Groth.
 
 
 350
 Relying on Byrd v. Brishke, 466 F.2d 6 (7th Cir. 1972), Judge Swygert's opinion holds that the directed verdicts in favor of the nonshooters regarding their activities in the raid were improperly granted by the trial court. As indicated, I disagree. The holding of impropriety is based upon the factual premise that the nonshooters were in the apartment at the time the occupants were being mistreated and did nothing to protect them. In my view, there is no need to reach the Byrd question as there appears to me to be a complete lack of proof of the factual premise stated above. The Hampton plaintiffs' brief does not touch at all upon this matter. The Anderson plaintiffs' brief in its argument portion, relying upon a case of gross negligence, stated with regard to the nonshooters only the following, "Similarly culpable is the conduct of the raiders who did nothing to stop the use of excessive force, or the beating and mistreatment which followed. See Byrd v. Brishke, 466 F.2d 6 (7th Cir. 1972)." In the Summary of Evidence portion of their brief, after describing in two paragraphs, with frequent transcript citations, the mistreatment of the occupants following the shooting, the brief then contained the following which is the first reference to the presence of the nonshooters:
 
 
 351
 All 14 raiding police officers were present inside the apartment during the beatings and abuse, participated in them and did nothing to try to stop them. FRED HAMPTON was still lying unattended on the floor in the dining room. All 14 police officers then ransacked the apartment, turning beds and dressers over and emptying their contents throughout the apartment, and destroying and mutilating evidence of what had occurred. (Pl # 553 PL. 410 1SSGJ84-5) All 14 police officers saw FRED HAMPTON lying on the floor with blood coming from his head, but none did anything to try to determine if he was alive and could be helped. At no time did any of the officers seek to determine the nature of Plaintiffs' injuries, or to assist or protect them in any way.
 
 
 352
 There is no reference at all to any portion of the transcript of the evidence with regard to any nonshooter officer even being in the apartment. The only two citations at all to the record are to Plaintiffs' Exhibits 553 and 410. Exhibit 553 is a photograph showing no people but showing drawers out of a dresser, clothing on the floor, and beds turned over. Exhibit 410 is a partial transcript of testimony by nonshooter defendant Lynwood Harris. Three of the pages, 77, 78, and 203 appear to be from a deposition of Harris and the balance of the pages are from his appearance before the grand jury at the time Barnabas Sears was appearing as the special prosecutor. This exhibit is somewhat difficult to read because of its disjointed nature, it being only a part of a complete transcript. The exhibit was 33 pages of the grand jury testimony but the first page of the exhibit is numbered 57 and the last 157. It is clear, however, that it contains no evidence of any of the outside nonshooters going into the apartment immediately following the shooting. Harris apparently did go in at some later time when the firearms were being laid out on a mattress. At the time of the shooting he heard the noise of the shots. When asked what happened next after he heard the second round of shooting, Harris, Who was not in uniform at the raid, responded:
 
 
 353
 Well, actually from that point on, I was really concerned with myself because cars were beginning to arrive in response to the policeman's call. And I was concerned in letting those officers arriving know that I was a police officer standing here. And this was a constant cry by me, police officer.
 
 
 354
 While Harris subsequently was asked "who else was there other than the fourteen State's Attorney's Police Officers, when you got back to the apartment?" he mentioned officers from other units, a photographer, an evidence technician and other officers making sketches. The question does not, of course, confine the 14 officers to the inside or outside of the apartment and obviously, in any event, the time referred to is obviously after the occupants had been removed when Lynwood Harris, himself, was helping by carrying out some of the firearms. When the raiders went inside, it was understandable in this neighborhood that others would be posted outside to prevent interference with the operation. The continuance of that guard duty clearly would have become more important after the actual shooting. In sum, I find no basis for even an inference that the nonshooters were inside when any occupant of the apartment was allegedly mistreated, and certainly not to support the inference suggested in Judge Swygert's opinion that they "callously chose to watch."
 
 
 355
 I must assume that the plaintiffs' counsel have advised us of all of their record support for their assertion that all fourteen officers were inside and certainly this court is under no duty to search 37,000 pages of transcripts plus voluminous documents to see if there is some other reference to any of the nonshooters being present in the apartment before the occupants had been removed.[2]
 
 
 356
 Even if we were to assume arguendo that some of the nonshooters were present when an occupant was mistreated, on the record we have here, I would not find Byrd applicable. That case on which I was a member of the panel, and the opinion of which was authored by Judge Swygert, reversed a judgment based upon a directed verdict which reversal was predicated upon the fact that the jury could have found nonfeasance, either negligent or intentional, on the part of officers of a particularly egregious nature. In the later case of Bonner v. Coughlin, 545 F.2d 565 (7th Cir. 1976), negligence was eliminated from the picture. In that case, the plaintiff relied upon Byrd, and in the en banc opinion written by Judge Cummings, Judge Swygert dissenting, the significance of Byrd was circumscribed to "purposeful nonfeasance." Id. at 568. "Thus defendants' failure to act in Byrd can be properly characterized as 'intentional.' " Id. at 569. I find absolutely no basis for a viable claim of proof of purposeful nonfeasance on the part of the nonshooters.
 
 
 357
 As to the conspiracy count pertaining to the raid insofar as the nonshooters are concerned, even if we were to assume that the sinister conspiracy with the object of using excessive force and killing some of the occupants existed among the federal defendants and the higher-ups of the state defendants, I find no basis for saying that the nonshooters, and indeed the shooters with the possible exception of Groth, were a part of the conspiracy. If there had been such a conspiracy, these men, five of whom including three of the shooters being black, were not doing anything except pursuing the often unhappy lot of a policeman of carrying out orders of superiors. Lynwood Harris, for example, found out he was to go on a raid when he left work the evening before. He reported at 3:45 a. m. and he along with the others was given an assignment by Groth. They were simply carrying out their duty of serving a judicially issued search warrant. If subsequent to learning that this might be a very dangerous assignment involving a local leader of the Black Panther Party, while it might not be surprising if those entering the premises overreacted in view of the knowledge that they were entering as "pigs," some of their colleagues having been allegedly killed by a Black Panther Party member, the fact of the subsequent overreaction would not bear upon the existence of a conspiracy on their part.
 
 
 358
 At this point, it is appropriate to refer to one point of emphasis both on the part of the plaintiffs and in Judge Swygert's opinion with regard to the existence of a conspiracy and this is applicable to all of the defendants who are charged with conspiracy in connection with the raid. That point was that Groth planned the raid for 4:00 a. m. and there was no discussion of the use of tear gas, sound equipment, bull horns, or of any equipment besides guns; and that there was no discussion of alternative ways of gaining entry to the apartment, including telephoning the occupants.
 
 
 359
 To anyone with a realistic regard to the circumstances existing at the time it might seem unnecessary to point our the foolishness of these various proposed alternatives if the purpose of serving a particular warrant was to search for and seize an arsenal of illegal weapons in a probably unfriendly neighborhood and to arrest those who were found to be possessors of those weapons. Nevertheless, because the nature of the raid has been given significance, it is necessary to analyze the existing situation.
 
 
 360
 In settling upon the early morning hour as the appropriate time for making the raid, Groth, as the commanding officer of the group, complied with Illinois law which provided that a search warrant may be served at any time of the day or night. § 108-13, Ill.Rev.Stat. Ch. 38 (1969). As the state defendants point out the key factor in that decision was to surprise the occupants while hopefully they would be asleep, thus avoiding, if possible, any use of force or resistance, and that the possessors of those illegal weapons would most likely be present subject to arrest at the early morning hour. The apartment was located in a residential area and police arriving in any force at the scene during a daylight hour, even during working time, would attract a crowd and in the event of any shooting the lives of nearby citizens would be in danger.
 
 
 361
 The police had a right to anticipate the possibility that the guns in the apartment might be used against them particularly in view of the well-known attitude of the Black Panther Party on the subject of the dispensability of policemen.
 
 
 362
 As the Supreme Court stated in Terry v. Ohio, 392 U.S. 1, 23, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968):
 
 
 363
 Certainly it would be unreasonable to require that police officers take unnecessary risks in their performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded.
 
 
 364
 One of the occupants, Anderson, indeed said that he was searching trying to find his shotgun which he had loaded before going to bed with deer slugs and .00 shells and the pistol which he had loaded and placed between the beds, but he could not find them because there was shooting although he would have used them had he found them.
 
 
 365
 To have gone to the apartment in the early evening of December 3 might well have attracted reinforcements from the Panther Party headquarters only a short distance away. During daylight hours snipers could reasonably be anticipated from the buildings in the area. To have brought equipment such as bullhorns or to have telephoned the occupants or to have thrown strong searchlights on the apartment and ordered the occupants to come out could have reasonably been anticipated to precipitate a battle royal. The use of tear gas at this point might have been appropriate if the battle royal had policemen shooting from the outside and Black Panther Party members shooting from the inside. To have used it as an initial matter, however, would have given the real possibility of other types of damage to the occupants. Expert testimony in this trial was that tear gas should be avoided in residential districts such as this one. Further, it is noted that gas masks were reported to be stored at the apartment which would have been effective against the use of tear gas by the police. A telephoning or other type of communication would only have given the occupants time to set up their counter-attack and the time to fire the weapons which the plaintiffs contend were never fired. To have used bullhorns, spotlights, or loud speakers in this residential area would have only exacerbated the situation by attracting crowds and thereby exposing more persons to a potentially dangerous situation.
 
 
 366
 One only has to recall the gun battle occurring when the police were involved with the Symbionese Liberation Army in Los Angeles a few years ago to realize that the police chose a wise and prudent course in attempting to serve their warrant by way of surprise when the purpose of seizing the weapons could be accomplished with the least likelihood of harm to anyone. As to why this did not go as planned will ultimately apparently have to be determined by a jury but there seems to be little dispute that someone fired a shot and thereafter the shooting inside the apartment occurred rapidly. All of this, however, does not negative the fact that the timing and manner of the raid was prudently planned as opposed to all alternatives and the timing of the raid and carrying of the weapons are, in my opinion, no evidence whatsoever of the existence of a conspiracy.
 
 
 367
 Turning next to the shooters, what I have said with regard to the conspiracy as to the raid itself is applicable to them with, as I have previously indicated, the possible exception of Groth. If there was such a sinister conspiracy, or putting it in the context of this case, if there was evidence in the case sufficient to require the conspiracy-raid issue to go to the jury, then the jury should also have the opportunity of deciding whether he was a party to the conspiracy. As will be indicated hereinafter I do not think there was a jury issue developed.
 
 
 368
 With regard to the non-conspiracy raid activity case against the shooters, the state defendants' brief presents a persuasive case to the effect that these officers who were acting pursuant to a judicial warrant did not fire a weapon until there had been firing at them. It seems fairly certain that some of the officers who went in, negligently thought that the occupants were firing at them and thereupon returned the fire. This could well result in a jury verdict for some of the shooting officers and against others. Insofar as the case before us is concerned, however, there is testimony from which a jury could reasonably find that the shooters overreacted and used excessive force. See Davis v. Freels, 583 F.2d 337 (7th Cir. 1978). Where evidence is to be weighed, that is not the function of this court but that of the trial court trier of fact. I think the district judge, although understandably satiated with this long drawn-out trial which was not going to come to a final decision because of a hung jury, mistakenly directed a verdict on the raid issue as to the shooting officers.
 
 
 369
 Going next to the conspiracy-raid issue as to the remaining state defendants and the federal defendants, I cannot agree that there was a basis for reasonable inferences that there was any kind of an agreement among them, express or implicit, to cause a raid to be made with the object of killing or wounding various Black Panther Party members. It is true that at the time in question, the federal authorities thought it would be in the public good to neutralize the Black Panther Party so that it could not carry out its avowed purpose, among others, of killing policemen. Indeed, the idea perhaps could have been entertained by some, if not all, of those defendants who were engaged in law enforcement work that the community would be a safer place for law-abiding citizens to live and work in if Fred Hampton and his cohorts were not on the scene. This human feeling is far removed from a basis for an inference that they deliberately set a course to accomplish that by violence.
 
 
 370
 In our jurisprudence a person cannot be convicted of a traffic offense unless proven guilty beyond a reasonable doubt. Even though the present case is of the civil variety, I cannot believe that the law should permit a determination that any person has deliberately planned a homicide on nothing more than speculative conjecture or mere suspicion. The hard basic reasonable inference-creating facts just did not exist in this case.
 
 
 371
 What I have said about the conspiracy-raid is also applicable to the non-conspiracy counts concerning the planning and participation in the raid by the federal defendants and the state defendants. The shooters, as I have previously indicated, remain in the case not because they planned a raid with the objective of attempted homicide, but because of the excessive force question. As I have stated previously I do not regard the carrying of the firearms or the time and manner of the raid as being the basis of an inference of a plan to use excessive force.
 
 
 372
 An aspect that is directly involved in the result of the decision in this appeal is, in my opinion, a potentially disastrous curtailment on necessary exchanges of information between law enforcement and agencies. The rising need for effective law enforcement cannot but be substantially chilled if there should be the prospect of becoming a defendant in a suit for monetary damages whenever information concerning law violations is communicated by one agency or official to another agency or official having primary jurisdiction over the crime.
 
 
 373
 At this point in the preparation of this dissent, I have become confronted with an increasingly compelling necessity to turn to other cases of this court with which I am concerned, many of which have statutory priority over this civil case, notwithstanding Judge Swygert's concluding admonition that upon remand this case should be given "high priority." I have not requested, nor have I been given, a respite from a full calendar of sitting accompanied as that must be by the necessity of preparing opinions or orders on at least one-third of the cases on which I have sat. Therefore, while not doing so happily because of my belief that sending virtually the complete case back for another extended trial constitutes a miscarriage of justice and a misuse of the federal judicial facilities, I will endeavor simply to outline as briefly as possible my remaining observations on this case.[3]
 
 
 374
 1. Post-raid prosecutorial matters. An initial difficulty for the plaintiffs here is that the occupants were in possession of illegal firearms and were subject to prosecution. In any event, under Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), most of the post-raid direct prosecutorial activities of the state's attorney and his assistants provided to them absolute immunity from civil liability. It is true that the Imbler Court expressly left open the question of whether absolute immunity extended to a prosecutor in the role of an administrator or investigative officer rather than an advocate. Here charges were being made following the raid that the police and Hanrahan were guilty of murder and genocide. Demonstrations occurred and there was tension in the community. Under these circumstances it appears to me to have been well within the prosecutorial authority and duty of this public official charged with the enforcement of the criminal law in his county to take the steps that he did in defense of the system of law administration. Hanrahan's concept of this duty was thus stated:
 
 
 375
 I had a public responsibility as the chief prosecuting officer in Cook County to do everything possible to preserve the peace and to prevent an outbreak of violence. I saw that coming as a result of what I described as the press orgy, the accusations of murder and unlawful conduct, and I did not feel that there had been clear and accurate reporting of the accounts given by the officers.
 
 
 376
 Vociferous denunciations of the police conduct by those supporting the Panthers, as an aftermath of the raid does not mean that Hanrahan was not entitled to believe those who were involved in the law enforcement activities of the county. It appears to be a frequent practice today when steps are taken to enforce the law that the one charged attempts to divert attention from his own malfeasance by asserting that his constitutional rights have been violated.
 
 
 377
 The involvement here in public statements and media publicity was of a far less egregious nature than that which has been involved in cases of absolute immunity where prosecutors were engaged directly in the prosecutorial process. The conduct here was so intimately interrelated with the prosecutorial process that it should have the same protection. As the Court pointed out in Imbler, at 425, 96 S.Ct. at 992, "Frequently acting under serious constraints of time and even information, a prosecutor inevitably makes many decisions that could engender colorable claims of constitutional deprivation." That is what has happened here in my opinion, and, again quoting the Court, at 426, 96 S.Ct. at 993, "The affording of only a qualified immunity to the prosecutor also could have an adverse effect upon the functioning of the criminal justice system." In the present case, the counterattack to the publicity was for the purpose of avoiding such an adverse effect.
 
 
 378
 It is the state authorities who prosecute, and irrespective of whether the federal defendants may have thought prosecution was proper, I fail to see a jury case of malicious prosecution against them. One, of course, does not have to be in the prosecutor's office to be chargeable with malicious prosecution but he should have some connection with bringing about the wrongful prosecution more than just thinking that the defendant should be prosecuted.
 
 
 379
 2. Claimed obstructionism. Under my view the matter of the raid would only remain in litigation as to the shooters. Without the issue of conspiracy as to the raid, the post-hoc claimed acts of obstructionism, upon which the Anderson plaintiffs particularly rely, have not been, it seems to me, demonstrated to have harmed the plaintiffs. As Chief Judge Fairchild has pointed out in his concurrence, it seems clear that plaintiffs cannot recover damages for injury to reputation, without more. If the defendants have engaged in the obstruction of justice or perjury the criminal courts not this civil suit are the proper place for their consideration.
 
 
 380
 Indeed, the history of criminal proceedings in the area with which we are concerned during the past decade testifies to the fact that high office or powerful position does not provide a shield against successful prosecution for violations of the law.
 
 
 381
 I find it almost incredible that Sadunas, who made a mistake in identifying one of many guns he examined from which a shell had been fired, is being left in the case. This is particularly true because he is paying a penalty for honesty by promptly acknowledging his mistake when he made a reexamination and because this is not a case of a rifle or pistol cartridge where the rifling in the barrel gives a much more distinctive basis for identification than in the shotgun shell casing here involved.
 
 
 382
 Other charges of obstructionism upon which the plaintiffs rely amount to nothing more than nonfeasance, or failure to act.
 
 
 383
 Again, the fragmentation of the complaints creates difficulties. These matters are all interrelated and when they are viewed in the light of a nonsupportable claim of conspiracy as to the raid, the prosecutorial immunity, the nonexistence of claims based upon mere negligence, the existence of law violations in the illegal possession of firearms and the fact that the plaintiffs who were offered an opportunity to appear and participate in the post-raid investigations declined to do so, I find no merit in the claim that the charged obstructionism was the basis for an action against the defendants.
 
 
 384
 3. Groth's informant. I must confess that I fail to comprehend the considerable emphasis given to this matter. I have no idea whether Groth did or did not have his own informant; but I cannot agree with Judge Swygert's conclusion that the lack of or unreliability of the informant, or the furnishing of incorrect information by the informant, would, on the facts of this case, place the search warrant in any serious jeopardy. I do know that a knowledgeable and reliable informant known to be such to a law officer provided information which was passed through a reliable chain of law enforcement officers into an application for a search warrant and the information so furnished was correct. And it was on this judicially issued search warrant that the police officers acted as they had to do.
 
 
 385
 At one point in their brief, the Anderson plaintiffs say they are seeking to learn the identity of the informant in order to "try and find" evidence of illegality. Mere speculation or suspicion that an informant might be of some assistance should not be sufficient to overcome the public interest in the protection of an informant's identity.
 
 
 386
 The matter of protecting the identity of a confidential informant, in my opinion, is one of extreme importance in law enforcement. Perhaps if this were the best of all worlds, spying would not be tolerated because there would be no place for it. The said fact, however, is that this is not the best of all worlds and crime, whether it is caused by poverty, economic inequality, psychological maladjustment, or other causes for which society may be responsible, does continue to exist, and at the present moment appears in no way to be declining. Particularly with regard to those who have consciously embarked upon a criminal career, one of the most effective ways of learning of their activities and curtailing them is through the use of confidential informants.
 
 
 387
 I would let the matter rest upon the determination of Judge Perry, who had the opportunity to see and evaluate Groth's credibility. The fact that Groth declined to reveal the informant's identity to Judge Perry in camera is a strong indication of the truth of his assertion that the informant's life would be endangered by his identification. O'Neal's identity could be revealed even though his usefulness as an informant was thereby ended because he was no longer associated with the Black Panther Party. There is ample basis for belief that if Groth's informant were still in such an association he would be in a position of retributive jeopardy.
 
 
 388
 I cannot conceive that the scope of our appellate review is such as to permit us to conclude, as Judge Swygert's opinion does, that upon remand the identity of the informer must be disclosed. The matter, if it really is of significance, which I doubt on the facts of this case, should be reexamined carefully in the light of Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). By this court deciding as a matter of law that the identity of the informer is not entitled to protection, we are deciding a factual matter in much the same way as that which the majority faults Judge Perry for doing.
 
 
 389
 4. Discovery matters. I have already earlier in this dissent expressed my views on this subject. This was not in trite parlance "a fine-tooth-comb" operation but was a time-wasting and harassing "fishing expedition."
 
 
 390
 5. Evidentiary rulings. I find no basis for a reversal in this respect. The Anderson plaintiffs' claims for the most part relate either to instances where the judge sustained objections to improper questions, barred testimony on an irrelevant area, made non-damaging comments or clarifying remarks to the jury, explained the pertinent law or himself asked questions of the witness, all of which were well within his discretion. United States v. Pellegrino, 470 F.2d 1205, 1206-08 (2d Cir. 1972), Cert. denied, 411 U.S. 918, 93 S.Ct. 1556, 36 L.Ed.2d 310 (1973); United States v. Curcio, 279 F.2d 681, 682 (2d Cir. 1960), Cert. denied, 364 U.S. 824, 81 S.Ct. 59, 5 L.Ed.2d 52.
 
 
 391
 Insofar as the complaints of the Anderson plaintiffs that Judge Perry disparaged their evidence or that he engaged in acrimonious exchanges with their lawyers are concerned, I regard these as nothing more than instances in which the judge either lamented the irrelevant and repetitive nature of appellants' counsel's questions, instructed the jury on a relevant point of law, or aptly described improper questions by plaintiffs' counsel.
 
 
 392
 The exchanges which did occur between court and counsel were, it appears to me, the result of repeated improper questioning and, on the whole, resulted from the rude and insulting behavior on the part of the Anderson plaintiffs' lawyers. Thus, frequently, counsel would persist in asking improper questions, in interrupting, in making improper statements in front of the jury, and in continuing to argue and object after the judge had made a ruling. It is well settled that the judge may admonish counsel for unnecessary and improper questions or for failing to comply with the rules of the court. Miley v. Delta Marine Drilling Co., 473 F.2d 856, 857 (5th Cir. 1973), Cert. denied, 414 U.S. 871, 94 S.Ct. 93, 38 L.Ed.2d 89 (1974); United States v. Glaziou, 402 F.2d 8, 17 (2d Cir. 1968), Cert. denied, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969); Pacific Coast Cheese, Inc. v. Wirtz, 314 F.2d 145, 148 (9th Cir. 1963), and the judge did nothing more than that here.
 
 
 393
 As the court stated in Volkswagen Interamericana, S.A. v. Rohlsen, 360 F.2d 437, 445 (1st Cir. 1966), Cert. denied, 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143:
 
 
 394
 It is inappropriate for counsel to complain of treatment that he has invited, particularly when that treatment is well within responsive limits. We have said before, and we repeat, such claims should not be made at all unless they are very sound. The proposition that counsel can disregard the court's instructions, obtain a rebuke, and then preserve the incident as insurance in the event the case is lost, does not sit well.
 
 
 395
 It appears to me that Judge Perry displayed wisdom and patience in a vigorously contested case with contentious counsel and that his rulings followed the governing rules of evidence, producing a fair trial for the plaintiffs.
 
 
 396
 6. The Contempts. The authority of a federal judge to punish summarily for conduct constituting contempt committed "in the actual presence of court" as well as the procedure to be followed, is established by Rule 42(a) of the Rules of Criminal Procedure.
 
 Rule 42(a) reads:
 
 397
 (a) Summary Disposition. A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.
 
 
 398
 The authority to punish summarily applies to behavior of counsel. Sacher v. United States, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717 (1952). See also United States v. Wilson, 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975). In Sacher the issue arose from a nine month trial, one-half the length of the present case. During the Sacher trial defense counsel, in the presence of the trial judge and in the face of repeated warnings from him that their conduct was regarded as contemptuous, persisted in a course of conduct that was highly contemptuous and that tended to disrupt and delay the trial and possibly to cause a mistrial. Upon receiving the verdict of the jury at the conclusion of the trial, the trial judge, without further notice or hearing, immediately filed a certificate under Rule 42(a) of the Federal Rules of Criminal Procedure summarily finding such counsel guilty of criminal contempt and sentencing them to imprisonment.
 
 
 399
 The decisive issue in the Sacher case was whether Rule 42(a) applied at the end of the case. Of significance to the present case is the fact that the Court in Sacher took it as conceded that there was no substantial issue when, as in the present case, the judge acted promptly. By way of summary, the Supreme Court stated at 13-14, 72 S.Ct. at 457:
 
 
 400
 But that there may be no misunderstanding, we make clear that this Court, if its aid be needed, will unhesitatingly protect counsel in fearless, vigorous and effective performance of every duty pertaining to the office of the advocate on behalf of any person whatsoever. But it will not equate contempt with courage or insults with independence. It will also protect the processes of orderly trial, which is the supreme object of the lawyer's calling.
 
 
 401
 It is clear in the present case that Judge Perry properly followed the procedures set forth in Rule 42(a). The conduct clearly was not committed outside "the actual presence of the court" nor is it contended that the judge did not see or hear such conduct. Also, the judge promptly signed and entered an order reciting the facts.
 
 
 402
 It is to be noted before taking up the individual contempt orders that both Haas and Taylor were counsel for the Anderson plaintiffs.
 
 
 403
 Taking up the Haas incident first, this incident developed very shortly after Haas had been reprimanded for directing a derogatory statement towards the judge. Thereafter, the jury was excused because of argument regarding the propriety of a question. When the jury returned the judge struck the last question and told the jury to disregard it. Haas resumed his examination of Hanrahan and upon objection the judge told Haas that they had just gotten through that out of the presence of the jury and "you will not go into that subject matter any further." Haas responded that he did not even get to argue it and the court repeated, "I said you will not go into it any further."
 
 
 404
 Upon this Haas responded, "Judge, we can't cover up the cover-up." Haas continued that that was part of their complaint, that they covered up. The judge immediately held him in contempt of court. All of the above was in the presence of the jury. After the jury retired Haas continued:
 
 
 405
 All right, Judge. I think all the people who have spoken the truth have always ended up in contempt, and the cover-up goes on and on and on.
 
 
 406
 It appears obvious to me, as it must have to the jury, that Haas in his first statement about a cover-up was not referring to something which had happened back in the early 1970's but was referring to the court participating in a further cover-up. His meaning was made clear by his subsequent statement that the cover-up goes on and on and on. A charge in the presence of the jury that the presiding judge is participating in a "cover-up" is particularly damaging during the course of a trial. On the one hand the jury may come to the conclusion that the judge thinks there is no merit in the answer which counsel is attempting to elicit and therefore he is curtailing the pursuit. On the other hand, the jury may think just the opposite, i. e., that the trial judge is improperly covering up for the defense, in which case the judge's necessary authority in further trial matters such as instructions is diminished. In either event a fair trial is hampered.
 
 
 407
 A charge that the trial judge engaged in a cover-up made in the presence of the jury is clearly an affront to the court and disruptive to the administration of justice and the order of contempt as to Haas should be affirmed. See United States v. Wilson, supra; United States v. Sacher, supra.
 
 
 408
 The case as to Taylor is closer although possibly with some significance it was Haas who was examining the witness but it was Taylor who engaged in the conduct charged as being contemptuous. The case is closer because it simply should not have occurred in the first place. This all began because defense counsel objected to a question which included the word "raid" and said that the defendants had never entered into a stipulation using that word. He accused Haas of a "deliberate, willful, and intentional intent to prejudice the jury." The defense was incorrect because the word "raid" had been used in the stipulation and indeed I am at a loss as to why this type of objection would have been made as there could be little doubt in my mind, and I have so characterized it herein, that the service of the search warrant on the morning of December 4, 1969, was a raid within the common dictionary definition of that word. The situation no doubt became more distressing to plaintiff's counsel when the judge told the jury that Haas had deliberately and willfully misread a statement and subsequently, after a transcript had been obtained, did not upon the request of Haas advise the jury that Haas' statement was not a misrepresentation.
 
 
 409
 At this point Taylor for some reason got into the act and as he slapped papers on the table his hand knocked off the pitcher which broke onto the floor. The glass lining of the pitcher was broken. In dealing with this incident in the Anderson plaintiffs' brief, typical of the hyperbole throughout the brief was the reference to defense counsel's bringing to the attention of the judge that a water pitcher was broken which caused the brief writer to characterize the defense counsel as "the snitch."
 
 
 410
 The appellants' brief concedes the judge's action finally got them good and mad by refusing to hear them and that they returned to their table flinging down their papers in anger and frustration. At a further point the brief indicates that, "Taylor, by contrast, gave the judge grist for his mill, by letting him get his goat, to mix metaphors. In a case without such pervasive bias and unremitting provocation by the Court, some rebuke might arise on such a gesture. . . ."
 
 
 411
 I have no reason for believing that Taylor deliberately knocked the pitcher off onto the floor. On the other hand one cannot safely predict the consequences of uncontrolled anger which should not occur, or at least which should not be exhibited in the courtroom by counsel.
 
 
 412
 Under all of the circumstances, I would affirm the contempt orders as to both Taylor and Haas.
 
 
 413
 7. Other contentions and issues. Judge Swygert's opinion correctly holds that the matter of whether plaintiffs should recover attorneys' fees must be deferred until the final outcome of the litigation but does allow such fees for the appellate work. Because of my position on the merits of the appeal I would only allow the appellate work fees commensurate with the work involving the shooter defendants which would be the full reasonable amount for the Hampton plaintiffs but which would be substantially curtailed for the Anderson plaintiffs.
 
 
 414
 Judge Swygert's opinion also directs the district court judge to whom the case is reassigned on remand "to give the retrial high priority." I assume that this can only mean all possible priority and that we are not directing the district court to disregard the numerous types of litigation which might have statutory priority over this civil suit. I should think, for example, that cases under the so-called Speedy Trial Act would have precedence over the instant litigation.
 
 
 415
 Because of the multiplicity of the claimed errors, at least in the Anderson plaintiffs' briefs, it is somewhat difficult to be sure that all significant claims have been addressed. I am not aware, however, of any, including any of the various elaborating fragmentations, which cause me to think that a new trial is indicated as to any of the defendants except to the extent herein indicated.
 
 
 416
 8. Conclusion. It has not been a happy task to disagree to the extent to which I have felt compelled with the opinion of an esteemed brother judge but I consider that this case has important overtones of unbridled denigrating attacks on governmental officials. I hope I have made it clear that I do not entertain the idea that government officials should not have to answer in some forum for abuse of power. I would agree that, individual governmental officials who do not have absolute immunity should anticipate that they will be held accountable for monetary damages to those whom they have injured when they have discharged their duties of office in a way that is known to them to violate the United States Constitution or in a manner that they should know transgresses a clearly established constitutional rule. The result would be the same where the actions were manifestly beyond their line of duty.[4]
 
 
 417
 I am saying, however, that a wide-ranging witch-hunting type of assault on public servants across the board should receive the most careful judicial attention.[5] I don't think the present case can withstand that scrutiny, the focus of which must be on the situation as it existed at the time of the events in question.
 
 
 
 [1]
 In June 1972 the death of Fred Howard, one of the police officers, was suggested on the record and the cause was dismissed as to him
 
 
 [2]
 Hampton v. City of Chicago, 339 F.Supp. 695 (N.D.Ill.1972)
 
 
 [3]
 We summarized our action as follows:
 Insofar as the district court's order of February 3, 1972, dismissed the charges against the City of Chicago and the County of Cook, it is reversed with respect to the Brewer complaint and affirmed as modified with respect to the Johnson complaint; insofar as it dismissed the charges against Mayor Daley and Superintendent Conlisk, it is affirmed; insofar as it dismissed the charges against defendants Hanrahan, Jalovec, Mulchrone, Ervanian, Meade, Kukowinski, Purtell, Koludrovic, Sadunas, Sorosky and Meltreger, it is reversed. The case is remanded to the district court for further proceedings consistent with this opinion.
 Hampton I, supra, 484 F.2d 602 at 611.
 
 
 [4]
 Judge Perry elected to provide the parties with a Summary of the evidence approximately one month after the trial's conclusion. Although the judge stated in a letter attached to the Summary that it was not intended to be an official memorandum in the case, we see no reason why the Summary is not a part of the record and therefore properly before us
 
 
 [5]
 The organizations originally the subject of COINTELPRO included the Southern Christian Leadership Conference (SCLC), the Student Nonviolent Coordinating Committee (SNCC), and the Nation of Islam
 
 
 [6]
 Further, the trial court's restrictions on discovery and its questionable evidentiary rulings hampered the plaintiffs' ability to marshall evidence to substantiate their contentions. See infra, pp. 639-642
 
 
 [7]
 For example, in Southern California the FBI mounted a covert operation to escalate a "gang war" between the BPP and an organization called the "United Slaves." This gang war resulted in the killing of four Panthers by members of United Slaves and numerous beatings and shootings
 
 
 [8]
 From January 1969 to June 1970, O'Neal's monthly pay for his services as an FBI informant ranged from $100 to $500
 
 
 [9]
 Testimony differed as to whether Winters was a member at the time of the shootout or whether he had been expelled from the Party prior to the incident. In any event, he was close to the Panthers and was eulogized by Hampton as a fallen comrade
 
 
 [10]
 Mitchell, however, never mentioned these federally illegal weapons in writing until eight days after the December 4 raid on the apartment
 
 
 [11]
 The SPU also was informed about the presence of a large quantity of weapons at 2337 West Monroe Street
 
 
 [12]
 From late November to December 4, 1969, Mitchell had five to seven conversations with Jalovec
 
 
 [13]
 The plaintiffs question whether Groth's informant in fact ever existed. The trial court did not require Groth to disclose the identity of his informant. See infra, pp. 635-639
 
 
 [14]
 The FBI document refers to action planned by "Chicago police." This, however, does not necessarily indicate that the local FBI thought that the Chicago Police Department planned an action and that it was unaware of the action planned by the SPU of the State's Attorney's Office. The officers detailed to the SPU were, in fact, Chicago police officers. More importantly, other FBI documents indicate that the local FBI at other times referred to police actions of the SPU as actions taken by Chicago police. For example, a December 10 counterintelligence memorandum sent from Johnson's office to Washington stated that Hampton was killed by "Chicago police."
 
 
 [15]
 Plaintiffs introduced the expert testimony of Eleanor Berman, chief toxicologist of Cook County Hospital, indicating that Hampton was drugged at the time of the raid. On the basis of blood samples extracted from his body, she concluded that secobarbital was present in Hampton's system at the time of his death in an amount which would make it difficult for him to awaken. Bell and O'Neal testified that Hampton was not a drug user
 
 
 [16]
 For example, Officer Kelly stated:
 A Yes, I have two questions. Am I charged with any crime?
 Q You are not charged with any allegations, no.
 A My second is not a question, it is a statement. I have known Sergeant Groth personally for approximately eight or more years. I have never seen him act in any manner other than that which would bring praise and credit to the Chicago Police Department. That is it.
 Officer Jones said:
 I am Black and proud of being Black and a member of the Chicago Police Department. I have worked with these officers, both black and white for over six months and consider them to be of highest professional caliber and a real credit to the Department. The courage they exhibited that night made me even prouder of my associates. I feel strongly about the advancement of Blacks on the Chicago Police Department and deeply sorry that criminal elements are using this incident to attempt to destroy mutual understanding and respect.
 
 
 [17]
 Plaintiffs attempted to join Leonard as a coconspirator-defendant in December 1975 after receiving certain discovery materials. The court denied the motion and plaintiffs have not raised the ruling on appeal. The record fails to reveal whether Treviranus was intended to be named as a defendant in the motion
 
 
 [18]
 The teletype stated:
 AAG Jerris Leonard, Civil Rights Division, Department of Justice, at Chicago, advised SAC Marlin Johnson in strictest confidence that no indictments of police officers are planned in captioned matter. AAG Leonard has a firm commitment to meet with Edward V. Hanrahan, State's Attorney, Cook County, Illinois, within one week, whereupon, on basis of Federal District Court order Hanrahan will receive testimony of State's Attorney's Police before FGJ.
 The above is based upon an agreement whereby Hanrahan will dismiss the local indictments against the BPP members. Hanrahan is to be given thirty days to dismiss the local indictment which will be based upon the change of testimony of John Sidunas (sic) of the Chicago Police Department Crime Lab.
 Subsequent to this dismissal, BPP victims will then be subpoenaed before the FGJ for their testimony in this case.
 
 
 [19]
 Plaintiffs' conspiracy claims are based on 42 U.S.C. §§ 1983 and 1985(3)
 
 
 [20]
 It should be noted that when we refer to a conspiracy among defendants, we are not passing on the ultimate validity of plaintiffs' claims. We merely are commenting on plaintiffs' claims and evidence from which a jury reasonably could infer that a conspiracy or conspiracies existed
 
 
 [21]
 The federal defendants make no contention that, because they are not state actors, they are not subject to the anti-discrimination provisions of the statute. Section 1985(3) clearly was intended to provide redress for victims of a conspiracy to violate civil rights whether or not the conspiracy was under color of state law. Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)
 
 
 [22]
 Discrimination on the basis of political beliefs or affiliations has been found to be actionable under section 1985(3). See, e. g., Means v. Wilson, 522 F.2d 833 (8th Cir. 1975), Cert. denied, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976); Glasson v. City of Louisville, 518 F.2d 899 (6th Cir.), Cert. denied, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975). See also Griffin, supra, 403 U.S. at 102 n. 9, 91 S.Ct. 1790, n. 9; Comment, Private Conspiracies to Violate Civil Rights, 90 Harv.L.Rev. 1721, 1728 (1977) ("the legislative history behind section 1985(3) points unmistakably to the conclusion that discrimination on (the basis of political beliefs or affiliations) was intended to be actionable"). One of the foremost concerns of the drafters of the original section 1985(3) was discrimination against individuals whose political affiliations were imbued with racial implications. See Avins, The Ku Klux Klan Act of 1871: Some Reflected Light on State Action and the Fourteenth Amendment, 11 St. Louis U.L.J. 331 (1967)
 
 
 [23]
 This evidence is examined in more detail. See, esp. Supra at pp. 608-612
 
 
 [24]
 If the evidence were to demonstrate that the federal and state defendants merely agreed to help each other enforce the law and prevent violence by the BPP through lawful means, the agreement, of course, would not have violated plaintiffs' civil rights
 
 
 [25]
 Defendants urge that plaintiffs be denied relief on the ground that negligent conduct is not cognizable under section 1983. We are not persuaded by this argument. Defendants are correct that "mere negligence" is not actionable under 42 U.S.C. § 1983. Bonner v. Coughlin, 545 F.2d 565, 567 (7th Cir. 1976), Cert. denied, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978). In Jamison v. McCurrie, 565 F.2d 483, 486 (7th Cir. 1977), Chief Judge Fairchild articulated the standard for a constitutional cause of action: "The plaintiff must show that (the police officers') misbehavior was either intentional or in reckless disregard of his constitutional rights," citing Bonner v. Coughlin, supra. The evidence offered by plaintiffs, however, viewed in the light most favorable to them, satisfies this test. Plaintiffs' case rests on evidence of excessive force, assault, battery, and wrongful death which a jury could conclude constituted reckless disregard of plaintiffs' civil rights in violation of 42 U.S.C. § 1983. See Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1960); Clark v. Ziedonis, 513 F.2d 79, 80 n. 1 (7th Cir. 1975)
 
 
 *
 Judge Pell states in dissent that the directed verdicts in favor of the nonshooters were proper because there is "no basis (in the record) for even an inference that the nonshooters were inside when any occupant of the apartment was allegedly mistreated, and certainly not to support the inference suggested in Judge Swygert's opinion that they 'callously chose to watch.' " Infra, p. 658
 The record demonstrates that the dissent's position is incorrect. Louis Truelock testified before the state grand jury that there were "fifteen or twenty officers in the kitchen," some in uniform and some in plainclothes, when the firing ceased and Groth ordered that the bodies be brought into the kitchen. Plaintiffs' Exhibit LT # 7, pp. 27-28. (The shooters wore black on the raid; nonshooters wore police uniforms.) Additionally, testimony of several of the nonshooters themselves establishes that they were inside the apartment before the survivors were taken away. Officer Kelly testified at the Coroner's inquest that he entered the apartment in the midst of the firing. Plaintiffs' Exhibit 417, p. 109. See also Federal Grand Jury testimony, Plaintiffs' Exhibit 574B, p. 152. And Officer Marusich testified at the Coroner's inquest that he entered the apartment "a couple of minutes" after the last shot was fired. Plaintiffs' Exhibit 421, p. 1236.
 This evidence demonstrates that at least some, if not all, nonshooters were in the apartment at the time the occupants allegedly were being abused. The question whether nonshooters are liable under section 1983 for purposeful nonfeasance, under the rule of Byrd, is one for the jury to determine.
 
 
 [26]
 In Count 4 of their complaint, plaintiffs allege under section 1986 that Hanrahan, Jalovec, the raiders, and the federal defendants neglected to prevent the wrongs perpetrated in violation of section 1985(3). Section 1986 states in part:
 Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented.
 On the basis of our examination of the evidence supporting plaintiffs' conspiracy claim, we conclude that plaintiffs established a prima facie case of section 1986 liability.
 
 
 [27]
 We read Counts 6 and 8 of plaintiffs' complaint as describing the post-raid conspiracy
 
 
 [28]
 In Count 7 plaintiffs charge Hanrahan, Jalovec, the raiders, and the federal defendants (except O'Neal) with failing to prevent the post-raid conspiracy in violation of section 1986. Plaintiffs have presented sufficient evidence to establish a prima facie case on this theory of liability. Additionally, in Count 11 of their complaint, plaintiffs allege that Hanrahan, Jalovec, Groth, O'Neal, Mitchell, Johnson, and Piper conspired to obstruct justice in violation of 42 U.S.C. § 1985(2). Section 1985(2) states:
 . . . if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws. . . . the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.
 We conclude, on the basis of our review of the evidence supporting plaintiffs' conspiracy claims, that plaintiffs established a prima facie case of a section 1985(2) violation.
 
 
 [29]
 In summary, a prima facie case has been made out against defendants as follows:
 Counts 1-4: Hanrahan, Jalovec, the raiders, and the federal defendants.
 Count 5: Hanrahan, Jalovec, and the raiders.
 Count 6: Hanrahan, Jalovec, and the raiders.
 Count 7: Hanrahan, Jalovec, the raiders, Johnson, Piper, and Mitchell.
 Count 8: Hanrahan, Jalovec, the raiders, Johnson, Piper, Mitchell, Sadunas, Meade, and Mulchrone.
 Count 9: Hanrahan, Jalovec, the raiders, Johnson, Piper, Mitchell, Sadunas, Meade, and Mulchrone.
 Count 10: Hanrahan, Jalovec, the raiders, Johnson, Piper, Mitchell, Sadunas, Meade, Mulchrone, Ervanian, Kukowinski, Sorosky, and Meltreger.
 Count 11: Hanrahan, Jalovec, Groth, and the federal defendants.
 Count 14: Hanrahan, Jalovec, the raiders, and the federal defendants.
 
 
 [30]
 Our recent decision in Daniels v. Kieser, 586 F.2d 64 (7th Cir. 1978), is not to the contrary. In Daniels we held that the prosecutor's actions were within his "quasi-judicial" functions and, for that reason, were absolutely immune from liability. Id. at 68-69
 
 
 [31]
 Today we hold that plaintiffs did not present sufficient evidence against Sorosky and Meltreger to warrant submission of the conspiracy claims against them to a jury. We do hold, however, that there was sufficient evidence supporting the section 1986 claims against them. While Imbler expressly discusses only section 1983, its reasoning applies to the 1871 civil rights statutes generally, See Tenney v. Brandhove, 341 U.S. 367, 369, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), and thus should be applied to claims brought against prosecutors pursuant to section 1986
 
 
 [32]
 The Butz Court held that a federal official's exposure to civil liability under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), should be the same as a state official's exposure under section 1983. In the instant case, the plaintiffs not only are seeking damages from the federal defendants under Bivens, but also are alleging that the federal defendants, by conspiring with state officials to violate the plaintiffs' civil rights, violated section 1983. We see no reason, given the Court's reasoning in Butz, to give different official immunity treatment to federal violators of section 1983 than to state violators
 
 
 [33]
 The suppression of plaintiffs' political speech through harassment, intimidation, and subversion part of plaintiffs' case against the defendants would constitute violation of a clearly established right
 
 
 [34]
 An illegal entry based on a falsified warrant is a violation of clearly established Fourth Amendment protections
 
 
 [35]
 Killing and wounding the inhabitants of an apartment without cause, placing the survivors in jail, and subjecting them to trial based on spurious charges is a patently obvious violation of an individual's right not to be deprived of life, liberty, or property without due process of law
 
 
 [36]
 There is no need to examine the second branch of the doctrine to determine whether the defendants acted with the requisite intent to deprive them of the benefits of their qualified immunity. Either branch of the doctrine independently can deprive a defendant of the immunity. We note, however, that plaintiffs in the instant case have presented sufficient evidence to require a trial court to submit the issue of the defendants' intent to a jury if it were necessary to determine whether the defendants could avail themselves of qualified immunity
 
 
 [37]
 The identity of Jalovec's "informant" has already been disclosed. In fact, Jalovec did not have an informant who saw the weapons in the apartment. Instead, Jalovec was told about the weapons by Mitchell, who in turn had learned about the weapons from his informant, O'Neal. O'Neal's identity was disclosed several years after these events by the United States Attorney for the Northern District of Illinois in an unrelated criminal case
 
 
 [38]
 The credibility of the affidavit to the warrant has already been undermined by the evidence that Jalovec did not have an informant and was relying on information which Mitchell had received from O'Neal. And the sufficiency of O'Neal's information alone as the basis for a warrant is questionable. See Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). See also Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); United States v. Carmichael, 489 F.2d 983 (7th Cir. 1973) (En banc )
 
 
 [39]
 The trial judge, in his "Summary," never mentioned Roviaro. In fact, he cited only a Missouri appellate court criminal case, Ex parte McClelland, 521 S.W.2d 481 (Mo.App.1975), to support his conclusion that Groth was not required to disclose the identity of his informant. Apart from the judge's obvious failure to apply the appropriate controlling precedent, his analysis and reliance on McClelland is not entirely accurate. There is a factual similarity between McClelland and the instant case: in both, a police officer refused to identify his informant. More importantly, though, McClelland recognized that the decision to compel disclosure or not should be based on a balancing test. And the two factors which the McClelland court said would justify disclosure, when translated for application in the civil context, are present in the instant case: The informant may have been a witness, if not a participant, to the conspiracy which constitutes the basis of the action, and the reasonableness of the law enforcement officers' conduct is dependent upon the reliability of the informant. See id. at 485. Thus, even under McClelland, disclosure would have been appropriate
 
 
 [40]
 The determination of the guilt or innocence of a criminal defendant has been characterized as qualitatively more significant than civil litigation, thus justifying a higher threshold of justification for exceptions to the privilege in civil cases. However, the difference in "significance" of criminal and civil cases simply should be considered another factor in the Roviaro balancing test. Further, the proposition that all civil cases are less significant and therefore require a higher level of justification for the disclosure of the identity of the informer than all criminal cases is a dubious one. It would seem impossible to conclude absolutely that every criminal misdemeanor case is "more significant" than civil actions to redress, for example, egregious violations of an individual's rights
 
 
 [41]
 And, conversely, the relevance to the establishment of a cause of action
 
 
 [42]
 The danger that law enforcement officials, protected by the informer's privilege, may, and have misrepresented themselves on affidavits for warrants, saying that informers have provided information which they have not provided, has been recognized by the courts. See, e. g., McCray v. Illinois, 386 U.S. 300, 316 n. 2, 86 S.Ct. 1575, 16 L.Ed.2d 546 (1967) (Douglas, J., dissenting ); United States v. Pearce, 275 F.2d 318, 322 (7th Cir. 1960)
 
 
 [43]
 In March 1977 the trial judge changed his position and refused to permit plaintiffs to reexamine Johnson and Mitchell
 
 
 [44]
 The federal defendants contend that since the documents in question are official FBI documents, they had no control over them and should not be held responsible for the obstructive tactics regarding their production in the course of discovery. Neither federal defendants nor their counsel (provided by the federal government) said at trial, however, that the delays in producing the relevant documents were caused by their lack of control over the documents; instead, the record is replete with statements by the federal defendants and their counsel suggesting that documents which were discovered later never existed
 
 
 [45]
 Fed.R.Civ.P. 37(b)(2) states in relevant part:
 In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.
 
 
 [46]
 The state defendants argued in a motion to strike the "Anderson" reply brief that plaintiffs' request for attorneys' fees is not a proper subject for consideration because the request was not raised in plaintiffs' opening brief. Plaintiffs, however, did assert the statutory basis for attorneys' fees in their main brief although the argument was directed to the federal defendants
 
 
 [1]
 Whatever the situation may now be, or should be, it is doubtful that in 1969 attempts to discredit groups thought to be presenting a clear and present danger of violence was a violation of First Amendment rights
 
 
 [2]
 A footnote has been added to Judge Swygert's opinion with regard to the point in my dissent that the nonshooters were entitled to a directed verdict because they were not even in the apartment at the time the plaintiffs claim the occupants were mistreated. I attempted to make it clear that I assumed that plaintiffs' counsel would give us all of the record support available to demonstrate the presence of the nonshooters in the apartment at the time in question and that upon analysis they gave no such support. Judge Swygert's added footnote, however, refers to other items of evidence on the question
 I see no reason, however, for receding from the position I took on this issue in my dissent. Judge Swygert's added footnote gives significance to there being fifteen or twenty officers in the kitchen some of them being in police uniforms. If the number was twenty, this, of course, was six more officers than were in the raiding party and would seem to indicate that the presence in the kitchen related to a time substantially subsequent to the cessation of the shooting when other officers had answered the call. Further, Officer Harris at least, upon whom the Anderson plaintiffs rested the matter, was in plain clothes although a nonshooter. The fact that two of the nonshooters Entered the apartment at or about the time of the shooting, if that indeed is a fact, does not place them there at the time of the alleged mistreatment of any of the occupants. While this is a situation in which reasonable inferences are permitted to be drawn, there should be something more than Judge Swygert's added footnote demonstrates to say that there was something to go to the jury on the matter of purposeful nonfeasance on the part of any of the nonshooters.
 
 
 [3]
 The incentive toward continuing a fuller discussion is not encouraged by the realities of the situation being that there is very little probability this case will not go back for retrial. Two of the active judges of this court (Judges Bauer and Wood) have disqualified themselves, two more, of course, are in the majority of the present panel, and all four of the remaining would have to vote to rehear the case En banc. Insofar as the Supreme Court of the United States is concerned, the small percentage of the heavy volume of petitions for certiorari which can be granted minimizes the likelihood in any case of being successful in the pursuit of certiorari
 
 
 [4]
 Nor, I should add, do I intend anything said herein to minimize the importance of lawyers accepting unpopular civil cases. Accepting such employment often requires a solid exercise of courage, but I regard doing so as one of the obligations assumed by a person who has been admitted to the practice of law
 
 
 [5]
 The pendulum has taken a far swing from the days of McCarthyism but the extremes of the swing seem to me to be equally undesirable for the good of the country. Unfortunately many who decried the excesses of McCarthyism do not seem equally concerned by the development of the extremity of present day witchhunting directed toward law enforcement officials